# NORTHERN SECURITIES COMPANY *v.* UNITED STATES.

APPEAL · FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

No. 277.   Argued December 14, 15, 1903.—Decided March 14, 1904.

Stockholders of the Great Northern and Northern Pacific Railway companies—corporations having competing and substantially parallel lines from the Great Lakes and the Mississippi River to the Pacific Ocean at Puget Sound—combined and conceived the scheme of organizing a corporation, under the laws of New Jersey, which should hold the shares of the stock of the constituent companies, such shareholders, in lieu of their shares in those companies, to receive, upon an agreed basis of value, shares in the holding corporation.   Pursuant to such combination the Northern Securities Company was organized as the holding corporation through which that scheme should be executed; and under that scheme such holding corporation became the holder—more properly speaking, the custodian—of more than nine-tenths of the stock of the Northern Pacific, and more than three-fourths of the stock of the Great Northern, the stockholders of the companies, who delivered their stock, receiving, upon the agreed basis, shares of stock in the holding corporation.

*Held*, that, necessarily, the constituent companies ceased, under this arrangement, to be in active competition for trade and commerce along their respective lines, and became, practically, one powerful consolidated corporation, by the name of a holding corporation, the principal, if not the sole, object for the formation of which was to carry out the purpose of the original combination under which competition between the constituent companies would cease.

*Held*, that the arrangement was an illegal combination in restraint of interstate commerce and fell within the prohibitions and provisions of the act of July 2, 1890, and it was within the power of the Circuit Court, in an action, brought by the Attorney General of the United States after the completion of the transfer of such stock to it, to enjoin the holding company, from voting such stock and from exercising any control whatever over the acts and doings of the railroad companies, and also to enjoin the railroad companies from paying any dividends to the holding corporation on any of their stock held by it.

*Held*, that although cases should not be brought within a statute containing criminal provisions that are not clearly embraced by it, the court should not by narrow, technical or forced construction of words exclude cases from it that are obviously within its provisions and while the act of July 2, 1890, contains criminal provisions, the Federal court has power under § 4 of the act in a suit in equity to prevent and restrain violations

of the act, and may mould its decree so as to accomplish practical results such as law and justice demand.

HARLAN, BROWN, McKENNA and DAY, JJ.[1]

The combination is, within the meaning of the act of Congress of July 2, 1890, known as the Anti-Trust Act, a "trust"; but if not, it is a combination in restraint of interstate and international commerce, and that is enough to bring it under the condemnation of the act.

From prior cases in this court, the following propositions are deducible and embrace this case:

Although the act of Congress known as the Anti-Trust Act has no reference to the mere manufacture or production of articles or commodities within the limits of the several States, it embraces and declares to be illegal every contract, combination or conspiracy, in whatever form, of whatever nature, and whoever may be parties to it, which directly or necessarily operates in restraint of trade or commerce among the several States or with foreign nations.

The act is not limited to restraints of interstate and international trade or commerce that are unreasonable in their nature, but embraces all direct restraints, reasonable or unreasonable, imposed by any combination, conspiracy or monopoly upon such trade or commerce.

Railroad carriers engaged in interstate or international trade or commerce are embraced by the act.

Combinations, even among private manufacturers or dealers, whereby interstate or international commerce is restrained, are equally embraced by the act.

Congress has the power to establish rules by which interstate and international commerce shall be governed, and by the Anti-Trust Act has prescribed the rule of free competition among those engaged in such commerce.

Every combination or conspiracy which would extinguish competition between otherwise competing railroads, engaged in interstate trade or commerce, and which would in that way restrain such trade or commerce, is made illegal by the act.

The natural effect of competition is to increase commerce, and an agreement whose direct effect is to prevent this play of competition restrains instead of promotes trade and commerce.

To vitiate a combination, such as the act of Congress condemns, it need not

---

[1] Mr. Justice HARLAN announced the affirmance of the decree of the Circuit Court and delivered an opinion in which BROWN, McKENNA and DAY, JJ., concurred. Mr. Justice BREWER delivered a separate opinion in which he concurred in affirming the decree of the Circuit Court.

Mr. Justice WHITE delivered a dissenting opinion in which the CHIEF JUSTICE and PECKHAM and HOLMES, JJ., concurred; Mr. Justice HOLMES delivered a dissenting opinion in which the CHIEF JUSTICE and WHITE and PECKHAM, JJ., concurred.

be shown that such combination, in fact, results, or will result, in a total suppression of trade or in a complete monopoly, but it is only essential to show that by its necessary operation it tends to restrain interstate or international trade or commerce, or tends to create a monopoly in such trade or commerce, and to deprive the public of the advantages that flow from free competition.

The constitutional guarantee of liberty of contract does not prevent Congress from prescribing the rule of free competition for those engaged in interstate and international commerce.

Under its power to regulate commerce among the several States and with foreign nations, Congress had authority to enact the statute in question. *United States* v. *E. C. Knight Co.,* 156 U. S. 1; *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290; *United States* v. *Joint Traffic Association,* 171 U. S. 505; *Hopkins* v. *United States,* 171 U. S. 578; *Anderson* v. *United States,* 171 U. S. 604; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211; *Montague & Co.* v. *Lowry,* 193 U. S. 38.

Congress may protect the freedom of interstate commerce by any means that are appropriate and that are lawful and not prohibited by the Constitution.

If in the judgment of Congress the public convenience or the general welfare will be best subserved when the natural laws of competition are left undisturbed by those engaged in interstate commerce, that must be, for all, the end of the matter, if this is to remain a government of laws, and not of men.

When Congress declared contracts, combinations and conspiracies in restraint of trade or commerce to be illegal, it did nothing more than apply to interstate commerce a rule that had been long applied by the several States when dealing with combinations that were in restraint of their domestic commerce.

Subject to such restrictions as are imposed by the Constitution upon the exercise of all power, the power of Congress over interstate and international commerce is as full and complete as is the power of any State over its domestic commerce.

No State can, by merely creating a corporation, or in any other mode, project its authority into other States, so as to prevent Congress from exerting the power it possesses under the Constitution over interstate and international commerce, or so as to exempt its corporation engaged in interstate commerce from obedience to any rule lawfully established by Congress for such commerce; nor can any State give a corporation created under its laws authority to restrain interstate or international commerce against the will of the nation as lawfully expressed by Congress. Every corporation created by a State is necessarily subject to the supreme law of the land.

Whilst every instrumentality of domestic commerce is subject to state control, every instrumentality of interstate commerce may be reached and controlled by national authority, so far as to compel it to respect the rules for such commerce lawfully established by Congress.

By Mr. Justice Brewer.

The act of July 2, 1890, was leveled, as appears by its title, at only unlawful restraints and monopolies. Congress did not intend to reach and destroy those minor contracts in partial restraint of trade which the long course of decisions at common law had affirmed were reasonable and ought to be upheld.

The general language of the act is limited by the power which each individual has to manage his own property and determine the place and manner of its investment. Freedom of action in these respects is among the inalienable rights of every citizen.

A corporation, while by fiction of law recognized for some purposes as a person and for purposes of jurisdiction as a citizen, is not endowed with the inalienable rights of a natural person, but it is an artificial person, created and existing only for the convenient transaction of business.

Where, however, no individual investment is involved, but there is a combination by several individuals separately owning stock in two competing railroad companies engaged in interstate commerce, to place the control of both in a single corporation, which is organized for that purpose expressly and as a mere instrumentality by which the competing railroads can be combined, the resulting combination is a direct restraint of trade by destroying competition, and is illegal within the meaning of the act of July 2, 1890.

A suit brought by the Attorney General of the United States to declare this combination illegal under the act of July 2, 1890, is not an interference with the control of the States under which the railroad companies and the holding company were, respectively, organized.

THE pleadings in this action and the decree of the Circuit Court are as follows:

PETITION.[1]

*To the judges of the Circuit Court of the United States for the District of Minnesota:*

Now comes the United States of America, by Milton D.

---

[1] Bill in equity of United States, this page, *supra.*

Exhibit: Certificate of Incorporation of Northern Securities Company, page 216, *post.*

Answer of Northern Securities Company, page 221, *post.*

Answer of Hill and other defendants, page 241, *post.*

Answer of Great Northern Railway Company, page 241, *post.*

Answer of Northern Pacific Railway Company, page 242, *post.*

Answer of Morgan and other defendants, page 247, *post.*

Answer of Lamont, defendant, page 255, *post.*

Purdy, the United States attorney for the District of Minnesota, acting under direction of the Attorney-General of the United States, and brings this its proceeding by way of petition against the Northern Securities Company, a corporation organized and existing under the laws of the State of New Jersey; the Great Northern Railway Company, a corporation organized and existing under the laws of the State of Minnesota; the Northern Pacific Railway Company, a corporation organized and existing under the laws of the State of Wisconsin; James J. Hill, a citizen of the State of Minnesota and a resident of St. Paul, and William P. Clough, D. Willis James, John S. Kennedy, J. Pierpont Morgan, Robert Bacon, George F. Baker, and Daniel Lamont, citizens of the State of New York and residents of New York City, and, on information and belief, complains and says:

I. The defendants, the Northern Pacific Railway Company and the Great Northern Railway Company, were, at the times hereinafter mentioned, and now are, common carriers, employed in the transportation of freight and passengers among the several States of the United States and between such States

Decree of the Circuit Court, page 255, *post.*

Summary of facts from argument and brief of Mr. George B. Young for appellants, page 257, *post.*

Abstract of argument of Mr. John G. Johnson for appellant Northern Securities Company, page 268, *post.*

Abstract of argument of Mr. Charles W. Bunn for appellant Northern Pacific Railway Company, page 273, *post.*

Abstract of brief submitted by Mr. John W. Griggs for appellant Northern Securities Company, page 276, *post.*

Abstract of brief submitted by Mr. M. D. Grover for appellant Great Northern Railway Company, page 280, *post.*

Abstract of brief submitted by Mr. Francis Lynde Stetson and Mr. David Willcox for appellants Morgan, Bacon and Lamont, page 290, *post.*

Abstract of argument and brief of Mr. Attorney General Knox and Mr. William A. Day, assistant to Attorney General, for the United States, appellee, page 297, *post.*

Opinion of Mr. Justice HARLAN, page 317, *post.*

Opinion of Mr. Justice BREWER, page 360, *post.*

Opinion of Mr. Justice WHITE, page 364, *post.*

Opinion of Mr. Justice HOLMES, page 400, *post.*

and foreign nations, and, as such carriers so employed, were and are engaged in trade and commerce among the several States and with foreign nations.

II. On and prior to the 13th day of November, 1901, the defendants, James J. Hill, William P. Clough, D. Willis James, and John S. Kennedy, and certain other persons whose names are unknown to the complainant, but whom it prays to have made parties to this action when ascertained (hereinafter referred to as James J. Hill and his associate stockholders), owned or controlled a majority of the capital stock of the defendant, the Great Northern Railway Company, and the defendants, J. Pierpont Morgan and Robert Bacon (members of and representing the banking firm of J. P. Morgan & Co., of New York City), George F. Baker and Daniel S. Lamont, and certain other persons whose names are unknown to the complainant, but whom it prays to have made parties to this action when ascertained (hereinafter referred to as J. Pierpont Morgan and his associate stockholders), owned or controlled a majority of the capital stock of the defendant, the Northern Pacific Railway Company.

III. The Northern Pacific Railway Company and the Great Northern Railway Company, at and prior to the doing of the acts hereinafter complained of, owned or controlled and operated two separate, independent, parallel, and competing lines of railway running east and west into or across the States of Wisconsin, Minnesota, North Dakota, Montana, Idaho, Washington, and Oregon, the Northern Pacific system, extending from Ashland, in the State of Wisconsin, and from Duluth and St. Paul, in the State of Minnesota, through Helena, in the State of Montana, and Spokane, in the State of Washington, to Seattle and Tacoma, in the State of Washington, and Portland, in the State of Oregon, and the Great Northern system, extending from Superior, in the State of Wisconsin, and from Duluth and St. Paul, in the State of Minnesota, through Spokane, in the State of Washington, to Everett and Seattle, in the State of Washington, and to Portland, in the State of Oregon, with a branch line to Helena, in the State of Montana, thus furnishing

to the public two parallel and competing transcontinental lines connecting the Great Lakes and the Mississippi River with Puget Sound and the Pacific Ocean. At the times mentioned, these two railway systems, which will hereafter be referred to respectively as the Northern Pacific system and the Great Northern system, each of which, with its leased and controlled lines, main and branch, aggregates over 5,500 miles in length, were the only transcontinental lines of railway extending across the northern tier of States west of the Great Lakes, from the Great Lakes and the Mississippi River to the Pacific Ocean, and were then engaged in active competition with one another for freight and passenger traffic among the several States of the United States and between such States and foreign countries, each system connecting at its eastern terminals, not only with lines of railway, but with lake and river steamers to other States and to foreign countries, and at its western terminals with sea-going vessels to other States, Territories, and possessions of the United States and to foreign countries.

IV. Prior to the year 1893 the Northern Pacific system was owned or controlled and operated by the Northern Pacific Railroad Company, a corporation organized and existing under certain acts and resolutions of Congress. During that year the company became insolvent, and the line was placed in the hands of receivers by the proper courts of the United States. While in this condition, awaiting foreclosure and sale, an arrangement was entered into between a majority of the bondholders of the Northern Pacific Railroad Company and the defendant, the Great Northern Railway Company, for a virtual consolidation of the Northern Pacific and Great Northern systems and the placing of the practical control of the Northern Pacific system in the hands of the defendant, the Great Northern Railway Company. This arrangement contemplated the sale, under foreclosure, of the property and franchises of the Northern Pacific Railroad Company to a committee of the bondholders, who should organize a new corporation, to be known as the Northern Pacific Railway Company, which was to become the

successor of the Northern Pacific Railroad Company; one-half of the capital stock of the new company was to be turned over to the shareholders of the defendant, the Great Northern Railway Company, which in turn was to guarantee the payment of the bonds of the Northern Pacific Railway Company. An agreement was to be entered into for the exchange of traffic at intersecting and connecting points and for the division of earnings therefrom. The carrying out of this arrangement was defeated by the decision of the Supreme Court of the United States in the case of *Pearsall* v. *The Great Northern Railway Company* (which was decided March 30, 1896, and is reported in the one hundred and sixty-first volume of the reports of said court, beginning on page 646, to which reference is made), in which it was held that the practical effect would be the consolidation of two parallel and competing lines of railway, and the giving to the defendant, the Great Northern Railway Company, a monopoly of all traffic in the northern half of the State of Minnesota, as well as of all transcontinental traffic north of the line of the Union Pacific, to the detriment of the public and in violation of the laws of the State of Minnesota.

V. Early in the year 1901 the defendants, the Great Northern and Northern Pacific Railway companies, acting for the purpose of promoting their joint interests, and in contemplation of the ultimate placing of the Great Northern and Northern Pacific systems under a common source of control, united in the purchase of the total capital stock of the Chicago, Burlington and Quincy Railway Company, of Illinois, giving the joint bonds of the Great Northern and Northern Pacific Railway companies, payable in twenty years from date, with interest at 4 per cent per annum, for such stock, at the rate of $200 in bonds in exchange for each $100 in stock, and in this manner purchased and acquired about $107,000,000 of the $112,000,000 total capital stock of the Chicago, Burlington and Quincy Railway Company, or about 98 per cent thereof. In this manner, at the time stated, the defendants, the Great Northern and Northern Pacific Railway companies, secured control of the vast system of rail-

way lines known as the Burlington system, about 8,000 miles in length, extending from St. Paul, in the State of Minnesota, where it connects with the Great Northern and Northern Pacific Railway systems, through the States of Minnesota, Wisconsin, and Illinois, to Chicago, in the State of Illinois, and from these two cities through said States and through the States of Iowa, Missouri, Nebraska, Colorado, South Dakota, Wyoming, and Montana, to Quincy, in the State of Illinois; to Burlington and Des Moines, in the State of Iowa; to St. Louis, Kansas City, and St. Joseph, in the State of Missouri; to Omaha and Lincoln, in the State of Nebraska; to Denver, in the State of Colorado; to Cheyenne, in the State of Wyoming, and to Billings, in the State of Montana, where it again connects with the Northern Pacific Railway system, these States lying west of Chicago and south of the States crossed by the Great Northern and Northern Pacific systems, and constituting the territory occupied in part by what is known as the Union Pacific Railway system, which has been and is a parallel and competing system within said territory with the said Burlington system.

VI. The attempt to turn over a controlling interest in the stock of the Northern Pacific Railway Company to the Great Northern Railway Company and thus effect a virtual consolidation of the two railway systems, having thus, in the year 1896, been defeated by a decision of the Supreme Court of the United States, the defendants James J. Hill and his associate stockholders of the defendant, the Great Northern Railway Company, owning or controlling a majority of the stock of that corporation, and the defendants J. Pierpont Morgan and his associate stockholders of the defendant, the Northern Pacific Railway Company, owning or controlling a majority of the stock of that corporation, acting for themselves as such stockholders and on behalf of the said railway companies in which they owned or held a controlling interest, on and prior to the 13th day of November, 1901, contriving and intending unlawfully to restrain the trade or commerce among the several States

and between said States and foreign countries carried on by the Northern Pacific and Great Northern systems, and contriving and intending unlawfully to monopolize or attempt to monopolize such trade or commerce, and contriving and intending unlawfully to restrain and prevent competition among said railway systems in respect to such interstate and foreign trade or commerce, and contriving and intending unlawfully to deprive the public of the facilities and advantages in the carrying on of such interstate and foreign trade or commerce theretofore enjoyed through the independent competition of said railway systems, entered into an unlawful combination or conspiracy to effect a virtual consolidation of the Northern Pacific and Great Northern systems, and to place restraint upon all competitive interstate and foreign trade or commerce carried on by them, and to monopolize or attempt to monopolize the same, and to suppress the competition theretofore existing between said railway systems in said interstate and foreign trade or commerce, through the instrumentality and by the means following, to wit: A holding corporation, to be called the Northern Securities Company, was to be formed under the laws of New Jersey, with a capital stock of $400,000,000, to which, in exchange for its own capital stock upon a certain basis and at a certain rate, was to be turned over and transferred the capital stock, or a controlling interest in the capital stock, of each of the defendant railway companies, with power in the holding corporation to vote such stock and in all respects to act as the owner thereof, and to do whatever it might deem necessary to aid in any manner such railway companies or enhance the value of their stocks.   In this manner, the individual stockholders of these two independent and competing railway companies were to be eliminated and a single common stockholder, the Northern Securities Company, was to be substituted; the interest of the individual stockholders in the property and franchises of the two railway companies was to terminate, being thus converted into an interest in the property and franchises of the Northern Securities company.  The individual stockholders of the

Northern Pacific Railway Company were no longer to hold an interest in the property or draw their dividends from the earnings of the Northern Pacific system, and the individual stockholders of the Great Northern Railway Company were no longer to hold an interest in the property or draw their dividends from the earnings of the Great Northern system, but having ceased to be stockholders in the railway companies and having become stockholders in the holding corporation, both were to draw their dividends from the earnings of both systems, collected and distributed by the holding corporation. In this manner, by making the stockholders of each system jointly interested in both systems, and by practically pooling the earnings of both systems for the benefit of the former stockholders of each, and by vesting the selection of the directors and officers of each system in a common body, to wit, the holding corporation, with not only the power but the duty to pursue a policy which would promote the interests, not of one system at the expense of the other, but of both at the expense of the public, all inducement for competition between the two systems was to be removed, a virtual consolidation effected, and a monopoly of the interstate and foreign commerce formerly carried on by the two systems as independent competitors established.

VII. In pursuance of the unlawful combination or conspiracy aforesaid, and solely as an instrumentality through which to effect the purposes thereof, on the 13th day of November, 1901, the defendant, the Northern Securities Company, was organized under the general laws of the State of New Jersey, with its principal office in Hoboken, in said State, and with an authorized capital stock of $400,000,000. A copy of the articles of incorporation of such company is attached to and made a part of this petition. Among the purposes and powers designedly inserted in said articles is the purpose and power, not only to "purchase" and "hold" "shares of the capital stock of any other corporation or corporations," under which said company wrongfully claims and is exercising the power to acquire by exchange

and hold the stock of the Northern Pacific and the Great North-
ern Railway companies, but the purpose and power, while
owner thereof, "to exercise all the rights, powers, and privileges
of ownership;" that is, to vote such stock, collect the dividends
thereon, and in all respects act as a stockholder of such railway
companies; and the purpose and power "to aid in any manner
any corporation . . . of which any bonds . . . or
stock are held, . . . and to do any acts or things designed
to protect, preserve, improve, or enhance the value of any such
bonds . . . or stock," meaning thereby to do whatever
it may deem necessary to aid in any manner the Northern Pa-
cific and the Great Northern Railway companies, or to preserve
or enhance the value of their stocks or bonds.

VIII. In further pursuance of the unlawful combination or
conspiracy aforesaid, and solely as an instrumentality through
which to effect the purposes thereof, on or about the 14th day
of November, 1901, the defendant the Northern Securities
Company was organized by the election of a board of directors
and the selection of a president and other officers, the defendant
James J. Hill, the president and controlling power in the
management of the defendant the Great Northern Railway
Company, being chosen a director and president thereof; and
thereupon, in further pursuance of the unlawful combination or
conspiracy aforesaid, the defendants James J. Hill and his asso-
ciate stockholders of the defendant the Great Northern Railway
Company assigned and transferred to the defendant the North-
ern Securities Company, a large amount of the capital stock of
the Great Northern Railway Company, the exact amount being
unknown to complainant, but constituting a controlling interest
therein, and complainant believes a majority thereof, upon the
agreed basis of exchange of $180, par value, of the capital stock
of the said Northern Securities Company for each share of the
capital stock of the Great Northern Railway Company; and the
defendants J. Pierpont Morgan and his associate stockholders of
the Northern Pacific Railway Company assigned and trans-
ferred to the defendant the Northern Securities Company a

large majority of the capital stock of the defendant the Northern Pacific Railway Company, the exact amount being unknown to complainant, upon the agreed basis of exchange of $115, par value, of the capital stock of the said Northern Securities Company for each share of the capital stock of the Northern Pacific Railway Company; and thereafter, in further pursuance of the unlawful combination or conspiracy aforesaid, the defendant, the Northern Securities Company, offered to the stockholders of the defendant railway companies to issue and exchange its capital stock for the capital stock of such railway companies, upon the basis of exchange aforesaid, no other consideration being required. In further pursuance of the unlawful combination or conspiracy aforesaid the defendant the Northern Securities Company has acquired an additional amount of the stock of the defendant railway companies, issuing in lieu thereof its own stock upon the basis of exchange aforesaid, and is now holding, as owner and proprietor, substantially all of the capital stock of the Northern Pacific Railway Company and, as complainant believes and charges, a majority of the capital stock of the Great Northern Railway Company, but if not a majority, at least a controlling interest therein, and is voting the same and is collecting the dividends thereon, and in all respects is acting as the owner thereof in the organization, management, and operation of said railway companies, and in the receipt and control of their earnings, and will continue to do so, unless restrained by the order of this court. By reason whereof a virtual consolidation under one ownership and source of control of the Great Northern and Northern Pacific Railway systems has been effected, a combination or conspiracy in restraint of the trade or commerce among the several States and with foreign nations formerly carried on by the defendant railway companies independently and in free competition one with the other has been formed and is in operation, and the defendants are thereby attempting to monopolize, and have monopolized, such interstate and foreign trade or commerce, to the great and irreparable damage of the people of the United

States, in derogation of their common rights, and in violation of the act of Congress of July 2, 1890, entitled "An-act to protect trade and commerce against unlawful restraints and monopolies."

IX. If the defendant the Northern Securities Company has not acquired a large majority of the capital stock of the defendant the Great Northern Railway Company, it is because the individual defendants named, and their associates in the combination or conspiracy charged in this petition, or some of them, since it became apparent that the legality of their corporate device for the merger of the stock of competing railway companies, through the instrumentality of a central or holding corporation, would be assailed in the courts, have purposely withheld, or caused to be withheld, a large amount of the capital stock of said railway company from transfer for the stock of the Northern Securities Company, and have purposely discouraged and prevented the transfer and exchange of such stock for the stock of the Northern Securities Company, all for the purpose of concealing the real scope and object of the unlawful combination or conspiracy aforesaid, and of deceiving and misleading the state and Federal authorities, and of furnishing a ground for the defence that the Northern Securities Company does not hold a clear majority of the stock of the Great Northern Railway Company. The complainant avers that such stock, so withheld or not transferred to the Northern Securities Company, is now in the hands of some person or persons (unknown to the complainant) friendly to and under the influence of the individual defendants named and their associates aforesaid, or some of them, and will either not be voted, or be voted in harmony with the Great Northern stock held by the Northern Securities Company, until the question of the legality of this corporate device for merging competing railway lines shall be finally and judicially determined, when such stock will either be turned over to the Northern Securities Company or continue to be held and voted outside said company but in harmony with the Great Northern

stock held and voted by it, as may at the time seem advisable.

X. In further pursuance of the unlawful combination or conspiracy aforesaid, the Northern Securities Company (subject, it may be, to the condition stated in the next preceding paragraph) is about to and will, unless restrained by the order of this court, receive and acquire, and hereafter hold and control as owner and proprietor, substantially all of the capital stock of the defendant railway companies, issuing in lieu thereof its own capital stock to the full extent of the authorized issue, of which, upon the basis of exchange aforesaid, the former stockholders of the Great Northern Railway Company have received or will receive and hold about 55 per cent thereof, the balance going to the former stockholders of the Northern Pacific Railway Company.

XI. No consideration whatever has existed, or will exist, for the transfer as aforesaid of the stock of the defendant railway companies from their stockholders to the Northern Securities Company, other than the issue of the stock of the Northern Securities Company to them in exchange therefor, for the purpose, after the manner, and upon the basis aforesaid.

The defendant, the Northern Securities Company, was not organized in good faith to purchase and pay for the stocks of the Great Northern and the Northern Pacific Railway companies. It was organized solely to incorporate the pooling of the stocks of said companies and to carry into effect the unlawful combination or conspiracy aforesaid. The Northern Securities Company is a mere depositary, custodian, holder, and trustee of the stocks of the Great Northern and the Northern Pacific Railway companies, and its shares of stock are but beneficial certificates issued against said railroad stocks to designate the interest of the holders in the pool. The Northern Securities Company does not have and never had any capital sufficient to warrant such a stupendous operation. Its subscribed capital was but $30,000, and its authorized capital stock of $400,000,000 is just sufficient, when all issued, to

represent and cover the exchange value of substantially the entire stock of the Great Northern and Northern Pacific Railway companies, upon the basis and at the rate agreed upon, which is about $122,000,000 in excess of the combined capital stock of the two railway companies taken at par.

XII. If the Government fails to prevent the carrying out of the combination or conspiracy aforesaid, and the defendant, the Northern Securities Company, is permitted to receive and hold and act as owner of the stock of the Northern Pacific and Great Northern Railway companies as aforesaid, not only will a virtual consolidation of two competing transcontinental lines, with the practical pooling of their earnings, be effected, and a monopoly of the interstate and foreign commerce formerly carried on by them as competitors be created, and all effective competition between such lines in the carrying of interstate and foreign traffic be destroyed, but thereafter, to all desiring to use it, an available method will be presented, whereby, through the corporate scheme or device aforesaid, the act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," may be circumvented and set at naught, and all transcontinental lines, indeed the entire railway systems of the country, may be absorbed, merged, and consolidated, thus placing the public at the absolute mercy of the holding corporation.

XIII. In furtherance of the purpose and object of the unlawful combination or conspiracy aforesaid to monopolize or attempt to monopolize the trade or commerce among the several States, and between such States and foreign countries, formerly carried on in free competition by the defendants, the Northern Pacific and Great Northern Railway companies, and to place a restraint thereon, the individual defendants named and their associate stockholders of the defendant railway companies, have combined or conspired with one another and with other persons (whose names are unknown to the complainant, but whom it prays to have made parties to this action when ascertained) to use and employ, in addition to the corporate scheme

or device aforesaid, and in aid thereof, various other schemes, devices, and instrumentalities, the precise details of which are at present unknown to the complainant but will be laid before the court when ascertained, by means of which, unless prevented by the order of this court, the object and purpose of the unlawful combination or conspiracy aforesaid may and will be accomplished. ·

### PRAYER.

In consideration whereof, and inasmuch as adequate relief in the premises can only be obtained in this court, the United States of America prays your honors to order, adjudge, and decree that the combination or conspiracy hereinbefore described is unlawful, and that all acts done or to be done in carrying it out are in derogation of the common rights of all the people of the United States and in violation of the act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," and that the defendants and each and every one of them, and their officers, directors, stockholders, agents, and servants, and each and every one of them, be perpetually enjoined from doing any act in pursuance of or for the purpose of carrying out the same, and, in addition, that the several defendants be respectively enjoined as follows:

First. That the defendant, the Northern Securities Company, its stockholders, officers, directors, executive committee, and its agents and servants, and each and every one of them, be perpetually enjoined from purchasing, acquiring, receiving, holding, voting (whether by proxy or otherwise), or in any manner acting as the owner of any of the shares of the capital stock of either the Northern Pacific Railway Company or the Great Northern Railway Company; and that a mandatory injunction may issue requiring the Northern Securities Company to recall and cancel any certificates of stock issued by it in purchase of or in exchange for any of the shares of the capital stock of

either of said railway companies, surrendering in return therefor to the holders thereof the certificates of stock in the respective railway companies in lieu of which they were issued.

Second. That the defendant, the Northern Pacific Railway Company, its stockholders, officers, directors, agents, and servants, and each and every one of them, be perpetually enjoined from in any manner recognizing or accepting the Northern Securities Company as the owner or holder of any shares of its capital stock, and from permitting such company to vote such stock, whether by proxy or otherwise, and from paying any dividends upon such stock to said company or its assigns, unless authorized by this court, and from recognizing as valid any transfer, mortgage, pledge, or assignment by such company of such stock, unless authorized by this court.

Third. That the defendant, the Great Northern Railway Company, its stockholders, officers, directors, agents, and servants, and each and every one of them, be perpetually enjoined from in any manner recognizing or accepting the Northern Securities Company as the owner or holder of any shares of its capital stock, and from permitting such company to vote such stock, whether by proxy or otherwise, and from paying any dividends upon such stock to said company or its assigns, unless authorized by this court, and from recognizing as valid any transfer, mortgage, pledge, or assignment by such company of such stock unless authorized by this court.

Fourth. That the individual defendants named, and their associate stockholders, and each and every stockholder of either of said railway companies who has exchanged his stock therein for the stock of the Northern Securities Company, be each, respectively, perpetually enjoined from in any manner holding, voting, or acting as the owner of any of the stock of the Northern Securities Company, issued in exchange for the stock of either of the said railway companies, unless authorized by this court; and that a mandatory injunction may issue requiring each of the said defendants to surrender any stock of the Northern Securities Company so acquired and held by him, and accept

therefor the stock of the defendant railway company in exchange for which the same was issued.

Fifth. That the individual defendants named, and their associate stockholders, and each and every person combining or conspiring with them, as charged in Paragraph XIII hereof, and their trustees, agents, and assigns, present or future, and each and every one of them, be perpetually enjoined from doing any and every act or thing mentioned in said paragraph, or in furtherance of the combination or conspiracy described therein, or intended or tending to place the capital stock of the defendant railway companies, or the competing railway systems operated by them, or the competitive interstate or foreign trade or commerce carried on by them, under the control, legal or practical, of the defendant, the Northern Securities Company, or of any person or persons, or association or corporation, acting for or in lieu of said company, in the carrying out of the unlawful combination or conspiracy described in said paragraph.

The United States prays for such other and further relief as the nature of the case may require and the court may deem proper in the premises.

To the end, therefore, that the United States of America may obtain the relief to which it is justly entitled in the premises, may it please your honors to grant unto it writs of subpœna directed to the said defendants, the Northern Securities Company, the Northern Pacific Railway Company, the Great Northern Railway Company, James J. Hill, William P. Clough, D. Willis James, and John S. Kennedy, and their associate stockholders of the Great Northern Railway Company, as their names may become known to complainant and the court be advised thereof, J. Pierpont Morgan, Robert Bacon, George F. Baker, and Daniel S. Lamont, and their associate stockholders of the Northern Pacific Railway Company, as their names may become known to complainant and the court be advised thereof, and the persons referred to in Paragraph XIII hereof, as their names may become known to complainant and the court be advised thereof, and to each of them, commanding them, and

each of them, to appear herein and answer (but not under oath) the allegations contained in the foregoing petition, and abide by and perform such order or decree as the court may make in the premises; and that, pending the final hearing of this case, a temporary restraining order may issue enjoining the defendants and their associates, and each of them, and their stockholders, directors, officers, agents, and servants as hereinbefore prayed.

The petition was signed and verified by Milton D. Purdy, Attorney of the United States for the District of Minnesota, and also signed by Philander C. Knox, Attorney-General of the United States, and John K. Richards, Solicitor-General of the United States.

Annexed to the petition as an exhibit was the charter of the Northern Securities Company, as follows:

## CERTIFICATE OF INCORPORATION OF NORTHERN SECURITIES COMPANY.

STATE OF NEW JERSEY, ss:

We, the undersigned, in order to form a corporation for the purposes hereinafter stated, under and pursuant to the provisions of the act of the legislature of the State of New Jersey entitled "An act concerning corporations" (revision of 1896), and the acts amendatory thereof and supplemental thereto, do hereby certify as follows:

First. The name of the corporation is Northern Securities Company.

Second. The location of its principal office in the State of New Jersey is at No. 51 Newark street, in the city of Hoboken, county of Hudson. The name of the agent therein, and in charge thereof, upon whom process against the corporation may be served, is Hudson Trust Company. Such office is to be the registered office of the corporation.

Third. The objects for which the corporation is formed are:

(1) To acquire by purchase, subscription, or otherwise, and to hold as investment, any bonds or other securities or evidences of

indebtedness, or any shares of capital stock created or issued by any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, Territory, or country.

(2) To purchase, hold, sell, assign, transfer, mortgage, pledge, or otherwise dispose of any bonds or other securities or evidences of indebtedness created or issued by any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, Territory, or country, and while owner thereof to exercise all the rights, powers, and privileges of ownership.

(3) To purchase, hold, sell, assign, transfer, mortgage, pledge, or otherwise dispose of shares of the capital stock of any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, Territory, or country, and while owner of such stock to exercise all the rights, powers, and privileges of ownership, including the right to vote thereon.

(4) To aid in any manner any corporation or association of which any bonds or other securities or evidences of indebtedness or stock are held by the corporation, and to do any acts or things designed to protect, preserve, improve, or enhance the value of any such bonds or other securities or evidences of indebtedness or stock.

(5) To acquire, own, and hold such real and personal property as may be necessary or convenient for the transaction of its business.

The business or purpose of the corporation is from time to time to do any one or more of the acts and things herein set forth.

The corporation shall have power to conduct its business in other States and in foreign countries, and to have one or more offices out of this State, and to hold, purchase, mortgage, and convey real and personal property out of this State.

Fourth. The total authorized capital stock of the corporation is four hundred million dollars ($400,000,000), divided into

four million (4,000,000) shares of the par value of one hundred dollars ($100) each.  The amount of the capital stock with which the corporation will commence business is thirty thousand dollars.

Fifth. The names and post-office addresses of the incorporators, and the number of shares of stock subscribed for by each (the aggregate of such subscriptions being the amount of capital stock with which this company will commence business), are as follows:

| Name and  post-office address. | Number of shares. |
|---|---|
| George F. Baker, jr., 258 Madison avenue, New York, N. Y... | 100 |
| Abram M. Hyatt, 214 Allen avenue, Allenhurst, N. J......... | 100 |
| Richard Trimble, 53 East Twenty-fifth street, New York, N. Y. | 100 |

Sixth. The duration of the corporation shall be perpetual.

Seventh. The number of directors of the corporation shall be fixed from time to time by the by-laws; but the number, if fixed at more than three, shall be some multiple of three.  The directors shall be classified with respect to the time for which they shall severally hold office by dividing them into three classes, each consisting of one-third of the whole number of the board of directors.  The directors of the first class shall be elected for a term of one year, the directors of the second class for a term of two years, and the directors of the third class for a term of three years; and at each annual election the successors to the class of directors whose term shall expire in that year shall be elected to hold office for the term of three years, so that the term of office of one class of directors shall expire in each year.

In case of any increase of the number of the directors the additional directors shall be elected as may be provided in the by-laws, by the directors or by the stockholders at an annual or special meeting, and one-third of their number shall be elected for the then unexpired portion of the term of the directors of the first class, one-third of their number for the unexpired portion

of the term of the directors of the second class, and one-third of their number for the unexpired portion of the term of the directors of the third class, so that each class of directors shall be increased equally.

In case of any vacancy in any class of directors through death, resignation, disqualification, or other cause, the remaining directors, by affirmative vote of a majority of the board of directors, may elect a successor to hold office for the unexpired portion of the term of the director whose place shall be vacant, and until the election of a successor.

The board of directors shall have power to hold their meetings outside the State of New Jersey at such places as from time to time may be designated by the by-laws, or by resolution of the board. The by-laws may prescribe the number of directors necessary to constitute a quorum of the board of directors, which number may be less than a majority of the whole number of the directors.

As authorized by the act of the legislature of the State of New Jersey passed March 22, 1901, amending the seventeenth section of the act concerning corporations (revision of 1896), any action which theretofore required the consent of the holders of two-thirds of the stock at any meeting after notice to them given, or required their consent in writing to be filed, may be taken upon the consent of, and the consent given and filed by, the holders of two-thirds of the stock of each class represented at such meeting in person or by proxy.

Any officer elected or appointed by the board of directors may be removed at any time by the affirmative vote of a majority of the whole board of directors. Any other officer or employé of the corporation may be removed at any time by vote of the board of directors, or by any committee or superior officer upon whom such power of removal may be conferred by the by-laws or by vote of the board of directors.

The board of directors, by the affirmative vote of a majority of the whole board, may appoint from the directors an executive committee, of which a majority shall constitute a quorum,

and to such extent as shall be provided in the by-laws such committee shall have and may exercise all or any of the powers of board of directors, including power to cause the seal of the corporation to be affixed to all papers that may require it.

The board of directors may appoint one or more vice-presidents, one or more assistant treasurers, and one or more assistant secretaries, and, to the extent provided in the by-laws, the persons so appointed, respectively, shall have and may exercise all the powers of the president, of the treasurer, and of the secretary, respectively.

The board of directors shall have power from time to time to fix and determine and to vary the amount of the working capital of the corporation; to determine whether any, and if any, what part of any accumulated profits shall be declared in dividends and paid to the stockholders; to determine the time or times for the declaration and payment of dividends, and to direct and to determine the use and disposition of any surplus or net profits over and above the capital stock paid in; and in its discretion the board of directors may use and apply any such surplus or accumulated profits in purchasing or acquiring its bonds or other obligations, or shares of the capital stock of the corporation to such extent and in such manner and upon such terms as the board of directors shall deem expedient; but shares of such capital stock so purchased or acquired may be resold, unless such shares shall have been retired for the purpose of decreasing the capital stock of the corporation to the extent authorized by law.

The board of directors, from time to time shall determine whether and to what extent, and at what times and places and under what conditions and regulations, the accounts and books of the corporation, or any of them, shall be open to the inspection of the stockholders, and no stockholders shall have any right to inspect any account or book or document of the corporation except as conferred by statute of the State of New Jersey, or authorized by the board of directors or by a resolution of the stockholders.

The board of directors may make by-laws, and from time to time may alter, amend, or repeal any by-laws; but any by-laws made by the board of directors may be altered or repealed by the stockholders at any annual meeting or at any special meeting, provided notice of such proposed alteration or repeal be included in the notice of the meeting.

In witness whereof we have hereunto set our hands and seals the 12th day of November, 1901.

Signed, sealed and acknowledged by Geo. F. Baker, Jr., Abram M. Hyatt and Richard Trimble.

The answer of the Northern Securities Company to the petition of the United States of America, was as follows:

I. This defendant admits and avers that the defendant railway companies were, at the time mentioned in the petition, and are now common carriers employed in transportation of freight and passengers within and among those States of the United States in which the railways operated by them are situated, and not further or otherwise, but were and are engaged in commerce among the several States and with foreign nations.

II. This defendant admits that, on and prior to November 13, 1901, the capital stock of the defendant railway companies was owned and controlled by their respective shareholders, and it avers, on information and belief, that the outstanding capital stock of the Great Northern Railway Company was owned by more than eighteen hundred (1,800) separate owners, and the outstanding capital stock of the Northern Pacific Railway Company was owned by more than thirty-five hundred (3,500) separate owners; and that among the shareholders of the Great Northern Railway Company (hereinafter called the Great Northern Company) were the defendants Hill, Clough, James, Morgan, and Kennedy; and that among the shareholders of the Northern Pacific Railway Company (hereinafter called the Northern Pacific Company) were the defendants Morgan, Bacon, Baker, Hill, Kennedy, James, and Lamont. It avers that the persons named and meant to be designated in the peti-

tion as owning, controlling, or as being associated in the owner-ship and control of a majority of the stock of the Great North-ern Company, did not at any time, nor in any manner, own or control a majority of said stock, nor as much as one-third ($\frac{1}{3}$) part thereof. Their holdings in said stock were at all times separate and individual, and not in association with each other, or with any other person or persons, and neither of them was under any obligation or promise to any of the others, or to any other person, to hold, use, or vote his stock other-wise than as he should, from time to time, determine to be best for his own individual interest. The persons named and meant to be designated in the petition as owning, con-trolling, or as being associated in the ownership and control of a majority of the stock of the Northern Pacific Company, did not, at the date named, nor at any time, or in any manner, own or control a majority of such stock, nor as much as one-third ($\frac{1}{3}$) part thereof. Their holdings in said stock were at all times separate and individual, and neither of them had any control of the holdings of the other, or of any other person or persons, and neither of them was under any promise of obliga-tion to the other, or to any person, to hold, use or vote his stock otherwise than as he should, from time to time, determine to be best for his own individual interest.

Except as herein admitted and averred, this defendant de-nies each and every allegation of subdivision II of the petition.

III. This defendant admits that the Northern Pacific Com-pany owned and operated a railway from Ashland, in Wisconsin, via Duluth, and from St. Paul, across Minnesota, North Dakota, Montana, Idaho, and Washington, and into Oregon, passing through Helena, in the State of Montana, and Spokane, in the State of Washington, and extending to Tacoma and Seattle in Washington, and to Portland in Oregon; and that the Great Northern Company operated lines of railway extending from St. Paul, in the State of Minnesota, across said State and North Dakota, Montana, Idaho, and Washington to Everett and Seattle in Washington, passing through Spokane in that State.

It admits that the said lines so operated by said companies connected with other railway lines, and that, either directly or by means of such other railway lines, they connected with lines of steamships on the Great Lakes and the ocean; and that the mileage operated by said companies aggregated about fifty-five hundred (5,500) miles for the Northern Pacific Company and about forty-one hundred and twenty-eight (4,128) miles for the Great Northern Company.

It denies that the lines operated by said companies are parallel or competing, except for the short distances and to the limited extent hereinafter mentioned, and denies that said companies were engaged in active competition with each other, except in the manner and to the extent hereinafter stated.

Except as hereinabove and hereinafter stated, it denies each and every allegation in subdivision III of said petition.

IV. This defendant admits and avers that prior to 1893 those portions, and those portions only, of the lines of the Northern Pacific Company which had been built and were operated by virtue of the act of Congress incorporating the Northern Pacific Railroad Company, approved July 2, 1864, were owned and operated by the last-named company, and that in the year 1893 that company became insolvent and its lines passed into the hands of receivers appointed by various Federal courts.

It admits that while in this condition a contract was made, as set forth in the report of the *Pearsall* case, referred to in the petition.    It avers that said contract was made under and in conformity with the provisions of the act of incorporation of the Great Northern Company, and that the only objection made to the validity of the contract was that the provisions in said charter under which it was made had been repealed by subsequent general laws of the State.   It denies that the case, or that the decision therein, is correctly stated in the petition. And it avers that neither the said contract nor the issues raised and decided in the said case have any relevancy to the matters in controversy in this case.

V. This defendant admits and avers that in the winter and

spring of 1901 the defendant railway companies, for the purpose of promoting their several interests and the interests of the country traversed by their lines and by those of the Chicago, Burlington and Quincy Railroad Company, purchased in equal parts the stock of the last-named company to the amount and at the price and upon the terms of payment stated in the petition. It admits that the lines operated by the Chicago, Burlington and Quincy Railroad Company and its connections are substantially as stated in the petition. It denies that what is called in the petition the Burlington system was or is parallel to or competing with what is therein called the Union Pacific system, but admits that some of the lines of each system compete with some lines of the other.

It denies that said purchase of stock was made in contemplation of the ultimate placing of the Great Northern and Northern Pacific systems under a common source of control, or that it was made for any other motive or with any other purpose than as hereinafter stated.

Except as herein admitted, it denies each and every allegation in subdivision V of the petition.

VI. This defendant denies that prior to its organization the defendants James J. Hill or J. Pierpont Morgan, or said Hill and Morgan, or any persons associated with them, or either of them, owned or controlled a majority of, or held a controlling interest in, the stock of either of said railway companies.

It denies that said persons, or that any of the persons concerned in its organization, contrived or intended any of the things alleged in subdivision VI of the petition or entered into any agreement or conspiracy to do any of the things charged in said subdivision.

It admits and avers that said James J. Hill and other holders (not exceeding ten in number) of the stock of the Great Northern Company, but not including the defendants Morgan, Bacon, or Lamont, did plan its organization with an authorized capital of four hundred million dollars ($400,000,000) for the purposes, and those only, set forth in its certificate of incorporation.

It denies that James J. Hill and J. P. Morgan agreed between themselves, or with other stockholders of either of the defendant railway companies, or with either of said railway companies, or with anyone whomsoever, that a controlling interest of the stock of either of said railway companies should be turned over or transferred to this defendant, whether in exchange for its stock or otherwise.

It denies that any of the matters stated in said subdivision VI of the petition were contemplated or intended; or have resulted, or will result, from its formation and operation. And it denies the allegation that it is the duty of the directors of said railway companies to pursue a policy which will promote the interest of both systems at the expense of the public.

It alleges that the motives and intentions of the persons so forming this defendant were and are such, and such only, as are in this answer stated, and it denies each and every allegation in subdivision VI of the petition not herein expressly admitted or specifically denied.

VII. This defendant admits its formation under the laws of New Jersey, with the articles, a copy of which is attached to the petition, and that the provisions of said articles were designedly inserted therein and were fully authorized by the general corporation laws of that State. And it says that the exercise of the powers of a stockholder provided for in said articles was not, as wrongly stated in the petition, confined to the stock of the defendant railway companies which this defendant might hold. It avers that the clause in said articles, partially quoted in paragraph VII of the petition, was not intended to, and does not, enlarge its powers, as the same are set forth in the preceding clauses of said articles, but makes clear its power to do such acts as making or procuring advances of money to any corporation whose securities are held by it, the indorsement or guaranty by it of the obligations of such corporation, becoming surety therefor, or in any lawful manner using its name or resources in aid of such corporation.

VIII. This defendant admits and avers that on or about the

14th day of November, 1901, its directors and officers were elected, and among them the defendant James J. Hill as a director and president, but denies that he was or is the controlling power in the management of the Great Northern Company.

It admits and avers that thereafter the defendant James J. Hill and other stockholders of the Great Northern Company, severally and each acting for himself alone, and without any agreement to that effect with any other stockholder, sold to this defendant a large amount of Great Northern stock at one hundred and eighty dollars ($180) per share in exchange for stock of this defendant at par, but it avers that the stock so sold was not within twenty-six million dollars ($26,000,000) of a majority of the stock of the Great Northern Company.

It admits and avers that thereafter and about November 22, 1901, it offered like terms of purchase to the other shareholders of the Great Northern Company, the offer to hold good for sixty days from its date, and that many of the shareholders of that company, each acting for himself alone, accepted such offer and made such sale.

It admits and avers that the defendant J. P. Morgan and other shareholders of the Northern Pacific Company sold to the defendant a majority of the stock of the Northern Pacific Company, and that this defendant has received such dividends as have been paid on the shares held by it, in the same manner and at the same rate as other shareholders; but it denies that it has acted, whether as owner of stock or otherwise, in the management or direction of either of said railway companies or in receipt or control of the earnings of either of them, and it avers that no change whatever has taken place in the management of the said railway companies, or either of them, and that each of them is managed by the same board of directors and officers as existed before the organization of this defendant.

It denies that any of the things done by the defendants James J. Hill and J. Pierpont Morgan, or by either of them, or by this defendant or its promoters, directors, officers, or stockholders, or any of them, were done in pursuance of the pre-

tended combination or conspiracy alleged in subdivision VIII of the petition, or as an instrumentality to effect the purposes thereof, and it denies that by reason of the matters or any of them in the petition alleged a virtual or any consolidation of said defendant railway companies or their business has been effected or intended; and it denies any conspiracy or combination in restraint of trade or commerce among the States, or with foreign nations, or that the defendants or any of them are attempting or intending to monopolize or restrain any such trade or commerce.

IX. It denies each and every allegation in subdivision IX of the petition.

X. This defendant says that it does not know and cannot set forth how much additional stock of either defendant railway company it is likely to acquire, since each acquisition of shares by it depends, among other contingencies, on the willingness of the holders of the said stock to sell it upon terms which this defendant may be willing to accept.

XI. This defendant says it has bought and paid for and has caused to be transferred to it upon the records of the Great Northern Company, in accordance with the by-laws of that company, about five-twelfths ($\frac{5}{12}$) of the shares of that company's stock; and has also negotiated for, but has not yet caused to be presented to the Great Northern Company for transfer upon its records, other shares of the stock of that company aggregating about four-twelfths ($\frac{4}{12}$) of the total amount of its stock, but has not acquired a right to vote as stockholder of the Great Northern Company on stock not so transferred. This defendant, in acquiring shares of the Great Northern Company and of the Northern Pacific Company, dealt solely with the separate owners of the said shares in their respective individual capacities. It has no knowledge of any agreement, promise, or understanding between any of the holders of said stock concerning the sale thereof to it, and it denies that any such agreement, promise, or understanding was ever made. All the sales and transfers of the said stock to this defendant

were absolute and without any reservation of any right or interest in any share thereof to the seller or to any other person.

This defendant has not paid for all the stock of the Great Northern Company and of the Northern Pacific Company acquired by it in shares of its own stock, but, on the contrary, has expended upward of forty million dollars ($40,000,000) cash in the making of such purchases. Every share of the Great Northern Company and the Northern Pacific Company acquired by this defendant has been, and so long as it remains the property of this defendant will continue to be, held and owned by it in its own right, and not under any agreement, promise, or understanding on its part, or on the part of its stockholders or officers, that the same shall be held, owned, or kept by it for any period of time whatever, or under any agreement that in any manner restricts its right and power immediately to sell or otherwise dispose of the same, or that restricts or controls to any extent any use of the same, which might lawfully be exercised by any other owner of said stocks. There has been and is no agreement, promise, or understanding between any of the holders of said stock so acquired by this defendant, or between any of them and any other person or corporation, that any of said shares should at any time be held, used, or voted by this defendant for the purpose of combining or con- solidating or placing under one common management or control the railways of the Great Northern Company and of the Northern Pacific Company, or the business thereof, or for the purpose of monopolizing or restraining traffic or competition between the said railways. Many stockholders of the said companies have not sold, and may never sell, their shares to this defendant; and the said railway companies have not nor have any of the directors of either of them, by any act, formal or informal, or by suggestion, ever solicited any of their respective shareholders to sell their shares to this defendant. This defendant was organized in good faith, and it denies all the allegations in subdivision XI of the petition.

XII. This defendant denies each and every allegation in subdivision XII of the petition.

XIII. This defendant denies each and every allegation subdivision XIII of the petition.

### SECOND.

Further answering the petition, this defendant, upon information and belief, says that the facts as to the purchase of the shares of the Chicago, Burlington and Quincy Railroad Company (hereinafter called the Burlington Company) and the planning and forming of this defendant and the motives, intentions, and purposes of the persons and corporations concerned in these enterprises, or either of them, were not as erroneously stated in the petition, but were and are as follows:

I. When projecting the line of the Great Northern Company to the Pacific coast, that company and its directors contemplated the necessity of creating for the line not merely State and interstate, but an international commerce. Nearly all the country traversed or reached by the line was then but sparsely settled or not settled at all. It was principally agricultural, grazing, or timber land, with mineral deposits in the mountain ranges believed to be large and valuable, but not developed or explored. Whatever commodities the region might furnish for carriage would be raw material, of great weight and bulk in proportion to its value, which would not bear transportation to market except at a low mileage rate, such as could be made possible only by every practical reduction in the cost of transportation. The available market for all such products was far from the places of production.

In Washington and Oregon are the largest and finest bodies of standing timber in the United States, the best market for which is in the prairie States of the Mississippi Valley east of the Rocky Mountains; but the lumber and shingles from the Pacific coast would not bear the cost of transportation to those States if the cars carrying them had to be hauled back empty, or nearly so, for a distance of from 1,500 to 2,000 miles. And

the same is true of the other products.    On the other hand, the unoccupied or sparsely populated country along the line, or reached by it, could not furnish a market for commodities enough to load the returning cars; the result being that unless the company could secure traffic for carriage beyond the Pacific coast no great traffic either way could exist or be created.

To meet these conditions the Great Northern Company not only went to great additional expense in the construction of its line to obtain gradients lower than those of any other line to the Pacific coast, but also made great efforts to create and increase in the countries of eastern Asia a demand for the products of this country; and soon after the completion of its railway in 1893 it induced a Japanese company to run a line of steamships, connecting with its railway, on the route between Seattle and ports of Japan, China, and Russian Siberia, and succeeded in creating and has since been actively engaged in building up a commerce in which the flour manufactured along its line, cotton (both raw and manufactured), iron and steel (especially steel rails and plates), machinery, and such other manufactures of this country as a market could be found or made for in eastern Asia, have been carried to oriental ports, and return cargoes of such oriental products as are consumed in this country have been brought back.    A large west-bound, as well as an increased east-bound, traffic has thus been secured by the company, enabling it to make such rates on lumber and other products of the country served by it as permit them to be shipped to Eastern markets with a profit to the shippers.

One year before the Burlington purchase, this oriental traffic had reached such proportions that the Great Northern Company caused to be begun the construction of steamships to run from Seattle to ports in Japan, China, and the Philippines, which, from their great carrying capacity (being the largest in the world), will be able to carry at very low rates (if full cargoes can be secured), and thus enable the company to move the largest volume of west-bound traffic (and also of east-bound traffic) at the lowest cost.

In the interstate and international commerce which the Great Northern Company has thus built up, it competes both in this country and on the ocean with the other transcontinental lines (including the Canadian Pacific), and at the oriental ports-it competes for commerce of the world. Its rates are and must be made in competition with the rates of ocean carriers and by way of the Suez Canal.

The policy thus followed by the Great Northern Company in building up an international, and thereby interstate, commerce has been followed by the Northern Pacific Company since its reorganization in 1896.

In creating and maintaining this competitive interstate and international commerce both the Great Northern Company and the Northern Pacific Company were hampered and placed at a disadvantage with the other transcontinental railways, as well as with European competitors, by the want of sufficient direct connection with the territory offering the best markets for the products of the country along their lines, and with the places of production and great centers of distribution from which their traffic must be supplied. For many months before the purchase of the Burlington shares they had considered the best means of getting closer to such markets and sources of supply. The lines of the Burlington, better than those of any other company, fulfilled the requirements of both the Great Northern Company and the Northern Pacific Company in respect of markets for east-bound and freight for west-bound traffic. The Burlington lines traverse the treeless States of Illinois, Iowa, Missouri, Nebraska, Wyoming, Kansas, and Colorado, which afford the best markets for the lumber of the Pacific coast. They reach Denver, Kansas City, Omaha, and Aurora, where are located the principal smelters of silver-lead ores, such as are mined near the lines of the defendant railway companies.

They reach Omaha, Kansas City, and Chicago, where are the great packing houses and the great markets for the cattle and sheep of the ranges of North Dakota, Montana, Wyoming, Idaho, Oregon, and Washington.

They reach St. Louis and Kansas City, connecting there with lines traversing the cotton States, from which come raw and manufactured cotton required for shipment to China and Japan.

At Chicago and St. Louis they connect with the lines which reach the points of supply of manufactured iron, steel, machinery; and other manufactured articles that find a market in Japan and China.

The Burlington line southward from Minneapolis and St. Paul along the Mississippi River reaches the great coal deposits of southern Illinois, the largest west of Pennsylvania and West Virginia; and its light gradients and consequent low cost of transportation make it possible to supply such coal to points on the lines of each defendant railway company east of the Missouri River, relieving the people and the railways of that territory from entire dependence upon the Pennsylvania and West Virginia mines, the supply from which is yearly becoming more costly and less certain.

The price paid for said Burlington stock was lower per mile of main track covered by the stock than that for which the stock of any other large and well established system in the same general territory could have then been bought.

The purchase of the Burlington stock by the Northern Pacific and Great Northern companies in equal parts served each company as well as if it were the sole owner of such stock, while such purchase might have been beyond the financial means of either company by itself.

The Great Northern and Northern Pacific companies therefore each purchased an equal number of shares of the Burlington stock as the best means and for the sole purpose of reaching the best markets for the products of the territory along their lines, and of securing connections which would furnish the largest amount of traffic for their respective roads, increase the trade and interchange of commodities between the regions traversed by the Burlington lines and their connections and the regions traversed or reached by the Great Northern and Northern Pacific lines, and by their connecting lines of shipping on

the Pacific coast. These connections and such interchange of traffic were deemed to be and are indispensable to the mainte- nance of their business, local as well as interstate, and to the development of the country served by their respective lines, and of like advantage to the Burlington lines and the country served by them, and strengthen each company in the competi- tion with the more southerly lines to the Pacific coast, with the Canadian Pacific Railway, and with European carriers, for the trade and commerce of the Orient.

In such purchase there was no purpose to lessen any compe- tition of the Burlington lines with those of either of the pur- chasers, for they are not competitive, or to lessen any competi- tion between the purchasers. Such purchase was not intended to have, and it cannot have, any such effect.

The purchase of the Burlington stock was not made in view of the formation of this defendant, but solely from the motives and with the purposes already stated.

II. The project of forming a holding company of any kind was not the result, in any way, of the failure of the plan which was defeated by the decision of the Supreme Court in the *Pearsall* case. There was no connection whatever between the two.

The project of a holding company which finally developed into the formation of this defendant had its inception years before that date, among several gentlemen, not exceeding ten in number, who had been large shareholders in the Great Northern Company and its predecessor, the St. Paul, Minneapolis and Manitoba Railway Company; some of them from the original organization of the latter company in 1879, and others from dates not long after that time. They have never held a major- ity of the stock of the Great Northern Company, but have taken an active interest in its policy and administration; have aided it when necessary in financing its operations; have acted to- gether in promoting its interests; have, with some exceptions, served from time to time as directors and officers (Mr. Hill having been president of the successive companies since 1882); and by reason of their active interest in the company and serv-

ices to it have influenced to a large degree its policy and management. As far back as 1893, most of these gentlemen being well advanced and some far advanced in years, they began to discuss together what would be the effect upon the policy which under their influence the company had pursued with great benefit to its shareholders and the public, should their holdings by death or otherwise become scattered, and by what means their holdings could be kept together, so as to secure the continuance of such policy in the management of the company. It was considered that if a company should be formed to which they might transfer their individual holdings, their shares were likely to be held together, so long as the majority in the holding company should so wish, and this would tend to give stability to the policy of the Great Northern Company; be of aid to it in financial operations, and maintain the value of their investments. These conclusions were the result of various consultations among the persons mentioned, or some of them, but no definite agreement was made for forming such a company or binding anyone to transfer his shares to it if formed.

From time to time, beginning with the reorganization of the Northern Pacific Company in 1896, Mr. Hill and said other Great Northern shareholders who had discussed with him the plan of forming a holding company, had made large purchases of Northern Pacific shares, individually, each for himself, without any concerted action, and solely as investments. About May 1, 1901, their aggregate holdings of the common stock of the Northern Pacific Company amounted to, nearly twenty million dollars ($20,000,000) of the eighty million dollars ($80,000,000) common stock of the company, which also had a preferred stock, amounting to seventy-five million dollars ($75,000,000), with the same voting power as the common stock. At this time the firm of J. P. Morgan & Co. held about six million dollars ($6,000,000) of the common stock. In the fall of 1900 Mr. Hill and said Great Northern shareholders discussed the question of putting their holdings of Northern

Pacific stock into the proposed holding company, as well as the suggestion that all the other stockholders of the Great Northern Company should be given the opportunity of selling and transferring their shares to the holding company, and that its capital stock should be made large enough to enable it to buy such holdings, though it was not known that the holders of any considerable amount of Great Northern stock, other than those above named, would desire to make such transfer.

At the time of the purchase of the Burlington shares it was not contemplated by either purchasing company or its shareholders that any alliance between the purchasing companies, or among their shareholders, was needed to preserve to each company its fair share of the advantages secured by the purchase. It was thought that the manifest interest of each company rendered any further guaranty or security needless. But pending or just after the conclusion of the negotiations for the Burlington stock, parties acting in the interest of the Union Pacific Railway system did purchase Northern Pacific shares, both common and preferred, to the amount of about seventy-eight million dollars ($78,000,000), being a clear majority of the entire capital stock of that company. The apparent intent of such purchase was to defeat and, if successful, it would have defeated, the carrying out of the purposes for which the Burlington shares had been bought by the Great Northern and Northern Pacific companies, and the development of the interstate and international commerce of each of them, and would have subordinated the policy of each to an interest adverse to both the Great Northern and Northern Pacific companies, and to the public served by their lines.

To protect the interests of the shareholders of the Northern Pacific Company, J. P. Morgan & Co. made additional purchases of Northern Pacific common stock, which, with the holdings in said stock of Mr. Hill and other Great Northern shareholders who had discussed with him the plan of forming a holding company, constituted about forty-two million dollars ($42,000,000), being a majority of the common stock. In

view of the injury apprehended to both companies, and to their shareholders, and the better to protect their interests in the future, the Great Northern shareholders holding Northern Pacific shares, deemed it advisable that the projected holding company should have power to purchase not only their own Great Northern and Northern Pacific shares, but also the shares of such other Great Northern and Northern Pacific shareholders as might wish to sell their stock to said holding company, and the shares of companies already formed, and others that might be formed, for the purpose of aiding the traffic or operations of the Great Northern and Northern Pacific companies, respectively. At this time it was not expected by any of the persons concerned that any Northern Pacific shares except the said forty-two million dollars ($42,000,000) would be acquired by the proposed holding company. The organization of such company was not dependent on any agreement that it should acquire a majority of the shares of either defendant railway company. It would have been organized if the Burlington purchase had not been made, and if its promoters had had no other shares to transfer to it than the thirty-four million dollars ($34,000,000) Great Northern stock and the twenty million dollars ($20,000,000) Northern Pacific stock held by them on May 1, 1901. It was not known that all or how many of the shareholders of either of the railway companies would be likely to transfer their shares to this defendant when formed. After its organization this defendant bought and still holds about one hundred and fifty million dollars ($150,000,000) of the stock of the Northern Pacific Company; and it has also purchased and negotiated for the purchase of the stock of the Great Northern Company, as hereinbefore stated. Neither the said persons who were concerned in the formation of this defendant, nor the said persons from whom it has acquired the stocks of said railway companies, nor this defendant itself since its formation, nor its stockholders, directors, or officers, have planned or intended that the stock of said railway companies acquired by this defendant, or any part thereof, should be held, used, or voted by

it, or by its officers, agents or proxies, for the purpose of com-
bining, consolidating or placing under one common manage-
ment or control the railways of the Great Northern and North-
ern Pacific companies, or the business thereof; or for the purpose
of monopolizing or restraining competition between the said
railway companies; or for any other purpose than the election
by each of said railway companies of a competent and distinct
board of directors, able and intending to manage each of them
independently of the other, and for the benefit of their share-
holders and of the public. By the acts of the legislature of the
State of Minnesota incorporating the Great Northern Railway
Company, and by the acts of the legislature of the State of
Wisconsin incorporating the Northern Pacific Railway Com-
pany, it is, in substance, provided that the business and affairs
of each railway company shall be managed by a board of di-
rectors to be elected by the stockholders, and that all the
powers of each corporation relating to said matters shall be
vested in such board.

. Every share of stock issued by this defendant has been issued
to the persons and corporations receiving the same in good faith,
for full value paid to it, either in cash or its equivalent, and in
accordance with the provisions of its articles of incorporation
and with the laws of the State of New Jersey. No agreement,
promise, or understanding has been made between this defend-
ant and any of its stockholders, or between its stockholders
themselves or any of them, or between said stockholders or any
other persons or corporations, that the stock of this defendant
should be held, used, or voted other than by each stockholder,
separately and individually, and in such way as he should see
fit; and there has been no agreement, promise, or understanding
between said stockholders themselves, or any of them, or be-
tween said stockholders and any other person or corporation,
that they or any of them should use, hold, or vote their stock in
this defendant in association or for any common purpose or
object. The owners and holders of stock of this defendant are
more than thirteen hundred (1,300) in number, and the owner-

ship of the stock is being changed from day to day by sales and transfers in the usual course of dealing. The said persons who formed or were otherwise concerned in the formation of this defendant have never, all together, held, owned or otherwise controlled an amount of stock of the said company equal to so much as one-third of the whole amount thereof now outstanding. This defendant has no contract or obligation to purchase or acquire any shares whatever in either railway company, in addition to those which it has purchased or negotiated to purchase, as above stated. Its authorized capital was fixed by persons who planned its organization to enable it to give to each stockholder in each of the defendant railway companies an opportunity to sell his stock to it, should he see fit to do so, and should this defendant desire to acquire it. The sum fixed was deemed ample by those who planned the formation of this defendant to furnish the means to pay for all such shares as would likely be acquired by it, and to leave remaining a large amount to be used for the purchase of stock in other corporations, not common carriers, which this defendant might consider beneficial to acquire. This defendant was not formed as a scheme or a device to evade the act of Congress known as the "Anti-Trust Act," or any other law whatever, but solely for the purposes hereinbefore stated.

III. This defendant was not formed, nor did any of those concerned in its formation, nor any of those who sold their shares of stock to it, have any purpose or intention, to restrain trade or commerce, or to lessen competition between said railway companies, or to monopolize traffic in any manner whatever; nor can any such results follow from the formation or operation of this defendant. In point of fact, since the organization of this defendant rates on the defendant railway companies' lines, including rates to and from points common to both, have voluntarily been so reduced as to decrease their earnings by upwards of a million of dollars annually. For all interstate commerce on the lines of either the defendant railway companies, except traffic beginning and ending on their own lines

respectively, the rates are fixed by joint tariffs with connecting lines. In respect to all such traffic neither of the defendant companies has ever had, or can have, any independent rate-making power or control of traffic or rates. All joint tariffs with other companies to or from points common to the lines of the defendant railway companies have always been, and necessarily must be, the same, whether the traffic is carried by one or the other of said companies. The total amount of all other inter-state traffic, that is, traffic between common points on the two roads, which is not competitive both as to rates and quality of service with other carriers having equal rate-making power with them, is less than 2 per cent of the total interstate traffic of the two companies.

IV. The sale and transfer of property, whether in the form of shares of corporate stock or otherwise, has never been adjudged to be, and is not, in violation of the act of Congress of July 2, 1890, known as the "Anti-Trust Act."

This defendant is not a railroad company, and it has no power to operate or manage railways or make or control rates of transportation, nor to monopolize or restrain traffic of any kind. So far from intending to violate any provision of said act of Congress, the persons who were concerned in organizing this defendant and those who have sold their shares to it had every reason to believe and did believe that such sales were not in any way in contravention of that act. In common with the general public, they were aware that during the eleven years since the passage of that act in many instances the stock of a competing railway company has been acquired by its competitor or the shareholders thereof, such acquisition including many of the principal railways doing business throughout the country. This has been done without objection from any branch of the Government of the United States, and has invariably proven beneficial to the railway companies concerned and to the public, and those making sales of stocks to this defendant had no reason to believe that such sales were open to any legal objection or question whatever.

V. This defendant was not organized for the purpose of acquiring a majority of the stock of either the Great Northern or the Northern Pacific Company, but merely to purchase the stock of those who wished to sell, as above stated, and was not organized for the purpose of controlling railway rates in the slightest degree; and has not had and cannot have any such effect. The transactions referred to in the petition have consisted in the organization of a lawful corporation and the purchase of property by it. All acts done in relation to the organization of this defendant and in the conduct of its business have been expressly authorized by law, and have had no effect whatever to restrain trade or commerce among the several States or with foreign nations. If these lawful transactions should hereafter have any effect to restrain trade or commerce among the several States or with foreign nations (which is hereby denied), that effect would be merely indirect, remote, incidental, and collateral, and not intended, and as nothing compared with the great expansion of the volume of interstate and international commerce which was intended, and which this defendant believes is destined to result from the enterprise of the two railway companies, that culminated in the purchase of the Burlington stock.

And this defendant says:

1. The "Anti-Trust Act" was not intended to prevent or defeat an enterprise in aid of a great competitive interstate and international commerce merely because such enterprise may carry with it the possibility of incidental restraint upon some commerce, trifling both as respects territory and volume.

2. Nor was the act intended to limit the power of the several States to create corporations, define their purposes, fix the amount of their capital, and determine who may buy, own, and sell their stock.

3. Otherwise construed, the act would be unconstitutional, because:

The power to regulate commerce with foreign nations and

among the States does not give Congress the power to regulate any of the matters above mentioned in respect to corporations created by the States; and because

Persons may not be deprived of their property without due process of law, by taking from them the right to sell it as their interest may suggest.

VI. There is a defect of necessary parties defendant, because, as already set forth, the persons who made sales of stock of the said railway companies to this defendant were numerous, exceeding more than 1,300 in number, and few of them had any connection whatever in the planning or forming of this defendant, and in their absence from this litigation no decree can be made affecting their rights in the premises.

VII. And this defendant denies all and all manner of unlawful combination and confederacy wherewith it is by the said petition charged, without this, that if there is any other matter, cause, or thing in the petition contained material or necessary for this defendant to make answer unto, and not herein or hereby well and sufficiently answered, confessed, traversed, and avoided or denied, the same is not true to the knowledge or belief of this defendant; all of which matters and things this defendant is ready and willing to aver, maintain, and prove as this honorable court shall direct, and humbly prays to be hence dismissed, with its reasonable costs and charges in this behalf most wrongfully sustained.

Signed (no verification) for the Northern Securities Company, by John W. Griggs and Geo. B. Young, solicitors and counsel.

A separate answer was filed by the defendants James J. Hill, William P. Clough, D. Willis James, John S. Kennedy, and George F. Baker, which was substantially the same as the answer of the defendant Northern Securities Company.

The answer of the Great Northern Railway Company was substantially the same as that of the Northern Securities Com-

pany with the omission of Paragraph II of the second statement of defence.

The answer of the defendant the Northern Pacific Railway Company was as follows:

I. This defendant admits the allegations of Paragraph I of the petition that this defendant and the Great Northern Railway Company were at the times mentioned in said petition and now are common carriers employed in the transportation of freight and passengers among the several States of the United States within which the railways operated by them are situated.

This defendant denies each and every other allegation of paragraph I of the petition.

II. This defendant admits the allegations of Paragraph II of the petition that prior to November 13, 1901, the stock of this defendant was owned and controlled by its shareholders, and that among them were the parties in that behalf alleged.

This defendant denies any knowledge or information sufficient to form a belief of each and every other allegation of Paragraph II of the petition.

III. This defendant admits the allegations of Paragraph III of the petition that this defendant at the times mentioned owned and operated a railway extending from Ashland in Wisconsin via Duluth, Minnesota, and from St. Paul, Minnesota, across Minnesota, North Dakota, Montana, Idaho, and Washington, passing through Helena, in the State of Montana, and Spokane, in the State of Washington, and extending to Tacoma and Seattle, in Washington, and to Portland, in Oregon; that the Great Northern Company operated lines of railway extending from St. Paul aforesaid across Minnesota, North Dakota, Montana, Idaho, and Washington, passing through Spokane and extending to Everett and Seattle, in the State last aforesaid; that the said lines connected with other railway lines, and either directly or by means of such other railway lines connected with lines of steamships on the Great Lakes and the ocean, and that the mileage operated by said companies aggregated about five thousand five hundred miles for this defendant

and about four thousand one hundred and twenty-eight miles for the Great Northern Company.

This defendant denies each and every other allegation of Paragraph III of the petition.

IV. This defendant admits the allegations of Paragraph IV of the petition that, prior to the year 1893, a corporation known as the Northern Pacific Railroad Company, organized and existing under certain acts and resolutions of Congress, and which then operated some parts of the lines of this defendant, became insolvent and was placed in the hands of receivers appointed by various courts of the United States; that, while in this condition, a plan of reorganization was entered into by the bondholders of said company, and that an arrangement was proposed between the said bondholders and the Great Northern Company which was never carried out. This defendant admits that a case entitled Pearsall against the Great Northern Railway Company was decided by the Supreme Court of the United States on March 30, 1896, and is reported in volume 161 of the reports of said court, beginning on page 696.

This defendant denies any knowledge or information sufficient to form a belief of each and every other allegation of Paragraph IV of the petition. It is informed and believes that said paragraph is wholly irrelevant to the cause of action, if any, stated in the petition.

V. This defendant admits the allegations in Paragraph V of the petition that early in the year 1901 this defendant and the Great Northern Company, acting for the purpose of promoting their several interests, each purchased shares of stock of the Chicago, Burlington and Quincy Railroad Company of Illinois, paying therefor with the joint bonds of the Great Northern Company and the Northern Pacific Company, payable in twenty years from date, with interest at 4 per cent per annum, at the rate of $200 in bonds for each $100 in stock, and in this manner the said companies severally purchased and acquired each about 49 per cent of said stock; that the lines operated by said

Burlington Company and its connections were geographically as stated in the petition, and that some of said lines compete with some lines of what is called in the petition the Union Pacific system.

This purchase was made by these defendants primarily in order to secure a terminus in Chicago and permanent connection with the eastern and southeastern markets, which are especially valuable to the agricultural and mineral products of the northwest, and also because the Burlington system serves a large and growing territory, and the purchase was deemed desirable and profitable in itself. It had no connection with the future formation of any company whatsoever and was not made with intent to violate the statute or common law of any State or of the United States, and was not in violation of any such law.

This defendant denies each and every other allegation of Paragraph V of the petition. It is informed and believes that said paragraph is wholly irrelevant to the cause of action, if any, stated in the petition.

VI. This defendant denies any knowledge or information sufficient to form a belief of each and every allegation of Paragraph VI of the petition.

VII. This defendant admits the allegation of Paragraph VII of the petition, that the defendant Northern Securities Company was heretofore organized, as it is informed and believes, under the general laws of the State of New Jersey.

This defendant denies any knowledge or information sufficient to form a belief of each and every other allegation of Paragraph VII of the petition.

VIII. This defendant admits the allegations of Paragraph VIII of the petition that the defendant, Northern Securities Company, has purchased and now holds and owns a large majority of the capital stock of this defendant, and that the Securities Company has received such dividends as have been paid on any shares held by it.

This defendant denies any knowledge or information suffi-

NORTHERN SECURITIES CO. *v.* UNITED STATES. 245

cient to form a belief of each and every other allegation of Paragraph VIII of the petition.

IX. This defendant denies any knowledge or information sufficient to form a belief of each and every allegation of Paragraph IX. of the petition.

X. This defendant denies any knowledge or information sufficient to form a belief of each and every allegation of Paragraph X of the petition.

XI. This defendant denies each and every allegation of Paragraph XI of the petition.

XII. This defendant denies each and every allegation of Paragraph XII of the petition. It is informed and believes that said paragraph consists merely of expressions of opinion, and is, therefore, without weight in support of any cause of action.

XIII. This defendant denies any knowledge or information sufficient to form a belief of each and every allegation of Paragraph XIII of the petition.

XIV. As this defendant is informed and believes, the purchase by the Northern Securities Company of shares of stock of this defendant and the sale thereof by the owners have been expressly authorized by law. They have had no effect whatever, in law or in fact, in restraint or monopoly of trade or commerce among the several States or with foreign nations. The petition does not allege that at any place within the jurisdiction of this court or elsewhere any such restraint or monopoly has been effected.

If these lawful transactions, consisting merely of the purchase and sale of property, should hereafter have any effect in restraint or monopoly of trade or commerce among the several States or with foreign nations, that would not be their direct effect, but would be merely indirect, remote, incidental, and collateral, and would, therefore, not bring said transactions within said act of Congress above mentioned. Any other construction would render the statute unconstitutional, as beyond the power of Congress, and as depriving the sellers of the stock thus sold and also the stockholders of this defendant who have not sold

their shares to the Securities Company, of liberty and property without due process of law, because, thus construed, it would be an inhibition upon their right to sell their property. If complainant's contention be sustained, the right of the owner of property to sell the same will be dependent upon what the courts at any future time may hold to have been the intention of the purchaser in buying such property. This result would seriously impair the liberty of the owner and the value of his property, and is contrary to the constitutional guaranties thereof.

These transactions are, therefore, not within the act of Congress above mentioned; nor has Congress any constitutional power to annul or prohibit action thus expressly authorized by state statutes under which the same has been or may hereafter be taken.

XV. There is a defect of necessary parties defendant herein, because in this suit it is sought to annul all sales of shares made by shareholders of this defendant to the Northern Securities Company and to cancel all certificates of stock of the latter company issued in purchase of the same. The parties making such sales are numerous, and many of them had no connection with the matter save to sell their shares to the Securities Company after its organization. It is obvious that in their absence no adjudication can be made annulling such sales to the Securities Company. A decree to such effect as prayed for by the petition necessarily would deprive such original sellers of their property without due process of law. All persons who sold shares in this defendant to the Securities Company are, therefore, necessary parties, and the petition is bad by reason of their absence.

XVI. And this defendant denies all and all manner of unlawful combination and confederacy wherewith it is by the said petition charged, without this, that if there is any other matter, cause, or thing in the petition contained material or necessary for this defendant to make answer unto, and not herein or hereby well and sufficiently answered, confessed, traversed, and

avoided or denied, the same is not true to the knowledge or belief of this defendant; all of which matters and things this defendant is ready and willing to aver, maintain, and prove as this honorable court shall direct, and humbly prays to be hence dismissed with its reasonable costs and charges in this behalf most wrongfully sustained.

The first five paragraphs of the answer of the defendants, J. Pierpont Morgan and Robert Bacon, were substantially the same as the same paragraphs of the answer of the Northern Pacific Railway and the remainder of the answer of such defendants was as follows:

VI. These defendants admit that the defendant James J. Hill and certain other persons decided upon the formation of a securities company for the purposes set forth in the certificate of incorporation of the Northern Securities Company attached to the petition and in all respects as therein stated.

These defendants deny each and every other allegation of Paragraph VI of the petition.

VII. These defendants admit the allegations of Paragraph VII of the petition that on November 13, 1901, the defendant Northern Securities Company was organized under the general laws of the State of New Jersey, with its principal office in Hoboken, in said State, and with an authorized capital stock of $400,000,000,. and that a copy of the articles of incorporation of said company correctly stating its powers is attached to the petition.

These defendants deny each and every other allegation of Paragraph VII of the petition.

VIII. These defendants admit the allegations of Paragraph VIII of the petition that on or about November 14, 1901, the defendant Northern Securities Company was organized by the election of directors and officers; that the defendant James J. Hill was chosen a director and president thereof; that thereupon the said James J. Hill and other stockholders of the Great Northern Company, each individually and separately

from the others, sold to the Securities Company a large amount of the capital stock of the Great Northern Company for the price of $180 par value of the capital stock of the Securities Company for each share of the capital stock of the Great Northern Company; that these defendants and other stockholders of the Northern Pacific Company, each individually and separately from the others, sold to the Securities Company a large amount of the capital stock of the Northern Pacific Company; that the Securities Company also offered, for a limited period, like terms of purchase to the other shareholders of the Great Northern Company; that the Securities Company now holds and owns a large majority of the capital stock of the Northern Pacific Railway Company, and a large amount, though less than a controlling interest, of the stock of the Great Northern Company, and has negotiated for the purchase of additional shares of that company, and that the Securities Company has received such dividends as have been paid on any shares held by it.

These defendants deny each and every other allegation of Paragraph VIII of the petition.

IX. These defendants deny each and every allegation of Paragraph IX of the petition.

X. These defendants deny any knowledge or information sufficient to form a belief of each and every allegation of Paragraph X of the petition.

XI. These defendants deny each and every allegation of Paragraph XI of the petition.

XII. These defendants deny each and every allegation of Paragraph XII of the petition. They are informed and believe that said paragraph consists merely of expressions of opinion, and is, therefore, without weight in support of any cause of action.

XIII. These defendants deny each and every allegation of Paragraph XIII of the petition.

XIV. In July, 1896, the capital stock of the Northern Pacific Railway Company was fixed at $155,000,000, of which

$75,000,000 were preferred and $80,000,000 common stock. The preferred stock of the company was issued in exchange for various obligations of the former Northern Pacific Railroad Company because the holders thereof would not accept new common stock therefor. At the same time it was contemplated that the time would arrive when said preferred stock should properly be retired, and it was, accordingly, then provided that the preferred stock might be retired in whole or in part at par on any first day of January, up to and including January 1, 1917. Both classes of stock were made subject to a voting trust in this defendant Morgan and others, continuing until November 1, 1901, but terminable by the trustees in their discretion at an earlier date.

The Northern Pacific Company shared in the recent prosperity of the country, and its common stock appreciated in value until it was deemed practicable to carry out the original intention of retiring the preferred stock and also to terminate the voting trust. Accordingly said trust was terminated by the trustees upon January 1, 1901, and the preferred stock was retired. Although the latter action was in contemplation and was practically decided upon some time before the termination of the voting trust, it was not made the subject of formal action by the board of directors until November 13, 1901, and was completed upon January 1, 1902.

XV. As hereinbefore stated, early in 1901, the Northern Pacific Company, and the Great Northern Company, each purchased about 49 per cent of the capital stock of the Chicago, Burlington and Quincy Railroad Company. This purchase was made by the Northern Pacific Company primarily in order to secure a terminus at Chicago and permanent connection with the eastern and southeastern markets, which are especially valuable for the agricultural and mineral products of the northwest, but also because the Burlington system serves a large and growing territory, and the purchase was deemed desirable and profitable in itself.

These purchases were not made, as the petition alleges, "in

contemplation of the ultimate placing of the Great Northern and Northern Pacific system under a common source of control." They had no connection whatever with the future formation of the Northern Securities Company, or any other company whatsoever, and had no connection with the fact alleged in the petition that the Union Pacific Railway system is to some extent a competing system with the Burlington system.

The said purchases were not made with intent to violate the statute or common law of any State or of the United States; were not in violation of any such law, and are not charged in the petition to have been in any respect unlawful.

XVI. During the reorganization of the Northern Pacific system the firm of J. P. Morgan & Co., of which these defendants are members, acted as reorganization managers, and ever since the reorganization of the Northern Pacific Company has been its fiscal agent. Said firm has accordingly at all times desired to further the best interests of the company and all its stockholders, and especially to aid in steadily devoloping the business of the company and the prosperity of the country which it serves. Said firm considered that these results were accomplished, so far as possible, by the policy of the company during the existence of the voting trust, as above stated. Not long after the termination of the voting trust, however, and very early in May, 1901, said firm became aware that unusually large purchases of both classes of stock were in progress in the stock market, apparently in a single interest. Said firm was apprehensive that these purchases were for the purpose of securing control of the direction of the Northern Pacific Company and thus managing it, not for what said firm conceived to be the best interest of the company, but for some ulterior purpose of which said firm was not informed.

Accordingly said firm, prior to May 7, 1901, purchased common stock of the Northern Pacific Company in considerable amounts, and their holdings upon that day amounted to about two hundred thousand shares. In making these purchases said

firm acted on its own account and in behalf of no other person whomsoever, and was actuated by no motive save those above stated.

The said purchases were not made with intent to violate the statute or common law of any State or of the United States, and were not in violation of any such law.

XVII. For some years the defendant Hill and others who were interested in the Great Northern Company, but not including these defendants, had in contemplation the formation of a corporation for the purpose of purchasing their separate interests in that company, with the general object that said interests should be held together and the policy and course of business of the Great Northern Company should be continuous in developing the company's system and the territory served by it, and not subject to radical change and possible inconsistency from time to time. In or about August, 1901, as this plan was approaching maturity, said parties for similar reasons determined that they would also sell to the new company, when formed, their interests in the Northern Pacific Company, which were considerable in amount, and that the capital of the new company should be made sufficiently large to enable it to purchase all shares of the Great Northern and Northern Pacific companies which the holders might desire to sell and any other shares which the new company might deem it advisable to acquire.

By this time it had become known that the purchases in the market of shares of the Northern Pacific Company, to which reference is made above, had been made in behalf of a corporation known as the Oregon Short Line Railroad Company, controlled by the Union Pacific Railroad Company; that there were held in that interest shares of the Northern Pacific Company to about the amount of $41,000,000 of preferred stock, which, however, was to be retired on January 1, 1902, and $37,000,000 of common stock, together making 780,000 shares and constituting an absolute majority of the total capital stock of the Northern Pacific Company. Thereupon and therefore,

with the view and for the purpose of protecting the Northern
Pacific Company and the holders of its common stock against
the possible control of the direction of said company in an ad-
verse interest, these defendants determined and also advised
their friends to sell their Northern Pacific stock to the new
company.

As set forth in the petition, the Northern Securities Com-
pany was duly organized pursuant to the laws of New Jersey
upon November 13, 1901. It was organized according to law,
and possesses all the powers set forth in its certificate of incor-
poration, and has full power to do every act which it has in fact
done, and the petition does not allege the contrary.

It having become known that the Oregon Short Line Com-
pany was not disinclined upon satisfactory terms to sell its
holdings of the major part of the Northern Pacific stock, the
firm of J. P. Morgan & Company, deeming such action for the
best interest of the Northern Pacific Company, purchased from
said Oregon Short Line Company all its holdings of the capital
stock of the Northern Pacific Company.

After its organization the Northern Securities Company duly
purchased all the shares of the Northern Pacific Company and
of the Great Northern Company hereinbefore mentioned, in-
cluding those purchased by the firm of J. P. Morgan & Com-
pany from the Oregon Short Line Company, for which it paid
partly in cash and partly in its own shares. It also was willing
to purchase the shares of any other shareholders of the Great
Northern Company, who desired to sell the same, for the price
of one hundred and eighty dollars for each share of the Great
Northern Company, payable in its own shares, and did actually
purchase and pay for considerable amounts of said stock at such
price.

None of these purchases by the Northern Securities Company
were made with intent to violate the statute or common law of
any State or of the United States, or were in violation of any
such law.

XVIII. The foregoing is a correct statement of all the mat-

ters mentioned in the petition, omitting its many irrelevant adjectives, adverbs, and conclusions, and of some other facts in addition thereto. The transactions prior to the formation of the Northern Securities Company had no connection whatever with the formation thereof, save as above stated. That company was organized, not for the purpose of acquiring a majority of the stock of either the Great Northern or the Northern Pacific Company, but as above set forth. It was not organized for the purpose of affecting railway rates or competition in the slightest degree, and has not had any such effect. In the transactions above stated these defendants and, so far as they are aware, the other parties who have been engaged therein have never sought or intended to violate the act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies" (26 Stat. 209, c. 647), or to enter into any contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States or with foreign nations, or to monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce among the several States or with foreign nations. The transactions have consisted merely in the organization of a lawful corporation of New Jersey and the sale to and purchase by it of property lawfully salable. All acts done in relation to the organization of the Securities Company and the purchase by it of shares of stock of the railway companies and the sale thereof by the owners have been expressly authorized by law. They have had no effect whatever, in law or in fact, in restraint or monopoly of trade or commerce among the several States or with foreign nations. The petition does not allege that at any place within the jurisdiction of this court or elsewhere any such restraint or monopoly has been effected.

If these lawful transactions, consisting merely of the purchase and sale of property, should hereafter have any effect in restraint or monopoly of trade or commerce among the several States or with foreign nations, such effect would not be their

direct effect, but would be merely indirect, remote, incidental, and collateral, and aside from any intention of the parties, and therefore would not bring said transactions within said act of Congress. Any other construction would render the statute unconstitutional as beyond the power of Congress, and as depriving these defendants and the sellers generally of the stock thus sold, of liberty and property without due process of law, because, thus construed, it would be an inhibition upon their right to sell their property. If complainant's contention be sustained, the right of the owner of property to sell the same will be dependent upon what the courts at any future time may hold to have been the intention of the purchaser in buying such property. Such a result would seriously impair the liberty of the owner and the value of his property, and is contrary to the constitutional guaranties thereof.

These transactions are, therefore, not within the act of Congress above mentioned; nor has Congress any constitutional power to annul or prohibit action thus expressly authorized by state statutes under which the same has been taken.

XIX. There is a defect of necessary parties defendant herein because in this suit it is sought to annul all sales of shares made by shareholders of the Great Northern Company and the Northern Pacific Company to the Northern Securities Company, and to cancel all certificates of stock of the latter company issued in purchase of the same. As already set forth, the parties making such sales are numerous, and many of them had no connection with the matter save to sell their shares in the railway companies to the Securities Company after its organization. It is obvious that in their absence no adjudication can be made annulling such sales to the Securities Company. A decree to such effect as prayed for by the petition necessarily would deprive such original sellers of their property without due process of law. All persons who sold shares in the railway companies to the Securities Company are, therefore, necessary parties, and the petition is bad by reason of their absence.

XX. And these defendants deny all and all manner of

unlawful combination and confederacy wherewith they are by the said petition charged, without this, that if there is any other matter, cause, or thing in the petition contained material or necessary for these defendants to make answer unto, and not herein or hereby well and sufficiently answered, confessed, traversed, and avoided or denied, the same is not true to the knowledge or belief of these defendants; all of which matters and things these defendants are ready and willing to aver, maintain, and prove as this honorable court shall direct, and humbly pray to be hence dismissed with their reasonable costs and charges in this behalf most wrongfully sustained.

The answer of the defendant Daniel S. Lamont was substantially the same as that of defendants Morgan and Bacon except that certain allegations as to the actions of J. P. Morgan & Co. in Paragraphs XVI and XVII were omitted.

On April 9, 1903, after the case had been tried before a Circuit Court consisting of Circuit Judges Caldwell, Sanborn, Thayer and Vandevanter (for opinion of Judge Thayer, see 120 Fed. Rep. 720), the following decree was entered:

"Ordered, adjudged and decreed as follows, to wit:

"That the defendants above named have heretofore entered into a combination or conspiracy in restraint of trade and commerce among the several States, such as an act of Congress, approved July 2, 1890, entitled 'An act to protect trade and commerce against unlawful restraints and monopolies' denounces as illegal.

"That all the stocks of the Northern Pacific Railway Company and all the stock of the Great Northern Railway Company, now claimed to be owned and held by the defendant, the Northern Securities Company, was acquired and is now held by it in virtue of such combination or conspiracy in restraint of trade and commerce among the several States.

"That the Northern Securities Company, its officers, agents, servants and employés be and they are hereby enjoined from

acquiring, or attempting to acquire further stock of either of the aforesaid railway companies.

"That the Northern Securities Company be enjoined from voting the aforesaid stock which it now holds or may acquire and from attempting to vote it, at any meeting of the stockholders of either of the aforesaid railway companies and from exercising or attempting to exercise any control, direction, supervision or influence whatsoever over the acts and doings of said railway companies or either of them by virtue of its holding such stock therein.

"That the Northern Pacific Railway Company and the Great Northern Railway Company, their officers, directors, servants and agents be and they are hereby respectively and collectively enjoined from permitting the stock aforesaid to be voted by the Northern Securities Company, or in its behalf, by its attorneys or agents at any corporate election for directors or officers of either of the aforesaid railway companies.

"And that they, together with their officers, directors, servants and agents, be likewise enjoined and respectively restrained from paying any dividends to the Northern Securities Company on account of stock in either of the aforesaid railway companies which it now claims to own and hold;

"And that the aforesaid railway companies, their officers, directors, servants and agents, be enjoined from permitting or suffering the Northern Securities Company or any of its officers or agents, as such officers or agents, to exercise any control whatsoever over the corporate acts of either of the aforesaid railway companies.

"But nothing herein contained shall be construed as prohibiting the Northern Securities Company from returning and transferring to the Northern Pacific Railway Company and the Great Northern Railway Company, respectively, any and all shares of stock in either of said railway companies which said, The Northern Securities'Company, may have heretofore received from such stockholders in exchange for its own stock; and nothing herein contained shall be construed as prohibiting

the Northern Securities Company from making such transfer and assignments of the stock aforesaid to such person or persons as may now be the holders and owners of its own stock originally issued in exchange or in payment for the stock claimed to have been acquired by it in the aforesaid railway companies.

"It is further ordered and adjudged that the United States recover from the defendants its costs herein expended, the same to be taxed by the clerk of this court, and have execution therefor."

*Mr. George B. Young* for appellants argued and presented in a brief the following summary of the facts:

1. For some years prior to 1901 the two railway companies had been engaged in an enterprise of building up a great interstate and Oriental commerce.

2. In April, 1901, they purchased nearly all the Burlington shares at a cost of over $200,000,000, paying for them with their joint bonds, and not with the bonds of the Burlington as stated in the decision of the lower court. They made the purchase not with any view of placing the two companies, their shares or their commerce, under a single control.

3. Immediately after this purchase, persons interested in the Union Pacific attempted to obtain the stock control of the Northern Pacific, their object being to prevent the carrying out of the enterprise of the defendant railway companies, and especially to prevent the use of the Burlington road in carrying out that enterprise.

4. This "raid" (as it is called) on the Northern Pacific stock failed, the failure being largely due to an error of the raiders in buying common instead of preferred stock. But there was imminent danger that another like attempt might be made and be successful.

5. Such a raid, if successful, would destroy the commerce the railway companies were building up, and in aid of which they had bought the Burlington shares.

6. For some years prior to 1901, Mr. Hill and ten other shareholders in the Great Northern Co., holding less than 30 per cent of its stock had contemplated the formation of a company to which they should make absolute transfers of their shares in consideration of the shares of such new company. Their purpose was that the shares should be voted alike in the future as they had been in the past, and that they should fare alike in any sale of them that might be made.

7. In June, 1901, after the defeat of the raid, it was first suggested that the proposed company should be enlarged so as to include the Northern Pacific common stock (about $21,000,000) held by the same persons, and later the plan was still further widened so as to include the Northern Pacific common stock (about $20,000,000) held by J. P. Morgan & Co. should they desire to make such disposition of the stock held by them.

8. It had all along been the purpose of Mr. Hill and his ten associates that every shareholder in the Great Northern Co. should be given an opportunity to join the company as originally planned,—this not because they needed or desired the accession of such other shareholders, but to avoid any complaint of unfair treatment on their part.

9. This purpose was carried into the enlarged project, and at the instance of Mr. Morgan, the same opportunity was to be given to holders of Northern Pacific stock. And like the company originally projected, the enlarged company was to be authorized and was expected to acquire shares in coal mines and in industrial enterprises of utility to the railways, but whose stock the railway companies could not hold, and also to be a financial as well as an investment company, with power in that capacity to aid the operations of the railway companies, or of any other companies whose shares or securities it might hold.

10. The amount of Great Northern stock held by Mr. Hill and his ten associates was from 33 to 35 millions out of a total capital of $125,000,000. In 1896, they had severally

acquired $29,000,000 of Northern Pacific common stock, which amount had, on May 1, 1901, been reduced by sales to $20,000,000.

11. In forming the Northern Securities Co. it was the intention of its promoters that it should acquire, if it could, a majority of Northern Pacific stock, thereby protecting such stock from future raids, and protecting the commerce of the railways from the ruin that would result from a successful raid.

They did not desire or expect that the Securities Co. should acquire a majority of Great Northern shares. Such acquisition was not deemed necessary for the protection of the stock of that company or of the commerce of the roads.

12. While the capitalization of the Securities Co. is nearly, it is not (as stated in the opinion) the *exact* amount required to pay for all the shares of the two railway companies at the prices ($180 for Great Northern and $115 for Northern Pacific) fixed for such exchanges.

13. Mr. Hill and his ten associates who promoted the Securities Co. did not agree or bind themselves even to transfer their own shares to the Securities Co. Each of them was left to decide for himself. Mr. Hill retained between two and three millions of his shares.

And neither they, nor any one concerned in promoting the Securities Co., nor J. P. Morgan & Co. ever agreed in any manner that upon the organization of the Securities Co. they would "use their influence to induce other stockholders in their respective companies to do likewise," as erroneously stated in the decision of the lower court.

14. The Securities Co. is not a railway company and has no power to build or operate railways. Its powers are limited to buying, selling and holding stocks, bonds and other securities, with power to aid in any manner any company whose stock or bonds it may hold, and to do all acts designed to aid any company whose shares or securities it may hold, and protect or enhance the value of its investment; also to hold any real or personal property required for the transaction of its business.

In short, it is at once an investment and a financial company.

15. Soon after its organization, and on November 18, 1901, the Securities Co. purchased the Northern Pacific shares that had been acquired by those concerned in the raid, known as the Harriman shares. Those had been purchased from them by J. P. Morgan & Co. The purchase comprised $37,023,000 of common stock and $41,085,000 of preferred stock, at a lump price of $91,407,500, payable (and paid) $8,915,629 in cash, and $82,491,871 in shares of the Securities Co. at par. About the same time it received from its promoters and J. P. Morgan & Co., the Northern Pacific common stock (about $42,000,000) held by them. It availed itself of its right as a common stockholder of the Northern Pacific to purchase at par for cash, the new common stock (issued to replace the $75,000,000 preferred stock retired) to the amount of 75-80 of the amount of common stock held by it. As a result of these purchases, the Securities Co., at the beginning of the year 1902, and before this suit was begun (in March, 1902) held about $152,000,000 of the total $155,000,000 stock of the Northern Pacific.

16. Soon after its organization, Mr. Hill and the other promoters of the Securities Co. transferred to it about 30 millions of Great Northern shares at $180 in exchange for Securities shares at par, and within three months from its organization, (and before the commencement of this suit,) the Securities Co. had acquired, on the same terms and from other holders, about 65 millions of Great Northern shares, making its total holdings 95 millions of the total capital of 125 millions.

17. It is not the fact, as stated in the decision that the Securities Co. was enabled to make the purchase of 65 millions of stock bought from non-promoters, or of any of it, by the advice, procurement or persuasion of the Great Northern shareholders who had been instrumental in organizing the Securities Co. There is not any evidence in support of this finding, and the evidence is conclusive against it.

The facts proved beyond question are that each purchase

was an independent transaction between the seller of stock, and the Securities Co., without solicitation, persuasion or other influence by the Securities Co., or any one else. .

18. At the time of the formation of the Securities Co., the Great Northern shareholders were 1,800 in number.  Of them about 1,200 transferred their shares to the Securities Co.

· When this suit was begun, in April, 1902, the shareholders of the Securities Co. were more than 1,300; in October, 1902, they were about 1,800.

19. The Securities Co. is the absolute owner of the shares acquired by it and of the dividends thereon.  The shares are not pooled or consolidated, nor are the earnings of the two roads pooled.  It is in no sense a "trust."

20. The promoters of the Securities Co.—Mr. Hill and his ten associates—do not, all of them together hold, nor have they ever held more than one-third of the $360,000,000 stock of the Securities Co. that has been issued and is outstanding, and these gentlemen and J. P. Morgan & Co. have never held more than $140,000,000.

21. By the charter of each railway company, its commerce is controlled and directed wholly by a board of directors, the members of which are chosen for prescribed terms and cannot be removed during their terms.  · And by the laws of Minnesota and Wisconsin no person who is a director in one company can be a director in the other.

22. The Securities Co. has not attempted to control or meddle with the commerce or the management of either railway, nor is there any evidence that it purposes doing either.  Ever since its formation such commerce has been conducted by the two boards of directors in complete independence of each other.

23. There has been no agreement to suppress and no suppression of competition between the two railway companies, which is as active as it was before the Securities Co. was formed.

·24. The entire interstate commerce of the two railways, the rates on which can be controlled by those companies without other competition or consent of connecting lines, falls short

of three per cent of their total interstate commerce; and any restraint that could be in any event imposed by the Securities Co. on their interstate commerce could only affect this three per cent.

All the interstate commerce of each railroad (including the competitive three per cent) has been largely increased since the organization of the Securities Co.; owing to the great advantages of the Burlington connection, and to the protection afforded to all the commerce of the roads by placing a majority of Northern Pacific shares beyond the reach of raids, in the ownership of the Securities Co. And during such period rates have been reduced to such an extent as to reduce net earnings by upwards of $1,000,000.

25. There has been no increase of capitalization of either railway company, nor any watering of that of the railway companies or of the Northern Securities Co. The capital of each railway remains unchanged. If the Securities Co. had issued its shares at par for cash, and used the money to buy the railway shares for cash in the market at their market value, its outstanding shares would be more than at present. It would have had to issue and sell at least 190 of its shares, to be able to buy for cash each 100 shares of Great Northern which it has obtained by exchange of only 180 of its own shares. And it would have had to pay more than $115 for Northern Pacific. The course pursued, instead of watering in any way the Securities Co.'s stock, has furnished that company with properties of a market and intrinsic value considerably in excess of the par value of the shares issued by it in payment for them.

Appellants contend as to the Anti-Trust Act and its meaning:

1. The act is wholly a criminal law, directed to the punishment and prevention of crime. The remedy by injunction, etc., given by the fourth section is not to protect property interests, but solely to prevent "violations of this Act" (i. e. crimes, for every violation of the act is a crime, and, without this section, would not be within the competence of a court of equity to restrain by injunction).

2. Being a criminal statute, the act is not to be enlarged by construction. The first section cannot be stretched so as to make criminal (and whatever the section declares unlawful, it makes criminal, and makes nothing criminal it has not declared unlawful) every agreement, combination or conspiracy that merely tends to restrain commerce among the States, or that confers on the parties to it or any one else the power to restrain trade.

3. The act makes unlawful and criminal every contract, combination or conspiracy in direct restraint of interstate trade or commerce.

The gist of the crime is the contract, combination or conspiracy, and the offense is complete on the making of such contract, or the formation of such combination or conspiracy, though nothing be done to carry it out, and though trade be not in fact restrained.

But to constitute a combination or conspiracy in restraint of interstate trade or commerce, the parties must combine or conspire to do acts, which, if performed, will of themselves restrain such trade or commerce, and will directly restrain it—that is, acts which operate directly on such commerce.

If the acts which the parties combine or conspire to do fall short of this, if they are not such as operate directly on the commerce, and by such operation directly restrain it, then the combination or conspiracy is not within the act.

4. The act makes criminal those contracts, combinations and conspiracies only which directly and immediately restrain interstate trade or commerce—that is by acting directly and immediately upon such trade or commerce. 171 U. S. 568, 592; 175 U. S. 234, 245.

5. As the crime consists in contracting, combining or conspiring to do acts which by their own operation will directly and immediately restrain interstate commerce, it necessarily follows that if the acts which the parties contract or combine to do are of that description, they violate the law, though they had no conscious purpose or "specific intent" to restrain interstate

commerce by the means of such acts or at all. 156 U. S. 341.

On the other hand, if the acts to be done are not such as by their own operation on interstate commerce directly restrain it, the contract, combination or conspiracy to do those acts is not a crime under the Anti-Trust Act. 175 U. S. 234.

6. The act makes criminal every contract, etc., in direct restraint of commerce, without respect of persons.

A contract or combination or conspiracy that would be criminal as in restraint of interstate commerce or trade if made between two or more railway companies, is equally a crime if made between two or more interstate carriers by wagon or stage-coach or ferry, or between two or more interstate traders wholesale or retail. 166 U. S. 312.

7. Any restraint of interstate commerce, or power to restrain it, directly consequent upon the acquisition of property and incident to its ownership, is not, nor is the agreement for such acquisition made criminal by, this act. 156 U. S. 16.

Hence, where competitors in interstate trade or commerce agree to and do form a partnership or a corporation, or where one of them buys out the other, or a third person or association of persons buys out both, whatever suppression of competition or power to suppress competition may follow is not, nor is the agreement to form such corporation, partnership or association for such purchase, made criminal by the act. 171 U. S. 505, 567.

8. So where a combination is formed to acquire, and which does acquire, nearly all of an article in common use throughout the country and shipped in large quantities among the States, such ownership, though it gives the power to control the interstate trade and commerce in such article, and to suppress such trade and commerce altogether, is not, nor is such combination, a restraint of commerce prohibited by the Anti-Trust Act, the power being an incident of ownership. 156 U. S. 1, 16.

9. By this act Congress regulates commerce by punishing

the making of certain contracts by fine and imprisonment. The regulation is and must be uniform throughout the United States, for an act made criminal when done in Minnesota cannot be innocent when done in Massachusetts. The matters embraced in the act, thus requiring a uniform regulation throughout the country, are matters within the *exclusive* jurisdiction of Congress, and no matters that are not within such exclusive jurisdiction are within the act. If it appears that the States have jurisdiction of any matter (e. g., the ownership of stock in or the consolidation of railway companies doing an interstate business) claimed to be within this act, the existence of jurisdiction in the States is conclusive that such matter is not within the act.

The appellants, therefore, maintain the following propositions:

1. The Government is not entitled to maintain this proceeding under sections 1 and 4 of the Anti-Trust Act, nor had the Circuit Court jurisdiction of it under those sections, for the conspiracy or combination charged in the petition and found by the Circuit Court, if it ever existed, had done all it was formed to do, and had come to an end, before the proceeding was instituted.

2. The only combination of which there is any evidence is a combination formed in aid of commerce, to liberate, protect and enlarge and not to restrain it, and which has liberated, protected, aided and enlarged it, and has not restrained and does not threaten to restrain it.

3. There is no evidence of the combination or conspiracy charged in the petition, or of the combination or conspiracy found by the Circuit Court.

4. The conspiracy or combination in question whether as alleged in the petition or as found by the Circuit Court, was not a combination or conspiracy in restraint of interstate commerce, for the only things which the parties thereto combined or conspired to do or procure to be done were (1) the organization of the Securities Co., and (2) the acquisition by the Se-

curities Co., with their help, of a large majority of the shares of each of the defendant railway companies in exchange for its own shares.

The things so to be done or procured to be done (whether taken separately or together) are such as do not and cannot in any wise restrain interstate commerce, and hence a combination or conspiracy to do them or procure them to be done is not in restraint of interstate commerce.

The Circuit Court erred in holding (1) that the Securities Co., having acquired such majority of shares, has power to suppress competition between the railway companies. In fact, the Securities Co. is without power to suppress competition. It is a mere shareholder and not a director. The office of director is created by the State and not by the shareholder. As to power of directors being distinct from those of shareholders, see *Hoyt* v. *Thompson*, 19 N. Y. 207, 216; *Burrill* v. *Nahant Bank*, 2 Metc. 163; *Pullman Car Co.* v. *Missouri Pac. Ry. Co.*, 115 U. S. 587. The charter of each railway company gives to the board of directors all the powers attributed to it in the foregoing decisions. Rev. Stat. Wisconsin, 1878, c. 87, § 1804; Gen. Stat. Minnesota, 1894, § 2717; (2) that it obtained and holds such power by means of and as a party to the combination or conspiracy and not as an incident of its ownership of the shares; (3) that the possession of such power to suppress competition is of itself, and irrespective of its exercise, a restraint of interstate commerce; and therefore (4) the combination or conspiracy in question was in restraint of such commerce.

5. The petition does not allege nor do the proofs disclose any facts showing a monopoly or a conspiracy or attempt to monopolize any interstate or foreign commerce. For definition of monopoly, see *Texas Pacific* v. *Interstate Com. Com.*, 162 U. S. 197, 210; *United States* v. *Freight Association*, 166 U. S. 290; *Pearsall* v. *Great Northern*, 161 U. S. 646, 676; *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 10; *In re Corning*, 51 Fed. Rep. 205, 211.

6. The case is not within the Anti-Trust Act, for in any view of the matters complained of, their effect upon commerce— whether much or little, for good or for ill—is indirect and remote. The Anti-Trust Act and the regulative power of Congress under the commerce clause of the Constitution, are alike strictly limited to matters which directly and immediately affect interstate or foreign commerce.

In determining what is a combination in direct restraint of commerce the distinction between direct and indirect regulations of commerce becomes important, see *Fargo* v. *Michigan*, 121 U. S. 230; *Phila. S. S. Co.* v. *Pennsylvania*, 122 U. S. 326, 328; *N. Y., L. Erie &c. R. Co.* v. *Pennsylvania*, 158 U. S. 431; *Maine* v. *Grand Trunk Railway Co.*, 142 U. S. 217; *Pickard* v. *Pullman Co.*, 117 U. S. 34; *Pullman Co.* v. *Pennsylvania*, 141 U. S. 18, 25. In the declarations of the limitations of the act and of the power of Congress, the court has merely repeated its settled doctrine. *Hooper* v. *California*, 155 U. S. 648, 655; *Williams* v. *Fears*, 179 U. S. 270, 278.

Where subjects for commercial regulation are of a nature to require or admit of one uniform system or plan of regulation, the power to regulate them is exclusively in Congress, and any attempted regulation by a State whether to enlarge or restrain, is simply *ultra vires*, for it is a usurpation of a power vested exclusively in Congress. *Wabash Railway Co.* v. *Illinois*, 118 U. S. 557, 574; *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 492; *Philadelphia S. S. Co.* v. *Pennsylvania*, 122 U. S. 326, 336; *Bowman* v. *Chicago, etc., R. R. Co.*, 125 U. S. 465, 480. Anything, therefore, not exclusively within the jurisdiction of Congress is not within the act.

7. The very general language of the Anti-Trust Act was not intended to include combinations to purchase railways or railway shares, competing or non-competing, nor consolidations actual or "virtual" of railways or railway companies. Congress, when passing the act did so with full knowledge of the situation. *Ches. & O. Tel. Co.* v. *Manning*, 186 U. S. 238, 245. It knew that the railway systems of the country

rested on such combinations authorized by state laws, some of them having existed many years.

These are matters of public history and within the knowledge of the court. *Ohio L. & T. Co.* v. *Debold*, 16 How. 416, 435; *R. R. Co.* v. *Maryland*, 21 Wall. 456, 469; *Brown* v. *Piper*, 91 U. S. 37, 42; *Phillips* v. *Detroit*, 111 U. S. 604, 606; *Lehigh Valley* v. *Pennsylvania*, 145 U. S. 192, 201; *Louisville & Nashville* v. *Kentucky*, 161 U. S. 677, 699; *Preston* v. *Browder*, 1 Wheat. 115, 121; *United States* v. *Union Pacific*, 91 U. S. 72, 79; *Platt* v. *Union Pacific*, 99 U. S. 48, 55.

If Congress had meant to declare such consolidations and stock purchases of competing companies to be illegal, the securities issued by them void and state legislation unconstitutional, it would have said so in plain, specific and apt language.

The construction put on the act by all branches of the government and by everybody down to the commencement of this proceeding, has been in full accord with our position that the act has nothing to do with combinations to own railways or railway shares. The following consolidations of competing railroad lines existed at the time of the passage of the act or have been effected since that time: Boston & Maine Railroad Company and competing lines; New York, New Haven & Hartford Railroad Co., and New England Railroad Co. and other roads; New York Central Railroad and the West Shore and Rome, Watertown and Ogdensburg and other railroad companies; Pennsylvania Railroad Company and Baltimore and Ohio and other companies; the Reading Company.

8. Even though the Government were entitled to any injunction, the decree goes far beyond what the Government was entitled to receive, or the Circuit Court authorized to grant.

*Mr. John G. Johnson*, for appellant, Northern Securities Company, argued:

The facts found by the court below cannot be deduced from the testimony and the substratum of the bill filed, of the ar-

guments below in its support, and of the decision of the lower court was the assertion of a conspiracy which never existed. It is conceded that the Securities Company did acquire a majority of stock of both railroad companies and such acquisition was because of its intent to acquire. The company is chargeable with all the legal consequences of an intentional acquisition of such shares. It is denied, however, that any individuals or corporations conspired to do anything except to form a corporation and acquire shares of the Northern Pacific Railway Company belonging to them, and about twenty-seven per cent of the stock of the Great Northern Railway Company. The subsequent acquisition of an additional fifty per cent of the Great Northern stock was for third persons over whom the defendants had no control but who simply accepted an invitation to sell their stock issued by the Securities Company after its formation. The authorized capital of that company was made sufficiently large to enable it to acquire all the stock of both roads but this was not in pursuance of any combination, conspiracy or contract but of the policy of the appellants to let every co-shareholder of the railroad companies have the benefit of every advantage obtained for themselves.

Everything of which the Government complains was done with the intention of working out with permanent results the problem of interstate and international commerce. In order to effect permanent arrangements and to promote a great public end through a greatly increased commerce, at low rates, the two railway companies purchased the shares of the Burlington road for over $200,000,000, paid by their joint and several bonds, thus being able to give assurances of permanency of low rates and do such other things as were necessary in building up and enlarging this great commerce. This resulted in demands by the Union Pacific for a part of the traffic and on their being refused the Oregon Short Line acting for the Union Pacific acquired a large amount, almost a controlling interest, in the stock of the Northern Pacific. The situation was critical and the organization of the Securities Com-

pany and all that followed was for the purpose of preventing a·raid on the stock similar to that which had so nearly succeeded and was done solely with the attempt to secure the maintenance of the benefit to commerce, which had resulted, and which, still more in the future, would result from the acquisition of the Burlington shares.

Such alliances as that of the Burlington with the Northern Pacific and Great Northern are valuable because they give an opportunity of securing a large number of markets in a great and rich territory under a fairly permanent transportation policy. They are of enormous value to the people along the lines of the railroads, to the country generally and to the world. To transact business, large investments must be made and the condition prerequisite thereto is reasonable assurance of continuance. When the Government seeks to condemn an arrangement which promotes the interest of the whole nation by pretending that it was intended to restrain trade, it must establish convincingly the existence of the illegal intent alleged.

The sole question of law to be determined is whether or not the acquisition by a corporation of a controlling interest in the shares of two competitive railway companies, violates the Sherman Act. It is not illegal for an existing corporation to acquire such controlling interest; it is not illegal for persons holding a sufficient number of shares to enter into an agreement that will form a company to acquire such control. An agreement to do what is legal cannot be an illegal conspiracy, combination or contract.

The Sherman Act is a penal one, defining a criminal offense, for which it provides a punishment. It is an indispensable prerequisite to a conviction for a criminal misdemeanor, especially if there be no criminal intent, and such does not exist in the present case, that the offense condemned shall be clearly defined, and it is well settled that penal laws are to be strictly construed. *United States* v. *Willberger,* 5 Wheat. 76; *United States* v. *Whittier,* 5 Dillon, 35, citing *United States* v. *Morris,* 14 Pet. 464; *United States* v. *Sheldon,* 2 Wheat. 119; *United*

NORTHERN SECURITIES CO. *v.* UNITED STATES. 271

193 U. S. Argument of Mr. Johnson for Northern Securities Co.

*States* v. *Clayton,* 2 Dillon, 219; Bishop on Statutory Crimes, sec. 41; *Andrews* v. *United States,* 2 Story, 213; *United States* v. *Hartwell,* 6 Wall. 385, 396; *Swearingen* v. *United States,* 161 U. S. 446, 451; *France* v. *United States,* 164 U. S. 676, 682; *Schooner Paulina's Cargo* v. *United States,* 7 Cr. 52, 61; *United States* v. *Reese,* 92 U. S. 214, 219; *United States* v. *Comerford,* 25 Fed. Rep. 902; *United States* v. *Chase,* 135 U. S. 255, 261; *United States* v. *Goldenberg,* 168 U. S. 95, 102; *Sarlls* v. *United States,* 152 U. S. 570, 575.

This court will not legislate but will merely discharge its duty of construction. If the legislation is incomplete a crime cannot be fastened upon one who has done innocently something not defined as criminal. An act not made criminal cannot be condemned because it may seem equally, or even more, evil than the one made criminal. That Congress had no clearly defined understanding of the nature of the misdemeanor at which it struck, is evidenced by the final debates in the House of Representatives.

The purchase by a person or corporation, of a majority of the shares of two competing railway companies, is not "a contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." The Sherman Act prohibits, not a contract *tending* to restrain trade, but one actually in restraint thereof. The meaning of "restraint of trade" was well understood when the Sherman Act was passed. *United States* v. *Freight Association,* 166 U. S. 290, 328. In the *Addyston Case,* 175 U. S. 211, the contract was actually in restraint of trade.

The holding by a person or corporation as owner of a majority of the shares of two competing railway companies, is not "a contract or combination or conspiracy in restraint of trade" within the meaning of the act.

A corporation, though incorporated for the purpose of holding, and actually holding, a majority of the shares of two competing railway companies is not such a combination or conspiracy. See the *Pearsall Case,* 161 U. S. 646; *United States*

272　　OCTOBER TERM, 1903.

Argument of Mr. Johnson for Northern Securities Co.　193 U. S.

v. *Joint Traffic Association*, 171 U. S. 505, 567. A person or corporation, by purchasing a majority of the shares of two competing railway companies does not monopolize, or attempt to monopolize, "any part of the trade or commerce among the several States." As to what a monopoly is, see *In re Green*, 52 Fed. Rep. 104; dissenting opinion of Story, J., in *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 606; 20 Am. & Eng. Ency. of Law, 846; 2 Rawle's Bouvier's Dictionary, 435, and cases cited; Blackstone, Bk. IV, 159; Century Dictionary.

The purchase by one person, of the property of his rival, with the intention thereby to destroy his competition, is not illegal, although by the purchase he will acquire the power to prevent the same. *Oregon Coal Co.* v. *Winsor*, 20 Wall. 64. A person or corporation, by holding, as owner, the majority of the shares of two competing railway companies, does not monopolize, or attempt to monopolize "any part of the trade or commerce among the several States."

The power of Congress to regulate commerce does not confer upon it a right to prescribe the persons who may engage therein, or to regulate, or to control, the ownership of shares of stock of corporations engaging therein. *United States* v. *Knight*, 156 U. S. 1; *Louisville & Nashville* v. *Kentucky*, 161 U. S. 677, 693.

The States create railroad corporations and may prescribe the manner of issuance of their shares, and the method of transfer of title thereto. In the use and operation of railroads engaged in interstate commerce, the corporations owning the same must submit to Federal jurisdiction but this does not involve any right on the part of the United States to control the transfer of shares by the shareholders, even though as a result of said transfers the controlling interest may be transferred. It is not within the power of the Federal government to destroy the title to property created by the State.

Congress has unrestricted power to prevent restraint or monopolization of interstate commerce, as the authorities de-

fine those words, but not as the United States now claims. Properly interpreted, the Sherman Act is constitutional but the United States is now endeavoring to have its provisions interpreted so as to be violative of States' rights. Such a construction should not be adopted, if there is one which harmonizes with the Constitution. *Grenada County* v. *Brogden,* 112 U. S. 261; *Hawaii* v. *Mankichi,* 190 U. S. 197.

The mere ownership of property cannot be an illegal restraint of trade. As to the power of the State over railroad corporations, see *Railroad Co.* v. *Maryland,* 21 Wall. 456; *Ashley* v. *Ryan,* 153 U. S. 436.

The relief decreed by the lower court was improper under any aspect of the case. *United States* v. *Knight,* 156 U. S. 1, 17.

*Mr. Charles W. Bunn* for appellant, Northern Pacific Railway Company, argued:

The Sherman Act only declares those contracts illegal which are in restraint of trade. The government cannot rest on proof of combination and conspiracy but must establish restraint of commerce and to do this must prove that the ownership by one person of the stocks of two competing roads is *per se* such restraint.

The statute must be interpreted so as to fall within the constitutional powers of Congress which do not extend to determine the ownership of stock in corporations or to the regulation of consolidations of railroad companies chartered by the States.

This power belongs to the States; Congress only has the power to regulate the use of such property in commerce between the States. See definition of commerce in *Gibbons* v. *Ogden,* 9 Wheat. 1, 189, 196, as repeated by this court in *Passenger Cases,* 7 How. 283, 394, 462; *Henderson* v. *Mayor,* 92 U. S. 259, 270; *Lottery Case,* 188 U. S. 321, 346. Congress has power only under § 8, Art. I, of the Constitution, and by Amendment X all power not thus granted is reserved to the States. Under the guise of regulating commerce Congress

274 OCTOBER TERM, 1903.

Argument of Mr. Bunn for Northern Pacific Railway. 193 U. S.

cannot prescribe general rules as to transfer of real or personal property or prohibit the purchase of stock and bonds because when bought they may be used in a business carried on with intent to monopolize or restrict interstate commerce. *In re Greene,* 52 Fed. Rep. 104, 113, citing *County of Mobile* v. *Kimball,* 102 U. S. 691, 702; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, 203; *United States* v. *E. C. Knight Co.,* 156 U. S. 1. The power of Congress extends only to those things that directly and immediately pertain to commerce; the powers of the States include many things which operate indirectly though importantly on commerce. *Gibbons* v. *Ogden,* 9 Wheat. 1, 203. For cases involving this demarkation between national and state powers, see *United States* v. *Joint Traffic Association,* 171 U. S. 505; *Addyston Pipe Co.* v. *United States,* 175 U. S. 211, 228; *Hopkins* v. *United States,* 171 U. S. 578, 592; *Anderson* v. *United States,* 171 U. S. 604, 615; *Sherlock* v. *Alling,* 93 U. S. 99; *Louisville & Nashville* v. *Kentucky,* 161 U. S. 677, 701. In the last case this court cites decisions in which state statutes prohibiting or permitting consolidation were enforced. This would have been erroneous if the things complained of fell within the power of Congress, for that power if it exists is exclusive of all state action, and must be so in order that it be uniform. As to matters in regard to which the States may act until Congress acts, see *Cooley* v. *Board of Port Wardens,* 12 How. 299; *The James Gray* v. *The John Fraser,* 21 How. 184; *Pound* v. *Turck,* 95 U. S. 459; *Robbins* v. *Shelby Taxing District,* 120 U. S. 489, 492; and cases cited *supra.* No rule of law is introduced by the Sherman Act; what was restraint of commerce is the same now; the only feature of the act is making the preliminary conspiracy a crime. The Constitution itself forbade restraint of interstate commerce. *In re Debs,* 158 U. S. 564. A combination that is restraint of trade now was restraint of trade before the act of leasing, buying and consolidation of competing railroads has gone on for fifty years both before and since the act of 1890.

NORTHERN SECURITIES CO. v: UNITED STATES. 275:

193 U.·S.  Argument of Mr. Bunn for Northern Pacific Railway.

If a thing restrains interstate commerce it is immaterial how innocent the intent may be, and if it does not restrain it, it is immaterial how evil the intent may be.  The question is does the agreement restrain trade or commerce.  *United States v. Freight Association*, 166 U. S. 290, 341; *Addyston Case, supra.* If an action be lawful its purpose is immaterial.  This is elementary.  *Phelps v. Nowlen,* 72 N. Y. 39, 45; *Kiff v. Youmans,* 86 N. Y. 324, 329; *Wood v. Amory,* 105 N. Y. 278, 281; *Lough v. Outerbridge,* 143 N. Y. 271, 282; *Adler v. Fenton,* 24 How. 407, 410; *United States v. Greenhut,* 51 Fed. Rep. 205, 211; *In re Greene,* 52 Fed. Rep. 104, 111; *Randall v. Hazleton,* 12 Allen, 412, 418; *Brackett v. Griswold,* 112 N. Y. 454; *United States v. Isham,* 17 Wall. 496; *Dickerman v. Northern Trust Co.,* 176 U. S. 181; *Fahrney v. Kelly,* 102 Fed. Rep. 403; *Mogul S. S. Co. v. McGregor,* App. Cas. (1892) 25, 41; *Allen v. Flood,* L. R. App. Cas. (1898) 1; *Bohn Mfg. Co. v. Hollis,* 54 Minnesota, 223, 234.  The opinion of the court below proceeds upon the proposition that a combination of two competitors is a restraint of trade because it lessens competition.  This is error.  The *Trans-Missouri, Joint Traffic* and *Addyston* cases prove only that a contract restraining rival companies from competing is a restraint of trade.  No such agreement exists in this case.  The law does not require competition.  The business of a rival may be purchased for the purpose of being rid of his competition.  *Gamble v. Queens County Water Co.,* 123 N. Y. 91, 104; *Diamond Match Co. v. Roeber,* 106 N. Y. 473; *Rafferty v. Buffalo City Gas Co.,* 37 N. Y. App. Div. 618, 621; *Trenton Potteries Co. v. Olyphant,* 56 N. J. Eq. 680; *Oakdale Co. v. Garst,* 18 R. I. 484.

The Securities Company is neither alleged nor proved to have done or omitted anything which can be construed as a violation of the Anti-Trust Act.  If it has the power to suppress or diminish competition it has not used it and if the act has been violated at all it must be due to the mere existence of the Securities Company, to its powers as applicable to railway com-

panies or to something illegal in its origin. The illegality can not be sustained under the decisions of this court.

*Mr. John W. Griggs* for appellant, Northern Securities Company, submitted a brief:

The acts of the defendants do not constitute a contract, combination, or conspiracy in restraint of interstate trade or commerce within the meaning and prohibition of the Sherman Act. The United States rests its case upon two allegations:

*First.* That the Northern Securities Company has been formed and has taken over a majority of the shares of the two railroad companies in the manner indicated by the pleadings and proofs.

*Second.* That the intended and the necessary effect of those acts is to destroy competition between the two railroad companies.

The answer of the defendants is:

*First.* That the formation of the Northern Securities Company and the acquirement by it of stock of the two railroad companies was a lawful transaction, governed solely by local state laws, and not in contravention of any provision of the Federal Constitution or statutes.

*Second.* That the acts of the defendants were all done in good faith, without any purpose to destroy competition or restrain trade.

To put it more concisely: The defendants contend that what they have done is lawful, has no direct effect in restraint of competition, and was not intended to restrain competition.

The creation of railway corporations; the form of their corporate organization; the character and qualities of their corporate stock; the routes which their roads shall take, whether they may connect with other roads running in the same general direction, whether they may or may not consolidate with parallel lines, or operate parallel lines through different portions of a State—all these matters are, and always have been, subjects of state jurisdiction. *Louisville & Nashville R. Co.* v.

*Kentucky,* 161 U. S. 677, 702; *Pearsall* v. *Great Northern,* 161 U. S. 646; *Lake Shore & Mich. Southern* v. *Ohio,* 173 U. S. 285; *Missouri, Kansas & Texas* v. *Haber,* 169 U. S. 613; *Cleveland &c. Railway* v. *Illinois,* 177 U. S. 514.

The lower court did not find as matter of fact that the defendants had in any way restrained trade or commerce; or that they had attempted so to do; or that they had contracted or combined so to do. What the court did find and decide was, that the defendants had done certain things whereby they had obtained the power to suppress competition between two interstate carriers who own and operate competing and parallel lines of railroad. This idea is repeated again and again throughout the opinion. It speaks of "a direct restraint of interstate commerce because it would have placed in the hands of a small coterie of men the power to suppress competition between two competing interstate carriers."

To say that one person, or several persons, cannot acquire or own a majority of the stock of two competing railroad corporations because they are thereby occupying a vantage ground from which they can, if they choose, effect an agreement or understanding between the two companies in restraint of competition, is to say that the power to commit a crime is equivalent to its actual commission.

The acts of the defendants being *prima facie* lawful, the burden of proof is upon the Government to show that they were, as the Attorney General charges, not *bona fide,* but a mere formal device intended to defeat the provisions of the Sherman Act. *Joint Traffic, Trans-Missouri, Addyston Pipe Cases; United States* v. *Hopkins,* 171 U. S. 578; *United States* v. *Workingmen's Amalgamated Council,* 54 Fed. Rep. 994; *State* v. *Shippers Compress & Warehouse Co.,* 67 S. W. Rep. (Texas) 1049; *S. C.,* affirmed, 69 S. W. Rep. 58.

Any restraint of trade or commerce which may result from the acts done by the defendants is indirect and incidental only, and not covered by the act. In every instance where this court has had occasion to pass upon the meaning of the act

it has carefully distinguished between acts which directly restrain commerce, and acts which only indirectly or incidentally have that effect. *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 12, 16; *Joint Traffic Case*, 171 U. S. 505, 566; *United States* v. *Ches. & Ohio Fuel Co.*, 105 Fed. Rep. 93; *S. C.*, affirmed, 115 Fed. Rep. 610.

If the Sherman Act can be so construed as to forbid the sale of stock in two competing railroad corporations to one purchaser, then that act is an attempted interference on the part of Congress with transactions which are wholly within the control of the States of the Union, and in that respect the act is unconstitutional.

As to the extent of state legislative power over the instrumentalities of interstate commerce, see *Louisville & Nashville Case*, 161 U. S. 677, 702; *C. & C. Bridge Co.* v. *Kentucky*, 154 U. S. 204. Regulation of commerce, to be constitutional, must be confined to commerce itself, and cannot reach out to those things which not being designed as agencies of such commerce, or not being actually enjoined therein, may yet have an indirect or ultimate relation thereto.

Such a construction of the Constitution would vest in Congress the regulation of all branches of productive business from their first beginnings. *License Tax Cases*, 5 Wall. 462.

The fact that an article was manufactured for export to another State does not make it an article of interstate commerce. *Coe* v. *Errol*, 116 U. S. 517; *Kidd* v. *Pearson*, 128 U. S. 1.

The creation of state corporations and the regulation of the sales of corporation shares belong to the class of business affairs over which the States have exclusive jurisdiction. *United States* v. *Boyer*, 82 Fed. Rep. 425; *Clark* v. *Central R. R. & Banking Co. of Georgia*, Jackson, J., June 30, 1893, U. S. Circuit Court, Savannah; *In re Greene*, 52 Fed. Rep. 104, 112; *Pearsall* v. *Great Northern*, 161 U. S. 646, 671; *Rogers* v. *Nashville &c. Ry. Co.*, 92 Fed. Rep. 312.

But assuming that Congress may, under the commerce clause of the Constitution and as a regulation of commerce, restrain

the States in the exercise of their prerogatives from permitting two or more corporations to which the States have given life from merging, yet such a purpose on the part of the Government ought to be clearly and distinctly expressed, and not be found in the judicial interpretation of doubtful language contained in a penal statute.

So that, if it be argued that Congress may forbid the sale of one railroad to another, it is enough to reply that it has never done so; that the Sherman Act does not expressly, or by any just interpretation, do so.

The Sherman Act is a penal statute; every act which may be prevented by injunctive order would, if committed and proven, subject the parties to criminal prosecution. The rule of strict construction must be therefore applied. *United States* v. *Whittier*, 5 Dillon, 35; *United States* v. *Sheldon*, 2 Wheat. 119; *United States* v. *Hartwell*, 6 Wall. 385; *United States* v. *Shackford*, 5 Mason, 445; *United States* v. *Clayton*, 2 Dillon, 219; *United States* v. *Garretson*, 42 Fed. Rep. 22; Dwarris' Stat. 641; *Hubbard* v. *Johnstone*, 3 Taunt. 177.

Acquiescence by the Government for more than eleven years in the actual merger and consolidation of many important parallel and competing lines of railroads and steamships engaged in interstate and international commerce, has given a practical construction to the act of July 2, 1890, to the effect that it was not intended to forbid, and does not forbid, the natural processes of unification which are brought about under modern methods of lease, consolidation, merger, community of interest, or ownership of stock. As held in 1803 in *Stuart* v. *Laird*, 1 Cranch, 299, where the right of a justice of the Supreme Court to sit as a Circuit Judge was challenged, upon the ground that, not having been appointed as such, and not having been distinctly commissioned as such, the act of Congress of 1789, under which the Circuit Court was originally instituted, was unconstitutional.

"Practice and acquiescence for a period of several years, commencing with the organization of the judicial system,

affords an irresistible answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course, the question is at rest, and ought not to be disturbed."

This is a just principle of jurisprudence, founded upon the very highest considerations of public equity.

It has frequently been invoked and enforced in order to prevent the disturbance and unsettlement of important affairs which have been transacted in reliance upon a general public and private belief that the law did not include them in its terms of condemnation.

But we venture the assertion that no case has ever arisen in which a disregard of that salutary rule of construction would result in such widespread and irremediable injury to vested interests as this. Not that any decree which this court could make against these defendants would particularly or radically affect their property interests, but because the decision once made that the Sherman Act applies to such transactions as the purchase, lease, merger or consolidation of parallel lines of transportation, would render every such transaction for the last thirteen years unlawful, and require the Attorney General, in the due discharge of his duty, to bring suit for dissolution and injunction. Unnumbered millions of dollars of capital stock and bonds issued upon railroad mergers and consolidations would be tainted with illegality, or affected in value by the withdrawal of the property against which they were issued. Purchases of stock in underlying roads long ago made and paid for would be unsettled, and financial chaos would result.

*Mr. M. D. Grover* for appellant, Great Northern Railway Company, submitted a brief:

The findings of fact upon which the decree rests are contrary to the evidence. This is made clear by separating the findings and considering the evidence bearing on each

separately. There was no desire or intent to evade the Anti-Trust Act, to restrain competition, to monopolize trade, to inflate securities, water stock, or create fictitious capital.

I. It is not denied that the Northern Securities Company is a corporation lawfully organized under the laws of the State of New Jersey, with charter power to purchase and sell securities of all kinds, and to purchase, hold, vote and sell all the shares of stock of any single corporation or of non-competing corporations. Its right to purchase, hold, vote and sell all the stock of the Great Northern Railway Company alone, or the Northern Pacific Railway Company alone, is not denied.

II. The organization of the company was the result of a plan to form an investment or holding company, which had its inception years before its articles were filed, among not exceeding ten large holders of Great Northern stock, who had taken an active interest in the policy of the company and its administration, but who never had held in the aggregate to exceed one-fourth of its outstanding stock. It was thought that if a company were formed to which they might sell their individual holdings, their shares would be likely to be held together, so long as a majority of the holding company should wish, and that this would tend to give stability to the policy of the company, be of aid to it in its financial operations, and maintain the value of its investments.

III. The Burlington purchase was made to enlarge trade, not to restrain it; to increase competition, not to suppress it. At the time of the purchase it was not contemplated by either purchasing company or its shareholders that any alliance between the purchasing company or its shareholders was needed to preserve to each company its fair share of the advantages secured by the purchase.

IV. At the time of the organization of the Securities Company the Great Northern shareholders referred to owned about $30,000,000 of Great Northern stock, and $35,000,000

of Northern Pacific common stock, having increased their
holdings of the latter by purchases from J. P. Morgan & Co.
They did not control a majority of the shares of either of the
defendant railway companies.  In view of the injury appre-
hended to both companies, and their shareholders, and the
better to protect their interests in the future, against raids of
adverse interests, the Great Northern shareholders referred to
deemed it advisable that the holding company which they had
considered should be organized, 'should have power to pur-
chase, not only their own Great Northern and Northern Pa-
cific shares, but also the shares of such other Great Northern
and Northern Pacific shareholders as might wish to sell their
stock to it, and also the shares of companies already formed,
and others that might be formed, for the purpose of aiding
the traffic operations of the Great Northern and Northern
Pacific companies.

V. At this time it was not expected by any of the persons
concerned, that any Northern Pacific shares, except the
$42,000,000 owned by them and by J. P. Morgan & Co. would
be acquired by the proposed holding company.  The or-
ganization of the company was not dependent on any agree-
ment that it should acquire, nor upon the question of, a
majority of the shares of either of the defendant railway com-
panies.  There was no agreement or understanding between
the Great Northern shareholders referred to, that they or
either of them would undertake to influence any one of the
other 1,800 Great Northern shareholders, or of the other 3,600
Northern Pacific shareholders, to sell their shares to the com-
pany.

VI. The Great Northern shareholders referred to, upon the
organization of the Northern Securities Company and the sale
of their shares to it, parted with such stock control as they
had in the Great Northern and Northern Pacific companies.
They do not own to exceed one-third of the outstanding capi-
tal stock of the Securities Company.  At the time of the
trial the stock of the Securities Company was held by 1,800

separate owners: The stock control of the Securities Company is, therefore, not in the eight or ten Great Northern shareholders referred to; but in the 1,790 other shareholders of the Securities Company, owning at least two-thirds of its outstanding shares.

VII. Nothing has been done except the purchase by the Securities Company of a majority of the stock of the Great Northern and Northern Pacific companies.

VIII. The Securities Company as owner of the stock so purchased may sell it or pledge it. It has made no agreement as to what it will do with it, or how it will vote it, or how it will dispose of the dividends received upon it. It is not a trustee of those from whom it received such shares, and owes them no duty or obligation respecting the shares, since they have no further interest in them.

IX. It is not claimed or pretended that the defendant railway companies have entered into any contract or combination in restraint of trade, or that either of them has done anything to restrain trade or in violation of law. It is not claimed that the Securities Company can restrain trade, except through the exercise of its right, as owner of the shares it purchased, to vote them at stockholders' meetings, in the election of a separate board of directors for each of the defendant railway companies; for the boards must be separate under the laws of the States of Minnesota and Wisconsin.

X. This suit was not brought to prevent or restrain the execution of a contract, or the forming of a combination, in restraint of trade, but to restrain the Securities Company from voting the stock it owns at stockholders' meetings, and from receiving dividends thereon, thereby preventing payment of dividends upon its own shares issued in payment for the shares it purchased, upon the ground that mere possession of the voting power of the shares, is an unlawful restraint and regulation of the interstate commerce of the defendant railway companies.

XI. The Government has no financial interest in this suit.

The only way in which the Securities Company could restrain the commerce of the two railway companies, is through the voting power of the shares it owns. If it had purchased the shares of only one of the companies, its right to vote such shares would not be questioned. Trade could not, within the contention of the Government, or the ruling of the court, be restrained by the Securities Company, should its voting powers be limited to the shares of one of the companies. The decree enjoins it from voting the shares of either company and from receiving dividends from either. The effect of the decree is to deprive it of the means to pay dividends upon its own stock whether issued in payment for the stock it purchased, or issued for cash. Thus the decree destroys the earning power of the stock of the Securities Company, a large majority of which is now held by over eighteen hundred *bona fide* holders in the usual course of business not parties to the suit.

The important questions are: 1. Does the commerce clause of the Constitution of the United States confer upon Congress jurisdiction to regulate the issue, sale and ownership of the capital stock of corporations organized under the laws of any one of the several States, or to inquire into the motives of incorporators, or of the buyers or sellers of their shares?

2. Has Congress, under the commerce clause of the Constitution of the United States, power to forbid or regulate the purchase or lease, by one railway company engaged in interstate commerce, of the railway of its competitor, or the purchase or lease by the owner of one ferryboat, stage coach or river steamboat, engaged in interstate trade, of the ferryboat, stage coach or river steamboat, of a competitor, on the ground that through such purchase or lease competition may be restrained, and commerce regulated?

3. Is the unity of ownership through purchase, partnership, consolidation or lease, of a majority of the shares of competing corporations, engaged in interstate trade, a contract or combination in the form of trust or otherwise, forbidden by the Anti-Trust Act, as in restraint of trade?

4. Is there anything in connection with the organization of the Northern Securities Company, or its purchasers of stock, that in any way distinguishes its right to vote and receive dividends upon such stock from the right of any single interest, individual or corporate, to vote and receive dividends upon shares of competing corporations engaged in interstate trade, purchased in the ordinary course of business, or acquired by gift or inheritance?

5. This suit was brought under section 4 of the Anti-Trust Act, which gives the court jurisdiction to prevent and restrain violations of the act. Every violation of the act is criminal. The court is, therefore, given jurisdiction to prevent and restrain the commission of a crime. Months before the suit was begun, the Securities Company had acquired a large majority of the shares of the defendant railway companies, from time to time, from hundreds of individual shareholders, who sold their holdings in good faith, and much of the stock so taken in payment therefor has since been sold and exchanged, and passed through many hands, in the usual course of business. Does the Anti-Trust Act give the court jurisdiction to annul the purchases made by the Northern Securities Company, and compel a return of the shares it purchased? Payment for the shares it bought was made in its own stock in part only. It paid cash to the amount of over $40,000,000. The owners of such shares are changing from day to day; they are not before the court. The decree does not restrain a contract or combination in restraint of trade. It destroys or impairs the value of millions of dollars worth of property, owned by many hundreds of people who acquired their title in good faith and who are not parties to this suit. *First.* The commerce clause of the Constitution of the United States does not take away from the several States the right to authorize the formation of corporations, define their business, fix the amount of their capital or purchasing power, and regulate the issue, sale and ownership of their capital stock.

As respects the purchase by one corporation of the shares

of another, the matter rests with the States which have created the corporations.   Should unification of ownership of property in corporations proceed to such an extent as to be thought against public policy, it may be prevented by the several States, through limiting the power of corporations, and restraining their right to engage in business.

It has been the practice, since the infancy of railroads in this country, for one railroad company to purchase or lease the railroad of a competing company, or to acquire a majority of the shares of a competing company, or of two companies competing with each other, or to effect the consolidation of competing companies.   This has been done without objection from any branch of the Federal Government, and has invariably proven beneficial to the railway companies concerned, to their shareholders, and to the public.   The extent to which this has been done appears in the record, and is shown by extracts from Poor's Manual and from the annual reports made by the Interstate Commerce Commission to Congress, from 1889 to 1900.   And see the brief of Judge Young where this subject is discussed at length with proper reference to the record.

*Second.* Unity of ownership of shares of competing corporations, engaged in interstate trade, does not restrain such trade, and is not forbidden by the Anti-Trust Act, nor is such unity of ownership a regulation of interstate commerce, and thus subject to exclusive Federal jurisdiction under the commerce clause of the Constitution.   *Joint Traffic, Trans-Missouri* and *Addyston Pipe Co.* cases.

There is a distinct difference between an agreement between the owners of competing concerns, to divide territory, to restrain output, or to maintain prices, and the unconditional sale of the property or business of one of them to the other, or of the property of business of both to another person.   In the former case, the agreement in terms restrains competition in trade operations, between separate owners or establishments, or instrumentalities engaged in such operations.   The agree-

ment relates to the manner in which competitors shall conduct their business. If one competing concern buys the plant or business of its competitor, competition is not thereby directly restrained. The restraint in such case, if any, is merely an incident to the ownership of property, and the fact that there may be such a restraint does not forbid the acquiring of such ownership. By unity of interest output is not necessarily limited, prices are not necessarily increased. On the contrary, the public may be benefited, prices may be less by reason of greatly increased volume of business and less cost per unit of production.

*Third.* The Anti-Trust Act is a penal statute and, as construed by the court below, it makes unity of ownership of a majority of the shares of competing corporations engaged in interstate trade, no matter how such ownership is acquired, criminal, because such ownership gives power to commit crime.

It is conceded that such ownership, so far as it may control the policy of the corporations, can be exercised for a lawful purpose, for building up trade, increasing competition and reducing prices.

It is not claimed or pretended that in the case under review trade has been restrained, yet the court below held that unity of ownership of a majority of the stock of the defendant railway companies was unlawful, and, therefore, criminal, because such ownership has necessarily caused the doing of something that has not been done; has necessarily restrained trade, though trade has not been restrained.

Stated in another way, the court below decided that ownership by the Securities Company of a majority of stock of the defendant railway companies regulates the commerce of the companies, and though such commerce has in fact been so regulated as to build up trade, increase competition and reduce prices, in law it has necessarily been so regulated as to restrain trade, suppress competition and increase prices because through unity of ownership motive to compete has been destroyed. *Tozer* v. *United States,* 4 I. C. C. Rep. 246; *R. R. Co.* v. *Dey,*

2 I. C. C. Rep. 325; *Schooner Paulina's Cargo* v. *United States,* 7 Cranch, 52, 61; *United States* v. *Reese,* 92 U. S. 214.

*Fourth.* Trade has not been restrained through the exercise of the voting power of these stocks. The ruling that trade has been restrained, is contrary to the facts, and charges the individuals engaged in this transaction with a crime, that has not been committed nor intended.

When this suit was begun, the shares of the Northern Securities Company were held by over eighteen hundred separate owners who had purchased them in good faith, in the usual course of business. The shareholders of the defendant railway companies, who were instrumental in organizing the Securities Company, have never owned to exceed one-third of its stock. The control of the Securities Company, so far as stock ownership can control it through the election of a board of directors, is not in the eight Great Northern shareholders who were concerned in the organization of the company, but in the seventeen hundred and ninety shareholders owners of more than two-thirds of its stock. The combination of which the court convicted the eight individual defendants, was not one by which they were to acquire control over the two railway companies, for themselves, but one through which such control would necessarily be conferred upon the seventeen hundred and ninety other stockholders of the Securities Company.

The ruling of the court that the possession of the voting power of a majority of the shares of the defendant railway companies by the Securities Company, necessarily restrains trade through suppressing competition, finds no support in facts. The boards of directors of both railway companies may be elected by the Securities Company. The executive officers of the two companies will be elected by these boards, and the ruling of the courts rests upon the proposition, that such boards and officers will be influenced, persuaded or coerced in such way, that they will lack their former incentive to compete for traffic, to obtain it from each other, and to underbid each other for the purpose of getting it; that they will enter

into contracts or in some way through concert of action, maintain higher rates than ought to be maintained; in other words, that they will charge unreasonable rates, will not provide adequate facilities, nor extend construction of lines.

The Northern Securities Company has no power or motive to restrain trade which any single owner of a majority of the shares of defendant railway companies would not have, and which the individual owners of the shares did not have, by lawful conference and concert of action, before they transferred their shares to it.

The defendant railway companies were hampered and placed at disadvantage with other transcontinental railways, as well as with ocean competitors by the want of sufficient direct connection with traffic centers offering the best markets for the products of the country along their lines, and with places of production and distribution from which their traffic must be supplied. Through the Burlington purchase they acquired permanent access to markets and sources of supply, instead of a temporary one resting upon joint rates subject to change at any time without regard to their interest. Having made the purchase and assumed the resulting joint and several obligations, it became a matter of the highest importance to each company that the burdens should be equally borne and the advantages equally shared. Through placing the ownership of a majority of the shares of both companies in the hands of a single owner, the benefits of the Burlington purchase became better assured than would be the case if the shares were held in many hands, and liable at any time to be sold to an interest adverse to the building up of the business of the defendant railway companies and the country which their lines traverse.

It has not been shown that the power of the defendant railway companies to restrain competition can affect more than three or four per cent of their interstate traffic, or that it has affected or can affect construction or extension of their lines, or the amount or quality of their equipment. Through their

ownership of Burlington shares, and by reason of the obligation assumed in paying for the shares, they have a common interest in building up the traffic of each in connection with the Burlington Company. This connection became necessary to their prosperity, to the welfare of their patrons, and to the successful meeting of a world-wide competition. What has been done was done, not to restrain competition, but to enlarge it.

The unity of ownership of their shares has not restrained the commerce of either, and the extent to which such unity can restrain it, is as nothing compared with the great increase in volume of interstate and international commerce which was intended, and which will result from the carrying out of the enterprise of the two companies in the purchase of the Burlington stock, and the preservation of the purchase, and its benefits, by placing the stock of the railroad companies where it is less likely to become scattered and to pass under control of adverse interests, than it would be if held by many owners.

*Mr. Francis Lynde Stetson* and *Mr. David Willcox* for appellants, Morgan, Bacon and Lamont, submitted a brief:

The transactions alleged are entirely lawful in their character. They consisted merely in the organization of a lawful corporation of New Jersey, and in the sale to, and purchase by, it of property lawfully salable. All the acts were expressly authorized by law. The legal effect of the transaction has been that the owner of stock in one of the railway companies has sold the same to the Securities Company, and has received therefor stock of the Securities Company, which company owns the stock not merely of one of the railway companies, but the stock of both. So that each individual who has transferred his property to the Securities Company has obtained therefor something entirely different—namely, an interest in a company holding stock of the other railway company as well. It is manifest that in the fullest possible sense this constituted a sale of the property. *Berger* v. *U. S. Steel*

*Corp.*, 53 Atl. Rep. (N. J.) 68. The title passed for valuable consideration to a purchaser authorized to hold the property. Aside from the corporate form of the transaction, the effect, too, was that each stockholder in one of the railway companies transferred an interest in his holdings to every other such stockholder.

These transactions being lawful are not affected by allegations as to the motive which actuated them. As the means employed were lawful, the only question must be whether the result accomplished was unlawful. *Pettibone* v. *United States,* 148 U. S. 197, 203; *United States* v. *Isham,* 17 Wall. 496; *Adler* v. *Fenton,* 24 How. 407, 410; *Kiff* v. *Youmans,* 86 N. Y. 324, 329; cited with approval in *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, 546; *Randall* v. *Hazleton,* 12 Allen, 412, 418; *Dickerman* v. *Northern Trust Co.,* 176 U. S. 181, 190; *Strait* v. *National Harrow Co.,* 51 Fed. Rep. 819; *Phelps* v. *Nowlen,* 72 N. Y. 39, 45; *Wood* v. *Amory,* 105 N. Y. 278, 281; *Lough* v. *Outerbridge,* 143 N. Y. 271, 282; *National Assn.* v. *Cumming,* 170 N. Y. 315, 326, 340; *Mogul Steamship Co.* v. *McGregor,* App. Cas. 1892, pp. 25, 41, 42; *Allen* v. *Flood,* L. R. App. Cas. 1898, p. 1; *Pender* v. *Lushington,* L. R. 6 Ch. Div. 70, 75.

An intent to violate the Anti-Trust Act, and therefore to commit a crime, could not in any case be inferred, but must be actually proved.

No indirect or remote effect of these lawful transactions upon competition between the railway companies could bring them within the Federal Anti-Trust Act.

The mere fact that a contract has the effect of restraining trade or suppressing competition in some degree does not render it injurious to the public welfare and thus bring it within the police power. *Oregon Co.* v. *Winsor,* 20 Wall. 64; *Gibbs* v. *Gas Co.,* 130 U. S. 396; *Hyer* v. *Richmond Co.,* 168 U. S. 471, 477, affirming, 80 Fed. Rep. 839; *Continental Ins. Co.* v. *Board,* 67 Fed. Rep. 310; *Diamond Match Co.* v. *Roeber,* 106 N. Y. 473; *Hodge* v. *Sloan,* 107 N. Y. 244; *Leslie* v. *Lorillard,* 110 N. Y. 519; *Tode* v. *Gross,* 127 N. Y. 480; *Matthews* v. *Associated Press,* 136

N. Y. 333; *Lough* v. *Outerbridge,* 143 N. Y. 271, 145 N. Y. 601; *Oakes* v. *Cattaraugus Co.,* 143 N. Y. 430; *Curran* v. *Galen,* 152 N. Y. 33, 36; *Watertown Co.* v. *Pool,* 51 Hun, 157, affirmed 127 N. Y. 485; *Central Shade Roller Co.* v. *Cushman,* 143 Massachusetts, 353.

In *United States* v. *E. C. Knight Co.,* 156 U. S. 1; *Hopkins* v. *United States,* 171 U. S. 578; *Anderson* v. *United States,* 171 U. S. 604, and *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 246, the Anti-Trust Act concerns only those agreements of which the direct and immediate effect is to restrain commerce. The transaction now under review was lawful, and, however considered, was not prohibited by the Anti-Trust Act, because such restraint upon interstate trade or commerce, if any, as it might impose, would be indirect, collateral and remote.

This act *is a criminal statute pure and simple* and its meaning and effect as now determined must also be its meaning and effect when made the basis of a criminal proceeding. Conversely, the act should not receive such construction only as it would receive upon the trial of those indicted for violating its provision. Criminal intent is essential to constitute a crime, and the testimony bearing thereon is always a question for the jury. *People* v. *Wiman,* 148 N. Y. 29, 33; *People* v. *Flack,* 125 N. Y. 324, 334.

Regardless of all other considerations presented on this argument, the judgment under review must be reversed unless it is to be established *as matter of law* that the mere possession of the power to control all the means of transportation of two competing interstate commerce carriers operates as the effectual exercise of such power and directly affects interstate commerce, notwithstanding the fact that such power has never been exercised by its possessors, and the further fact that it is perfectly practicable for them to exercise it in a perfectly proper way. Support for the proposition now under review was sought below in the *Pearsall case,* 161 U. S. 646, 674, the *Joint Traffic case,* the *Trans-Missouri case* and the *Addsyton*

*Pipe case.*  The proposition, however, can be deduced from these cases only by what to us seems violent distortion.  As to the case first cited, see *Minnesota* v. *Northern Securities Co.,* 123 Fed. Rep. 692, 705.

. In the other cases and also in cases decided by the Circuit Court and Court of Appeals, the combinations had been formed by corporations or individuals engaged in business independently of one another and they had agreed to regulate their prices or mode of carrying on their business by the rules of the combination.  *United States* v. *Jellico Coal Co.,* 46 Fed. Rep. 432; *United States.* v. *California Coal Dealers Association,* 85 Fed. Rep. 252; *Chesapeake Fuel Co.* v. *United States,* 115 Fed. Rep. 610; *Gibbs* v. *McNeeler,* 118 Fed. Rep. 120.

It has been held repeatedly that such restraints as result from the sale or the purchase of property are not within the provisions of anti-trust statutes. · Indeed, it is the settled law that the transfer of a business is not illegal because it restrains trade, even by an express covenant.  *Oregon Co.* v. *Winsor,* 20 Wall. 64; *Union Co.* v. *Connolly,* 99 Fed. Rep. 354, aff'd 184 U. S. 540; *Fisheries Co.* v. *Lennen,* 116 Fed. Rep. 217; *Harrison* v. *Glucose Co.,* 116 Fed. Rep. 304; *Hodge* v. *Sloan,* 107 N. Y. 244; *Leslie* v. *Lorillard,* 110 N. Y. 519; *Tode* v. *Gross,* 127 N. Y. 480; *Oakes* v. *Cattaraugus Co.,* 143 N. Y. 430; *Watertown Co.* v. *Pool,* 51 Hun, 157, approved 127 N. Y. 485; *Wood* v. *Whitehead Co.,* 165 N. Y. 545; *Walsh* v. *Dwight,* 40 App. Div. (N. Y.) 513; *Park & Sons Co.* v. *Druggists' Association,* 54 App. Div. (N. Y.) 223; *S: C.,* 175 N. Y. 1; *Diamond Match Co.* v. *Roeber,* 106 N. Y. 473.

So, too, it has been ruled precisely that the formation of associations or corporations is not illegal, because the result will be to restrain competition. · *Hopkins* v. *United States,* 171 U. S. 578; *Anderson* v. *United States,* 171 U. S. 604; *United States Vinegar Co.* v. *Foehrenbach,* 148 N. Y. 58; *Rafferty* v. *Buffalo City Gas Co.,* 37 App. Div. (N. Y.) 618; *Gamble* v. *Queens County Water Co.,* 123 N. Y. 91, 104; *In re Greene,* 52 Fed. Rep. 104; *United States* v. *Greenhut,* 51 Fed. Rep. 205; *In re Terrell,* 51 Fed.

Rep. 213; *Trenton Potteries Co.* v. *Olyphant*, 58 N. J. Eq. 507; *Mogul S. S. Co.* v. *McGregor*, App. Cas. (1892) 25; *Lough* v. *Outerbridge*, 143 N. Y. 283; *State* v. *Continental Tobacco Co.*, 75 S. W. Rep. (Mo.) 737.

It is very doubtful whether in any case the second section of the act applies to railroads. Prof. Langdell, 16 Harvard Law Review, 545, June, 1903; Mr. Thorndike, Pamphlet, 1903, *The Merger Case*, p. 32.

In the *Joint Traffic* cases the court did not specifically define "monopoly," but said that it had the meaning given to it in the body of the Anti-Trust Act, which was not involved in the *Pearsall* case, and the decision there cannot now be urged upon this court as a limitation upon its freedom of construction of the statute. See *Laredo* v. *International Bridge Co.*, 66 Fed. Rep. 246.

Obviously, a consolidation of two railroads authorized by the laws of every State which they enter would not be condemned as constituting a monopoly; nor would a purchase of all the stock of one road by a competing road similarly authorized be so condemned; nor would a combination to induce the legislatures of the several States to authorize such a consolidation or such a purchase. It cannot be that, in prohibiting monopolies, the Congress intended to forbid these familiar processes of railroad amalgamation, and if, when authorized by state law, the consummated act is not a monopoly, it would not be such merely because it has not been so authorized.

The construction claimed would make the statute unconstitutional because it would deprive the Securities Company of its property without due process of law. Corporations are entitled to the same constitutional protection of their property rights as natural persons. *Minneapolis Railway Co.* v. *Beckwith*, 129 U. S. 26; *Carrington Turnpike Co.* v. *Sandford*, 164 U. S. 578, 592; *Gulf Co.* v. *Ellis*, 165 U. S. 150, 154; *Lake Shore Co.* v. *Smith*, 173 U. S. 684, 690; *County of Santa Clara* v. *Southern Pacific R. R. Co.*, 18 Fed. Rep. 385, 404; *County*

*of San Mateo* v. *Southern Pacific R. R. Co.,* 13 Fed. Rep. 722, 745, 760.

This constitutional provision protects the right to acquire property—equally with the right—to hold the same after it has been acquired. *Holden* v. *Hardy,* 169 U. S. 366, 391; *State* v. *Goodwill,* 33 W. Va. 179; *State* v. *Julow,* 129 Missouri, 163, 173; *Knight Case,* 156 U. S. 1.

The *Pearsall Case,* 161 U. S. 646, distinctly recognizes that a natural person would be entirely at liberty to buy all the shares which his means permitted of the stock of the Northern Pacific Railway Company and the Great Northern Railway Company. The State creating a corporation might limit its power in this respect, but Congress had no such general authority to cut down the powers granted by the States to their corporations, merely because they are artificial instead of natural persons. Therefore, it is obvious that a corporation having authority by its charter to make such purchases cannot, merely because it is a corporation, be prevented from so doing without depriving it of that right without due process of law.

As construed and applied by the Circuit Court the Anti-Trust Act is unconstitutional, in that it discriminates between persons in the matter of property rights and privileges on grounds that are purely arbitrary and are without justification in reason.

The power to suppress competition between two competing interstate railroad companies being always existent and under the theory of the Circuit Court always attaching to a majority of the shares of both, whether owned by one person or by several, the Anti-Trust Act, if understood as intended to do away with such power, should be enforced so as to prevent any one person, as much as any two or more persons, from acquiring stock in both of such competing companies.

If as construed by the court below, the Anti-Trust Act arbitrarily and without reason discriminates between persons in the matter of their property, rights and privileges, the act

is beyond the power of Congress as clearly as it would be beyond the power of any state legislature.

"Liberty," as used in the Fifth Amendment to the Constitution means not merely bodily liberty—freedom from physical duress, but in effect comprehends substantially all those personal and civil rights of the citizen which it is meant to place beyond the power of the general government to destroy or impair. *Slaughter House Cases,* 16 Wall. 36, 122, 127; *Munn.* v. *Illinois,* 94 U. S. 113, 142; *People* v. *Walsh,* 117 N. Y. 60; *Butchers' Union Co.* v. *Crescent Co.,* 111 U. S. 746; *Allgeyer* v. *Louisiana,* 165 U. S. 578; *United States* v. *Joint Traffic Association,* 171 U. S. 505, 572; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 228; *Bertholf* v. *O'Reilly,* 74 N. Y. 509; *In re Jacobs,* 98 N. Y. 98; *People* v. *Gillson,* 109 N. Y. 389; *People* v. *King,* 110 N. Y. 418; *Godcharles* v. *Wigeman,* 113 Pa. St. 431. And see *Regina* v. *Druitt,* 10 Cox C. C. 592, 600.

It follows that, as used in the Fifth Constitutional Amendment, "liberty" includes equality of rights under the law and secures citizens similarly situated against discriminations between them which are arbitrary and without foundation in reason. *United States* v. *Cruikshank,* 92 U. S. 542, 554; *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369; *Gulf, Colorado & Santa Fé Ry. Co.* v. *Ellis,* 165 U. S. 150, 160.

Hence, the principles affirmed and acted upon by this court in applying the Fourteenth Amendment to state legislation, are equally applicable to legislation by Congress, and, as construed by the court below, the Anti-Trust Act is invalid as trespassing upon the "liberty" of citizens, by denying them equality of rights and discriminating between them in the matter of their property rights, arbitrarily and without reason. *Cotting* v. *Kansas City Stock Yards,* 183 U. S. 106; *Connolly* v. *Union Sewer Co.,* 184 U. S. 540; *Barbier* v. *Connolly,* 113 U. S. 27, 31.

As construed and applied by the Circuit Court, the statute is unconstitutional because without due process of law, it

would deprive these defendants and all others who sold to the Securities Company of their property. If there were any prohibitions on the companies it would not apply to their stockholders. A corporation and its stockholders are different entities. *Pullman Co.* v. *Missouri Pacific,* 115 U. S. 587; *Watson* v. *Bonfils,* 116 Fed. Rep. 157; *American Preserves Co.* v. *Norris,* 43 Fed. Rep. 711; *Electric Co.* v. *Jamaica Co.,* 61 Fed. Rep. 655, 678.

Any effort to limit the right to sell necessarily would deprive these defendants of their property without due process of law. *Cleveland Co.* v. *Backus,* 154 U. S. 439, 445; *People ex rel. Manhattan Co.* v. *Barker,* 146 N. Y. 304, 312; *People ex rel. Manhattan Institution* v. *Otis,* 90 N. Y. 48, 52; *Holden* v. *Hardy,* 169 U. S. 366, 391; *People* v. *Marx,* 99 N. Y. 377, 386; *People* v. *Gillson,* 109 N. Y. 389; *Forster* v. *Scott,* 136 N. Y. 577; *Ingersoll* v. *Nassau Co.,* 157 N. Y. 453, 463; *Purdy* v. *Erie R. R. Co.,* 162 N. Y. 42, 49; *City* v. *Collins Baking Co.,* 39 App. Div. (N. Y.) 432; *Rochester Turnpike Co.* v. *Joel,* 41 App. Div. (N. Y.) 43; *People* v. *Meyer,* 44 App. Div. (N. Y.) 1; *Ingraham* v. *National Salt Co.,* 72 App. Div. (N. Y.) 582; *Janesville* v. *Carpenter,* 77 Wisconsin, 288, 301.

If complainant's contention should be sustained, the right of an owner of property to sell the same would be dependent upon what the courts at any future time might hold to be the intention of the purchaser in buying the property. Such a result would seriously impair the liberty of the owner, and the value of his property.

Whatever view be taken of the character of the transaction the decree of the Circuit Court transcended the authority of the court under the statute, which was the sole ground and source of its jurisdiction.

*Mr. Attorney General Knox,* with whom *Mr. William A. Day,* Assistant to the Attorney General, was on the brief, for the United States, appellee:

The bill was filed by the United States to restrain a violation

of the Anti-Trust Act of July 2, 1890, 26 Stat. 209; the defendant, Northern Securities Company, is a corporation organized under the general laws of New Jersey; the two railway companies are common carriers engaged in freight and passenger traffic among the several States and with foreign nations; the Great Northern was chartered by the State of Minnesota and the Northern Pacific Railway Company operates under a Federal franchise originally granted to the Northern Pacific Railroad Company, and in taking over that franchise it not only became invested with the rights and privileges incident thereto, but also became charged with the duties, obligations and conditions which Congress attached to the granting thereof. The Northern Pacific Railroad Company was the constant concern of Congress. See Act of July 2, 1864, Res. May 7, 1866, extending time for completion; Act of June 25, 1868, relative to filing reports; Joint Resolution, July 1, 1868, extending time for completion; Joint resolution of March 1, 1869, allowing issue of bonds; Joint Resolution, April 10, 1869, granting right of way; Resolution of May 31, 1870, authorizing issue of bonds; act of September 29, 1890, forfeiting certain granted lands; act of February 26, 1895, providing for classification of mineral lands; act of July 1, 1898, granting lands in lieu of those taken by settlers.

The individual defendants were, prior to November 13, 1901, large and influential holders of the stock, some of one railway company and some of both companies. The two railroads are practically parallel for their entire length; each system runs east and west through Minnesota, North Dakota, Montana, Idaho and Washington; each connects with steamers on Lake Superior running to Buffalo and other eastern points and at Seattle with lines of the steamships engaged in trade with the Orient. The lower court found that the roads "are, and in public estimation have ever been regarded as, parallel and competing." The testimony in this case establishes that fact which is also res judicata, Pearsall v. Great Northern Railway Co., 161 U. S. 646, and even if the roads only competed for

three per cent of their interstate business they would be competing lines.

It has been the ever present aim of those dominating the policy of the Great Northern and the Northern Pacific, during the past few years, to bring about a community of interest or some closer form of union to the end that the motive from which competition springs might be extinguished. On at least three prior occasions Mr. Hill and Mr. Morgan and their associates acted in concert in transactions affecting both roads: the attempted transfer of half the stock of the Northern Pacific to the Great Northern in exchange for a guarantee of the bonds of the Northern Pacific which was held to be violative of the laws of Minnesota, *Pearsall* v. *Great Northern Ry. Co.*, 161 U. S. 646; the joint purchase of the Burlington in 1901; in the events leading up to the panic of May, 1901. After the refusal to admit the Union Pacific to an interest in the Burlington purchase, those in control of the Union Pacific attempted to acquire control of the Northern Pacific and as soon as Mr. Hill and Mr. Morgan heard of this attempt they reached an understanding to oppose it in concert, and this resulted in the threat to retire the preferred stock of the Northern Pacific, and the subsequent conference at which the plan announced in the statement of June 1, in the Wall Street Summary, was arranged. The testimony of defendants shows that the incorporation of the Securities Company, and its acquisition of a large majority of the stock of both railway companies were the designed results of a plan or understanding between the defendants Hill and Morgan and their associates, which was carried out to the letter by the parties thereto. The facts, as the Government asserts them, are recapitulated in the opinion of the Circuit Court.

On the facts as proved the Government maintains that a combination has been accomplished by means of the Securities Company which is in violation of § 1 of the act of July 2, 1890; that the defendants have monopolized or attempted to monopolize a part of the interstate or foreign commerce of the United

States and that if either result has been accomplished, the relief granted by the Circuit Court was authorized by law. The contention as to whether the Anti-Trust Act is or is not a criminal statute is not material.   Nor was it in the *Joint Traffic Case*, 171 U. S. 505.   The primary aim of Congress in passing the act was not to create new offenses but to pronounce and declare a rule of public policy to cover a field wherein the Federal government has supreme and exclusive jurisdiction.   As the United States has no common law, contracts in restraint of trade would not be repugnant to any law or rule of policy of the United States in the absence of a statute, and the controlling purpose of the act was to declare that the public policy of the nation forbade contracts, combinations, conspiracies, and monopolies in restraint of interstate and international trade and commerce, and the jurisdiction conferred upon courts of equity to restrain violations of the act was intended as a means to uphold and enforce the principle of public policy therein asserted, not as a means to prevent the commission of crimes.   *United States* v. *Trans-Mo. Freight Assn.*, 166 U. S. 290, 342.

If the Anti-Trust Act is a criminal statute, it is also in the highest degree a remedial statute; as such it is invoked in the case at bar, and as such it ought to be construed liberally and given the widest effect consistent with the language employed. It ought not to be frittered away by the refinements of criticism.   Broom's Legal Maxims, 5th Am. ed., 3d London ed., 80; Potter's Dwarris on Stat. and Const. 231, 234; Pierce and Hopper, Str. 253.   It makes no difference in the application of these rules that the statutes have a penal as well as a remedial side.   Ch. Prac. 215.

A statute may be penal in one part and remedial in another part.   But in the same act a strict construction may be put on a penal clause and a liberal construction on a remedial clause.   Sedgwick on Construction of Statutory and Constitutional Law, (2d ed.) 309, 310; Dwarris on Statutes, 653, 655; *Hyde* v. *Cogan*, 2 Doug. 702.

The Anti-Trust Act was purposely framed in broad and general language in order to defeat subterfuges designed to evade it. It is framed in sweeping and comprehensive language which includes every combination, regardless of its form or structure, in restraint of trade or commerce among the several States or with foreign nations, and every person, natural or artificial, monopolizing, attempting to monopolize, or combining with any other person to monopolize any part of such trade or commerce.

The form or framework is immaterial. Congress, no doubt, anticipated that attempts would be made to defeat its will through the "contrivances of powerful and ingenious minds," and to meet these it used the broad and all-embracing language found in the act; and it is in this light that that language is to be construed. And the device of a holding corporation for the purpose of circumventing the law can be no more effectual than any other means. Noyes on Intercorporate Relations, § 393.

This court has decided that this act applies to common carriers by railroad, as well as all other persons, natural or artificial. *Trans-Missouri Case*, 166 U. S. 290. The words in restraint of trade as used in the act extend to any and all restraints whether reasonable or unreasonable, partial or total, and there are peculiar reasons why this applies to railroad corporations.

In exercising its powers over commerce Congress may to some extent limit the right of private contract, the right to buy and sell property, without violating the Fifth Amendment. It may declare that no contract, combination, or monopoly which restrains trade or commerce by shutting out the operation of the general law of competition shall be legal. *Trans-Missouri Case, supra; Joint Traffic Case, supra; Addyston Pipe Co. Case*, 175 U. S. 211.

When its natural effect is to stifle, smother, destroy, prevent, or shut out competition, the agreement or combination is in restraint of trade or commerce and illegal under section 1 of

the act if in interstate or international trade or commerce. *Trans-Missouri Case, supra.*

"To prevent or suppress competition" and "to restrain trade" are, in fact, often used by judges as convertible terms to express one and the same thought.

*Mogul S. S. Co.* v. *McGregor,* L. R. App. Cas. (1892), 25, was decided upon common law principles; there being no statute, such as the Federal Anti-Trust Act, making it unlawful and criminal to enter into agreements or combinations in restraint of trade.

Both the Court of Appeal and House of Lords held that the action could not be maintained because, even if it were in restraint of trade, an agreement in restraint of trade was not unlawful at common law in the sense that it furnished cause for a civil action by one damaged by it, but only in the sense that it was void and unenforceable if sued on.

The Government does not claim that ordinary corporations and partnerships formed in good faith in ordinary course of business come within the prohibitions of the act because incidentally they may to some extent restrict competition, but those where the corporation or partnership is formed for the purpose of combining competing businesses. The act embraces not only monopolies but attempts to monopolize. The term monopoly as used by modern legislators and judges signifies the combining or bringing together in the hands of one person or set of persons the control, or the *power* of control, over a particular business or employment, so that competition therein may be suppressed. *People* v. *Chicago Gas Trust Company,* 130 Illinois, 294; *People* v. *North River Sugar Refining Co.,* 54 Hun (N. Y.), 377; *United States* v. *E. C. Knight Co.,* 156 U. S. 1. And as to railroads, see *Pearsall* v. *Great Northern Railway,* 161 U. S. 646, 677; *Louisville & Nashville R. R. Co.* v. *Kentucky,* 161 U. S. 677.

A combination or monopoly exists within the meaning of the act even if the immediate effect of the acts complained of is not to suppress competition or to create a complete monopoly.

It is sufficient to show that they *tend* to bring about those results. Cases cited *supra*, and *Salt Co.* v. *Guthrie*, 35 Ohio St. 672.

It is not essential to show that the person or persons charged with monopolizing or combining have actually raised prices or suppressed competition, or restrained or monopolized trade or commerce in order to bring them within the condemnation of the act. It is enough that the necessary effect of the combination or monopoly is to give them the power to do those things. The decisive question is whether the power exists, not whether it has been exercised. In the *Trans-Missouri, Joint Traffic, Pearsall* and *Addyston Cases, supra,* this court held that it was immaterial that trade or commerce had not actually been restrained—that it made no difference, even, that rates and prices had been lowered, it being enough to bring the combination within the condemnation of the act that it had the *power* to restrain trade or commerce. The very existence of the *power,* under these rulings, constitutes a restraint.

It is not necessary in order to bring a combination or conspiracy within the operation of the act that the members *bind* themselves each with the other to do the acts alleged to be in restraint of trade. It is enough that they act together in pursuance of a common object, and while, of course, this presupposes agreement between them in a broad sense, an agreement or contract in the technical sense is not at all essential. *Reg.* v. *Murphy,* 8 C. & P. 397.

A combination or a monopoly, the necessary effect of which is to restrain trade or commerce, is a violation of the act, and the aim, motive, intention, or design with which the combination is entered into or the monopoly created is wholly immaterial and outside the question. It may have been to aid and further commerce rather than to restrain it; but if in point of law the effect or the tendency of the combination is to restrain trade or commerce the combination is unlawful, and the motive behind it, however beneficent, does not alter that fact in the

slightest degree. *Trans-Missouri Case,* 166 U. S. 290, 341; *C. & O. Fuel Co.* v. *United States,* 115 Fed. Rep. 623.

A combination or monopoly of competing lines of interstate railway—of competing instrumentalities of interstate commerce—is a combination or monopoly in restraint of interstate commerce within the prohibition of the act. The transportation of persons and things is commerce and if a combination or monopoly of such transportation is a combination or monopoly in restraint of commerce within the act, and hence illegal, it follows as a corollary that a combination or monopoly of the means or instrumentalities of transportation is likewise a combination or monopoly in restraint of commerce, because a monopoly of the means of transportation leads directly and inevitably to a monopoly of transportation itself.

Again, a monopoly of the *means* of transportation puts it in the *power* of the monopolist to stifle competition in the *business* of transportation, and a combination or monopoly which had the *power* to stifle competition in the *business* of transportation among the States is in restraint of interstate commerce and therefore illegal.

From still another standpoint, Congress may prohibit, and has prohibited, combinations and monopolies in the *business* of interstate and international transportation. But what does this power amount to if Congress may not also prohibit monopolies of the *means and instrumentalities* of such transportation—of the roads themselves? Virtually nothing; for he who has a monopoly of the means of transportation has a monopoly of transportation itself. See the *Trans-Missouri Case, Joint Traffic Case* and *Pearsall Case, supra.*

The Anti-Trust Act prohibiting combinations and monopolies in restraint of interstate and foreign commerce is an exercise of the power granted to Congress to regulate commerce, *Champion* v. *Ames,* 188 U. S. 321, and the term "commerce" as used in that grant embraces the instrumentalities by which commerce is or may be carried on. *Railroad Co.* v. *Fuller,*

17 Wall. 560, 568; *Welton* v. *Missouri*, 91 U. S. 275, 280; *Pensacola Tel. Co.* v. *West. Un. Tel. Co.*, 96 U. S. 1; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 203.

But put the proposition as it is put by appellants: Can Congress regulate the ownership of interstate railroads, under its power to regulate commerce among the States, and has it done so by this act of 1890? Most certainly, yes. Congress can regulate anything and everything in the sense that it can prohibit and prevent its use in a way that will defeat a law that Congress may constitutionally enact. For this purpose, the supreme power operates upon everything, upon every one.

No device of State or individual creation can be interposed as a shield between the Federal authority and those who attempt to subvert it. No rules of law which govern the relations which individuals have created *inter sese*, or which have been assumed between themselves and a State, are to be considered in an issue between them and the United States to defeat the ends of a constitutional law. The Federal power would not be supreme if the operation of its laws could be defeated, embarrassed, or impeded by any means whatsoever.

It is no violation of the reserved rights of the States, but, on the contrary, is clearly within the Federal power for Congress to enact that no persons, natural or artificial, shall form a combination of the instrumentalities of any part of interstate commerce the effect or tendency of which would be to restrain interstate trade or commerce, and that no person or persons, natural or artificial, shall acquire a monopoly of such instrumentalities. This is a natural and logical deduction from the supreme, plenary, and exclusive nature of the power of the Federal Government over foreign and interstate commerce, in the exercise of which Congress may descend to the most minute directions.

The "penetrating and all-embracing" nature of this power has often been stated, explained, and emphasized by this court. *Gibbons* v. *Ogden*, 9 Wheat. 1, 197, and see concurring opinion of Johnson, J., also. The principles announced in

this case have never been departed from, but have been reaffirmed time and again by this court, notably in *Brown* v. *Maryland,* 12 Wheat. 419; *Passenger Cases,* 7 How. 283; *In re Debs,* 158 U. S. 564; *Champion* v. *Ames,* 188 U. S. 321; *Stockton* v. *Baltimore & N. Y. R. Co.,* 32 Fed. Rep. 11, 16.

The fact that in recent years interstate commerce has come to be carried on by railroads and over artificial highways has in no manner narrowed the scope of the constitutional provision or abridged the power of Congress over such commerce. On the contrary, the same fullness of control exists in the one case as in the other, and the same power to remove obstructions from the one as from the other.

Of course, it makes no difference whether the obstruction be physical or economic—whether it be a sand bar, a mob, or a monopoly—whether it result from the sinking of a vessel or the stifling of competition—the power of Congress to remove it is the same in each case. *Gilman* v. *Philadelphia,* 3 Wall. 713, 724.

On these subjects the state legislatures have no jurisdiction. *Addyston Pipe Co. Case,* 175 U. S. 211, 232; *Boardman* v. *Lake Shore &c. Ry. Co.,* 84 N. Y. 157, 185.

Congress has the power to legislate upon the subject of consolidations of railroad corporations when the consolidations form interstate lines; in the absence of legislation by Congress, the power exists in the States to legislate upon the subject, but in the presence of legislation by Congress the power of the States over the subject is excluded. Noyes on Intercorporate Relations, § 19, citing *Louisville & Nashville* v. *Kentucky,* *supra.*

This exclusive jurisdiction of the Federal Government over commerce with foreign nations and among the States, and over the instrumentalities of such commerce, includes the power of police, or, that which is its equivalent, over those subjects in all its undefined breadth and fullness and which is just as full, complete, and far-reaching as is the police power of the state legislatures with reference to subjects within the

exclusive jusridiction of the States. In either case there are no limitations to its exercise, except the constitutional guaranties in favor of life, liberty, and property. Thayer's Cases on Const. Law, 742, note; Cooley's Const. Lim. 723; Noyes on Intercorp. Rel. § 409.

Anti-trust statutes are enacted in the exercise of the police, or an analogous, power. *State* v. *Firemen's Fund Ins. Co.*, 152 Missouri, 46; *State* v. *Schlitz Brewing Co.*, 104 Tennessee, 715; *Waters-Pierce Co.* v. *State*, 19 Tex. Civ. App. 1.

Congress having the police power, or its equivalent, over foreign and interstate commerce and the instrumentalities thereof, may in exercising it, strike down restraints upon such commerce, whether they result from combinations and monopolies of the agencies of transportation or otherwise, just as a State could prohibit similar restraints upon interstate commerce. To contend otherwise is to contend that the Federal power over interstate and foreign commerce is not supreme, but is in some respects subordinate to state authority; that the police powers or the reserved powers of the States are, for some purposes, paramount to the powers of Congress in fields wherein the Federal Government has been invested by the Constitution with complete and supreme authority. This, of course, is not so. *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 661.

The *Louisville & Nashville Case, supra,* does not hold that Congress has no power to prohibit the consolidation of competing interstate railroads. Congress has created "the instruments of such commerce," and it has passed regulations concerning them, and the power to do these things is now unquestioned. *California* v. *Pacific Railway Co.*, 127 U. S. 1. What the court meant in the *Louisville Case* was that in respect of matters of a local nature, which did not admit or require uniform regulation, the States may "regulate the instruments of such commerce" until Congress legislates on the same subjects, while in respect of matters of national importance, or which admit of uniform regulation, the power

of the States is wholly excluded. The distinction was stated in *Welton* v. *Missouri*, 91 U. S. 275.

Ownership of a majority of its stock constitutes the control of a corporation when the inquiry is whether a combination or monopoly has been formed to stifle competition between two or more rival and competing railroads. Noyes on Intercorp. Rel. § 294; *Farmers' L. & T. Co.* v. *N. Y. &c. R. R. Co.*, 150 N. Y. 410, 424; *People* v. *Chicago & Gas Trust Co.*, 130 Illinois, 268, 291; Greenhood on Public Policy, 5; *Richardson* v. *Crandall*, 48 N. Y. 343; *Salt Co.* v. *Guthrie*, 35 Ohio St. 666; *Milbank* v. *N. Y., L. E. & W.*, 64 How. (N. Y.) 29; *Pearsall* v. *Great Northern Railway*, 161 U. S. 646, 671; *Pullman Co.* v. *Mo. Pac. R. Co.*, 115 U. S. 587; *Pa. R. Co.* v. *Commonwealth*, 7 Atl. Rep. 368, 371.

The Great Northern and Northern Pacific Railway companies, competing interstate carriers, have been combined in violation of section 1 of the Anti-Trust Act, that is to say, a majority of the stock of each road has been transferred to a common trustee, the Securities Company, which is thus vested with the power to control and direct both roads for the common benefit of the stockholders of each.

The Anti-Trust Act condemns in express terms every "combination in the form of trust," and if those companies have been combined "in the form of trust," a violation of the very letter of the statute has been proved.

There is no great difficulty in getting at what Congress meant by a "trust." The meaning of the term was well understood in the economic and industrial world at the time of the passage of the Anti-Trust Act, and is now. The word was first used to describe an arrangement whereby the business of several competing corporations is centralized and combined by causing at least a majority of the stock of the constituent corporations to be transferred to a trustee, who, in return, issues to the stockholders "trust certificates." The trustee holds the legal title to the shares and has the right to vote them, and in this way exercises complete control over the

business of the combination. The trustee also receives the dividends on the shares, and out of these pays the former stockholders of the constituent corporations dividends on the "trust certificates." See Century Dictionary; Am. & Eng. Ency. Law, 2d ed., title Monopolies & Trusts; *State* v. *Standard Oil Co.,* 49 Ohio St. 137; Eddy on Combinations, § 582; Noyes on Intercorp. Rel. § 304; Dodd's Pamphlet on Combinations: Their Uses and Abuses. The facts show that the Northern Securities Company constitutes a trust—it has all the essential elements of one. It is a trustee, and as such holds the stock of two competing companies; it has the legal title, its stockholders have the equitable title, to the property. Morawetz, § 237, and cases cited. There is a trust agreement, the terms whereof are in the charter; it is sufficient to show an agreement if the stockholders acted in pursuance of *any* understanding plan or scheme, verbal or otherwise. *Harding* v. *Am. Glucose Co.,* 182 Illinois, 551. The certificates of stock of the company represent and fill the same office as trust certificates; the company has the power to vote the stock of both railways and thus elect the directors of both. As trustee, it collects the dividends on the stock of both companies and thereout pays dividends on its own stock exactly as a trustee of a trust collects and pays on the trust certificates.

It constitutes a trust in another light also. As the courts throughout the country held with practical unanimity that the class of "trusts" just described is illegal, a second class was invented of corporations that have acquired control of other corporations by purchasing their stock. This organization is of the same general character as the preceding, but the form is changed in order to escape the force of the decisions of the courts relating to corporate partnerships. Beach on Monopolies and Industrial Trusts, § 159. The Securities Company clearly comes within this second classification of "trusts." Noyes on Intercorp. Rel. §§ 310, 285, 393; *People* v. *Chicago Gas Trust Co.,* 130 Illinois, 268, 292, 302, citing *Chicago Gas*

*Light Co.* v. *People's Gas Light Co.*, 121 Illinois, 530; *Am. Glucose Case, supra.*

It is not essential, however, to show that the Great Northern and Northern Pacific Railway companies have been combined in the technical form of "trust," or "corporate combination," as some writers call it when the trustee is a holding corporation. Section 1 of the Anti-Trust Act covers any and every form of combination. A violation of that section will have been established, therefore, if it is shown that—

Mr. Hill, Mr. Morgan, and the other individual defendants, acting in concert or in pursuance of a previous understanding, have caused the title to a majority of the shares of the Great Northern and Northern Pacific companies to be vested in a single person—the Securities Company—thereby centering the *control* of the two roads in a single head and in that way effecting a *combination* of them, the effect or tendency of which is to suppress competition between them.

When analyzed the disguise by which the defendants sought to hide the fact of the combination, and their connection therewith, appears so thin and transparent that it is a cause of wonder that they should ever have adopted such a flimsy device.

It may succeed for a time in baffling persons who may have an interest in preventing its being done and has succeeded, but it was a mere crafty contrivance to evade the requisition of the law. *Attorney-General* v. *The Great Northern Railway Company*, 6 Jur. (N. S.) 1006; *S. C.*, 1 Drew. & Smale, 159.

The defendants seem to have thought that they could procure the organization of a corporation and have it do what they could not lawfully do themselves or through the agency of natural persons, as if that which would have been illegal if done through the agency of a natural person would lose the stamp of illegality if done through the agency of a corporate organization; but see *Attorney General* v. *Central R. Co.*, 50 N. J. Eq. 52; *Ford* v. *Chicago Milk Shippers' Assn.*, 155 Illi-

nois, 166, 178, 180, citing Morawetz, § 227; 1 Kyd on Corp. 13; *State ex rel.* v. *Standard Oil Co.,* 49 Ohio St. 137; *Distilling and Cattle Feeding Co.* v. *People,* 156 Illinois, 448, 490.

Defendants insist that it is immaterial that a combination can be discovered by going behind the fiction that the Securities Company is a private person with an existence separate and apart from its members, because, as they say, the law will not allow that fiction to be disregarded or contradicted—will not allow the acts of the corporate entity to be treated as the acts of the natural persons who compose it. The defendants thus seek to defeat the ends of the law by a fiction invented to promote them. This proposition cannot be sustained. *People* v. *North River Sugar Rfg. Co.,* 121 N. Y. 582, 615.

It can never be a question as to whether parties to a combination in restraint of trade are individuals or corporations; it is always a question as to the nature, effect, and operation of the combination.

Of course a State has certain powers over the instrumentalities of commerce which it creates, as it has over the individuals by whom commerce is conducted. But a State has no power over either instrumentalities or individuals that can be interposed between them and the obligations imposed by a Federal statute regulating interstate commerce.

Where the subject is national in its character the Federal power is exclusive of the state power. *Welton* v. *Missouri,* 91 U. S. 280.

Congress has power to regulate commerce among the States, and when in the exercise of that power it becomes necessary to legislate respecting the instrumentalities of commerce, it may do so, irrespective of the question as to how or by what authority those instrumentalities were created.

And if regulation of the control of these instrumentalities is essential to prevent the subversion of a policy of Congress it may regulate that control.

The power to regulate commerce among the several States. includes the power to prevent restraint upon such commerce.

To restrain commerce is to regulate it.

Therefore any law of any State which restrains interstate commerce is invalid; and any contract between individuals or corporations, or any combination in any form which restrains such commerce is invalid.

The supreme power extends to the whole subject. Under this plenary power Congress has supervised interstate commerce from the granting of franchises to engage therein, to the most minute directions as to its operation. For this purpose it possesses all powers which existed in the States before the adoption of the National Constitution, and which have always existed in the Parliament of England. *In re Debs,* 158 U. S. 586; *Gilman* v. *Philadelphia,* 3 Wall. 725.

If the arrangement accomplishes that which the law prohibits, through the means which the law prohibits, it is certainly within the prohibition of the law, and if this *were* a consolidation under state *authority instead* of being a combination which effects that which defies the law of every foot of land which these railroads occupy, there should be no hesitation in saying that it violated the Federal statute, if it accomplished a restraint upon interstate commerce. To hold otherwise would be to read into the law a proviso to the effect that the act should not apply when the combination took the form of a railroad consolidation under authority of state legislation.

Fictions of law, invented to promote justice, can never be invoked to accomplish its defeat. "*In fictione juris semper æquitas existit.*" *Mostyn* v. *Fabriges,* Cowper, 177; *Morris* v. *Pugh,* 3 Burr. 1243; Morawetz, §§ 1, 227; Taylor on Corporations, § 50; Clark and Marshall on Private Corporations, 17, 22; *State* v. *Standard Oil Co.,* 49 Ohio St. 137; *Ford* v. *Milk Shippers, supra,* and other cases cited *supra.*

The Northern Securities Company, in violation of section 2 of the Anti-Trust Act, has monopolized a part of interstate commerce by acquiring a large majority of the shares of the

capital stock of the Great Northern and Northern Pacific Railway companies—two parallel and competing lines engaged in interstate commerce; and the Northern Securities Company and the individual defendants, or two or more of them, have combined, each with the other, so to monopolize a part, of interstate commerce.

From the facts and the argument already made it appears that by acquiring a majority of the shares of the Great Northern and Northern Pacific the Securities Company has obtained the control of, and, therefore, the power to suppress competition between, two rival and competing lines of railway engaged in interstate commerce, and in that way has monopolized a part of interstate commerce. This conclusion is sustained by the judgment of this court in the case of *Pearsall* v. *Great Northern Railway, supra,* which is conclusive of the case at bar, since it establishes the principle that to vest, designedly, in one person or set of persons, a majority of stock of two competing lines of interstate railway is to monopolize a part of interstate railroad traffic.

Even if a natural person could lawfully have done what the Securities Company has done, that would be no argument to prove that the Securities Company, in so doing, has not violated the law against monopolies. *People* v. *North River Sugar Refining Company, supra,* p. 625.

It is not denied that the very spirited contention that the construction the Government puts upon the law in question interferes with the power of people to do what they will with their property.

That was the very object of the law, and it was certainly contemplated that the rights of purchase, sale, and contract would be controlled, so far as necessary, to prevent those rights from being exercised to defeat the law.

A combination cannot be imagined coming into existence without more or less redistribution of property between individuals through purchases, sales, or contracts. Combinations are never bestowed upon us ready made.

It must be remembered that the monopoly complained of is a monopoly of railway traffic resulting from centering in a single body controlling stock interests in two competing railways, and whatever may be the power of Congress or state legislatures over monopolies in general, they may unquestionably, in the exercise of their broad regulative powers over *quasi*-public corporations, prohibit any monopoly of railway transportation within their respective spheres of action.

As to the contention that the transaction is simply a sale of stock to an investor and to stamp it as illegal would be an unwarranted infringement upon the right of contract, and that the Securities Company never intended to take any active part in the controlling of the two companies, the argument is not sincere and it is demonstrated by the testimony of the individual defendants that the Securities Company was the designed instrument for directing and controlling the policies of the competing lines.

As to the circular of Mr. Hill to the stockholders, it is well settled that because a person has the right to purchase stock it does not follow that stockholders of two or more competing corporations can combine among themselves and with such person to sell him their stock and induce others to do the same, so as to center the controlling stock interests of the several corporations in a single head, in violation of statutes against combinations, consolidations, and monopolies. Noyes on Intercorp. Rel. § 36; *Penna. R. Co.* v. *Com.*, 7 Atl. Rep. 373.

This distinction between an actual *bona fide* sale, and one which is merely nominal and really a cloak under which to accomplish a combination sometimes leads to confusion of language or thought. See *Trenton Potteries Co.* v. *Olyphant*, 58 N. J. Eq. 507; Noyes on Intercorp. Rel. § 354.

As to the argument of the appellants that the "acquiescence by the Government for more than eleven years in the merger and consolidation of many important parallel and competing

lines of railroad and steamships engaged in interstate commerce and foreign commerce has given a practical construction to the Anti-Trust Act of July 2, 1890, to the effect that it was not intended to forbid and does not forbid the natural processes of unification which are brought about under modern methods of lease, consolidation, merger, community of interest, or ownership of stock," there is no force whatever to the contention which the court below evidently deemed too flimsy even to refer to.    But the answer to it is threefold—the case of a company formed for the purpose of holding stocks of two competing lines of interstate railways is a new one and arose for the first time in this case; the constitutionality of the act and its application to railroads was not settled until 1898 by the decision of *Trans-Missouri* and *Joint Traffic Cases, supra;* even if there had been acquiescence as to certain combinations it would not amount to an estoppel against the Government for prosecuting this action.    *Louisville & Nashville* v. *Kentucky,* 161 U. S. 677, 689.

The combination and monopoly charged by the United States operate directly on interstate commerce, and do not affect it only indirectly, incidentally, or remotely.    Noyes on Intercorp. Rel. § 392, and authorities there cited.

The question in this case is not whether the means by which the power of the combination is brought into play are direct or indirect, but whether the combination itself, whenever its power has been brought into play—it matters not how indirect may have been the means employed in bringing it into play— operates directly on interstate or international commerce. The failure of the defendants' counsel to bear this in mind has led them to make very elaborate arguments to show that the combination charged by the Government affects interstate commerce only indirectly and remotely.    In reply to the contention on this point, see opinion of the court below, after citing *United States* v. *E. C. Knight Company,* 156 U. S. 1; *Hopkins* v. *United States,* 171 U. S. 578; *Anderson* v. *United States,* 171 U. S. 604, on which counsel for defendants rely,

properly held that no combination could more immediately affect such commerce.

The relief granted by the Circuit Court was authorized by section 4 of the Anti-Trust Act.

The gist of the Government's charge being that a. combination of the two railway companies has been formed by centering the title to a majority of their respective shares in the Securities Company, which by obtaining such majority of both stocks has acquired a monopoly—all in violation of the Anti-Trust Act and as unlawful combination and monopoly exists solely by virtue of the Securities Company's ownership of such majorities the logical and most direct way to destroy the combination and monopoly and prevent the continued violation of the statute is to strip such ownership, which was acquired in pursuance of an illegal object, of its powers and incidents—to disarm it of its power to violate the law.   And this is what the Circuit Court did.   Clearly this decree violates no rights of property which the Securities Company or any of the other defendants is entitled to claim.

It is proper to grant this relief even though the purpose of the company had already been accomplished.   The combination. charged by the Government is a combination of the two railways, formed by concentrating in the Securities Company the power to control both roads.   This combination did not "come to an end," did not "accomplish its purpose," with the organization of the Securities Company, and therefore the violation of the Anti-Trust Act did not "come to an end" there, but continued on without interruption, and under the act the Circuit Courts can prevent, restrain, enjoin or otherwise prohibit violations thereof, and are left free to frame their remedial process to meet the exigencies of the case, and as courts of equity they enjoy the same wide latitude in formulating relief in cases of this class that they enjoy in any other class of cases within the jurisdiction of equity.   *Taylor* v. *Simon*, 4 Mylne & Craig, 141; *Chicago, R. I. & P. Ry. Co.* v. *Union Pacific Ry. Co.*, 47 Fed. Rep. 15, 26.

There is no defect of parties; all interests materially affected by the decree of the Circuit Court are represented by the parties before the court.

There were 1,300 persons who exchanged stock of the railway companies for stock of the Securities Company, and in a court of equity the interests of absent parties are represented when there are parties having similar interests before the court. *Smith* v. *Swornstedt,* 16 How. 288, 302.

Any question as to a defect of parties which might have existed has been removed from the case by the form of the decree entered by the Circuit Court, which simply adjudges that the parties defendant have entered into an unlawful combination and conspiracy in restraint of interstate commerce, and then proceeds to enjoin the defendants, the Securities Company, and the railway companies from doing the things which alone give life and force to the combination. The decree thus operates only on the parties to the bill and materially affects only their interests. The defendant corporations stand for the interests of their respective stockholders. *Sanger* v. *Upton,* 91 U. S. 59; *Hawkins* v. *Glenn,* 131 U. S. 329; *Minnesota* v. *Northern Securities Co.,* 184 U. S. 199.

MR. JUSTICE HARLAN announced the affirmance of the decree of the Circuit Court, and delivered the following opinion:

This suit was brought by the United States against the Northern Securities Company, a corporation of New Jersey; the Great Northern Railway Company, a corporation of Minnesota; the Northern Pacific Railway Company, a corporation of Wisconsin; James J. Hill, a citizen of Minnesota; and William P. Clough, D. Willis James, John S. Kennedy, J. Pierpont Morgan, Robert Bacon, George F. Baker and Daniel S. Lamont, citizens of New York.

Its general object was to enforce, as against the defendants, the provisions of the statute of July 2, 1890, commonly known as the Anti-Trust Act, and entitled "An act to protect trade

and commerce against unlawful restraints and monopolies."
26 Stat. 209. By the decree below the United States was
given substantially the relief asked by it in the bill.

As the act is not very long, and as the determination of the
particular questions arising in this case may require a consideration of the scope and meaning of most of its provisions, it
is here given in full:

" Sec. 1. Every contract, combination in the form of trust or
otherwise, or conspiracy, in restraint of trade or commerce
among the several States, or with foreign nations, is hereby
declared to be illegal. Every person who shall make any such
contract or engage in any such combination or conspiracy,
shall be deemed guilty of a misdemeanor, and, on conviction
thereof, shall be punished by fine not exceeding five thousand
dollars, or by imprisonment not exceeding one year, or by both
said punishments, in the discretion of the court.

" Sec. 2. Every person who shall monopolize, or attempt to
monopolize, or combine or conspire with any other person or
persons, to monopolize any part of the trade or commerce
among the several States, or with foreign nations, shall be
deemed guilty of a misdemeanor, and, on conviction thereof,
shall be punished by fine not exceeding five thousand dollars,
or by imprisonment not exceeding one year, or by both said
punishments, in the discretion of the court.

" Sec. 3. Every contract, combination in form of trust or
otherwise, or conspiracy, in restraint of trade or commerce in
any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any
such Territory and another, or between any such Territory or
Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is hereby
declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall
be deemed guilty of a misdemeanor, and, on conviction thereof,
shall be punished by fine not exceeding five thousand dollars,

or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

" SEC. 4. The several Circuit Courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and, pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises.

" SEC. 5. Whenever it shall appear to the court before which any proceeding under section four of this act may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in the district in which the court is held or not; and subpœnas to that end may be served in any district by the marshal thereof.

" SEC. 6. Any property owned under any contract or by any combination, or pursuant to any conspiracy (and being the subject thereof) mentioned in section one of this act, and being in the course of transportation from one State to another, or to a foreign country, shall be forfeited to the United States, and may be seized and condemned by like proceedings as those provided by law for the forfeiture, seizure, and condemnation of property imported into the United States contrary to law.

" SEC. 7. Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any Circuit Court of the United States in the dis-

trict in which the defendant resides or is found, without re-
spect to the amount in controversy, and shall recover threefold
the damages by him sustained, and the costs of suit, including
a reasonable attorney's fee.

"Sec. 8. That the word 'person,' or 'persons,' wherever used
in this act shall be deemed to include corporations and associa-
tions existing under or authorized by the laws of either the
United States, the laws of any of the Territories, the laws of
any State, or the laws of any foreign country."

Is the case as presented by the pleadings and the evidence
one of a combination or a conspiracy in restraint of trade or
commerce among the States, or with foreign states? Is it one
in which the defendants are properly chargeable with monop-
olizing or attempting to monopolize any part of such trade
or commerce? Let us see what are the facts disclosed by the
record.

The Great Northern Railway Company and the Northern
Pacific Railway Company owned, controlled and operated sep-
arate lines of railway—the former road extending from Su-
perior, and from Duluth and St. Paul, to Everett, Seattle, and
Portland, with a branch line to Helena; the latter, extending
from Ashland, and from Duluth and St. Paul, to Helena, Spo-
kane, Seattle, Tacoma and Portland. The two lines, main
and branches, about 9,000 miles in length, were and are paral-
lel and competing lines across the continent through the north-
ern tier of States between the Great Lakes and the Pacific,
and the two companies were engaged in active competition for
freight and passenger traffic, each road connecting at its re-
spective terminals with lines of railway, or with lake and river
steamers, or with seagoing vessels.

Prior to 1893, the Northern Pacific system was owned or
controlled and operated by the Northern Pacific Railroad
Company, a corporation organized under certain acts and res-
olutions of Congress. That company becoming insolvent, its
road and property passed into the hands of receivers appointed
by courts of the United States. In advance of foreclosure and

sale a majority of its bondholders made an arrangement with the Great Northern Railway Company for a virtual consolidation of the two systems, and for giving the practical control of the Northern Pacific to the Great Northern. That was the arrangement declared in *Pearsall* v. *Great Northern Railway Company,* 161 U. S. 646, to be illegal under the statutes of Minnesota which forbade any railroad corporation or the purchasers or managers of any corporation, to consolidate the stock, property or franchises of such corporation, or to lease or purchase the works or franchises of, or in any way control, other railroad corporations owning or having under their control parallel or competing lines. Gen. Laws, Minn. 1874, c. 29; ch. 1881.

Early in 1901 the Great Northern and Northern Pacific Railway companies, having in view the ultimate placing of their two systems under a common control, united in the purchase of the capital stock of the Chicago, Burlington and Quincy Railway Company, giving in payment, upon an agreed basis of exchange, the joint bonds of the Great Northern and Northern Pacific Railway companies, payable in twenty years from date, with interest at 4 per cent per annum. In this manner the two purchasing companies became the owners of $107,000,000 of the $112,000,000 total capital stock of the Chicago, Burlington and Quincy Railway Company, whose lines aggregated about 8,000 miles, and extended from St. Paul to Chicago and from St. Paul and Chicago to Quincy, Burlington, Des Moines, St. Louis, Kansas City, St. Joseph, Omaha, Lincoln, Denver, Cheyenne and Billings, where it connected with the Northern Pacific railroad. By this purchase of stock the Great Northern and Northern Pacific acquired full control of the Chicago, Burlington and Quincy main line and branches.

Prior to November 13, 1901, defendant Hill and associate stockholders of the Great Northern Railway Company, and defendant Morgan and associate stockholders of the Northern Pacific Railway Company, entered into a combination to form,

under the laws of New Jersey, a *holding* corporation, to be called the Northern Securities Company, with a capital stock of $400,000,000, and to which company, in exchange for its own capital stock upon a certain basis and at a certain rate, was to be turned over the capital stock, or a controlling interest in the capital stock, of each of the constituent railway companies, with power in the holding corporation to vote such stock and in all respects to act as the owner thereof, and to do whatever it might deem necessary in aid of such railway companies or to enhance the value of their stocks. In this manner the interests of individual stockholders in the property and franchises of the two independent and competing railway companies were to be converted into an interest in the property and franchises of the holding corporation. Thus, as stated in Article VI of the bill, "by making the stockholders of each system jointly interested in both systems, and by practically pooling the earnings of both for the benefit of the former stockholders of each, and by vesting the selection of the directors and officers of each system in a common body, to wit, the holding corporation, with not only the power but the duty to pursue a policy which would promote the interests, not of one system at the expense of the other, but of both at the expense of the public, all inducement for competition between the two systems was to be removed, a virtual consolidation effected, and a monopoly of the interstate and foreign commerce formerly carried on by the two systems as independent competitors established."

In pursuance of this combination and to effect its objects, the defendant, the Northern Securities Company, was organized November 13, 1901, under the laws of New Jersey.

Its certificate of incorporation stated that the objects for which the company was formed were: "1. To acquire by purchase, subscription or otherwise, and to hold as investment, any bonds or other securities or evidences of indebtedness, or any shares of capital stock created or issued by any other corporation or corporations, association or associations, of the

State of New Jersey, or of any other State, Territory or country. 2. To purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of any bonds or other securities or evidences of indebtedness created or issued by any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, Territory or country, and while owner thereof to exercise all the rights, powers and privileges of ownership. 3. To purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of shares of the capital stock of any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, Territory or country, and while owner of such stock to exercise all the rights, powers and privileges of ownership, including the right to vote thereon. 4. To aid in any manner any corporation or association of which any bonds or other securities or evidences of indebtedness or stock are held by the corporation, and to do any acts or things designed to protect, preserve, improve, or enhance the value of any such bonds or other securities or evidences of indebtedness or stock. 5. To acquire, own and hold such real and personal property as may be necessary or convenient for the transaction of its business."

It was declared in the certificate that the business or purpose of the corporation was from time to time to do any one or more of such acts and things, and that the corporation should have power to conduct its business in other States and in foreign countries, and to have one or more offices, and hold, purchase, mortgage and convey real and personal property, out of New Jersey.

The total authorized capital stock of the corporation was fixed at $400,000,000, divided into 4,000,000 shares of the par value of $100 each. The amount of the capital stock with which the corporation should commence business was fixed at $30,000. The duration of the corporation was to be perpetual.

This charter having been obtained, Hill and his associate stockholders of the Great Northern Railway Company, and

Morgan and associate stockholders of the Northern Pacific Railway Company, assigned to the Securities Company a controlling amount of the capital stock of the respective constituent companies upon an agreed basis of exchange of the capital stock of the Securities Company for each share of the capital stock of the other companies.

In further pursuance of the combination, the Securities Company acquired additional stock of the defendant railway companies, issuing in lieu thereof its own stock upon the above basis, and, at the time of the bringing of this suit, held, as owner and proprietor, substantially all the capital stock of the Northern Pacific Railway Company, and, it is alleged, a controlling interest in the stock of the Great Northern Railway Company, "and is voting the same and is collecting the dividends thereon, and in all respects is acting as the owner thereof, in the organization, management and operation of said railway companies and in the receipt and control of their earnings."

No consideration whatever, the bill alleges, has existed or will exist, for the transfer of the stock of the defendant railway companies to the Northern Securities Company, other than the issue of the stock of the latter company for the purpose, after the manner, and upon the basis stated.

The Securities Company, the bill also alleges, was not organized in good faith to purchase and pay for the stocks of the Great Northern and Northern Pacific Railway companies, but solely "to incorporate the pooling of the stocks of said companies," and carry into effect the above combination; that it is a mere depositary, custodian, holder or trustee of the stocks of the Great Northern and Northern Pacific Railway companies; that its shares of stock are but beneficial certificates against said railroad stocks to designate the interest of the holders in the pool; that it does not have and never had any capital to warrant such an operation; that its subscribed capital was but $30,000, and its authorized capital stock of $400,000,000 was just sufficient, when all issued, to represent

and cover the exchange value of substantially the entire stock of the Great Northern and Northern Pacific Railway companies, upon the basis and at the rate agreed upon, which was about $122,000,000 in excess of the combined capital stock of the two railway companies taken at par; and that, unless prevented, the Securities Company would acquire as owner and proprietor substantially all the capital stock of the Great Northern and Northern Pacific Railway companies, issuing in lieu thereof its own capital stock to the full extent of its authorized issue, of which, upon the agreed basis of exchange, the former stockholders of the Great Northern Railway Company have received or would receive and hold about fifty-five per cent, the balance going to the former stockholders of the Northern Pacific Railway Company.

The Government charges that if the combination was held not to be in violation of the act of Congress, then all efforts of the National Government to preserve to the people the benefits of free competition among carriers engaged in interstate commerce will be wholly unavailing, and all transcontinental lines, indeed the entire railway systems of the country, may be absorbed, merged and consolidated, thus placing the public at the absolute mercy of the holding corporation.

The several defendants denied all the allegations of the bill imputing to them a purpose to evade the provisions of the act of Congress, or to form a combination or conspiracy having for its object either to restrain or to monopolize commerce or trade among the States or with foreign nations. They denied that any combination or conspiracy was formed in violation of the act.

In our judgment, the evidence fully sustains the material allegations of the bill, and shows a violation of the act of Congress, in so far as it declares illegal every combination or conspiracy in restraint of commerce among the several States and with foreign nations, and forbids attempts to monopolize such commerce or any part of it.

Summarizing the principal facts, it is indisputable upon this

record that under the leadership of the defendants Hill and Morgan the stockholders of the Great Northern and Northern Pacific Railway corporations, having competing and substantially parallel lines from the Great Lakes and the Mississippi River to the Pacific Ocean at Puget Sound combined and conceived the scheme of organizing a corporation under the laws of New Jersey, which should *hold* the shares of the stock of the constituent companies, such shareholders, in lieu of their shares in those companies, to receive, upon an agreed basis of value, shares in the holding corporation; that pursuant to such combination the Northern Securities Company was organized as the holding corporation through which the scheme should be executed; and under that scheme such holding corporation has become the holder—more properly speaking, the custodian—of more than nine-tenths of the stock of the Northern Pacific, and more than three-fourths of the stock of the Great Northern, the stockholders of the companies who delivered their stock receiving upon the agreed basis shares of stock in the holding corporation. The stockholders of these two competing companies disappeared, as such, for the moment, but immediately reappeared as stockholders of the holding company which was thereafter to guard the interests of both sets of stockholders as a unit, and to manage, or cause to be managed, both lines of railroad as if held *in one ownership.* Necessarily by this combination or arrangement the holding company in the fullest sense dominates the situation in the interest of those who were stockholders of the constituent companies; as much so, for every practical purpose, as if it had been itself a railroad corporation which had built, owned, and operated both lines for the exclusive benefit of its stockholders. Necessarily, also, the constituent companies ceased, under such a combination, to be in active competition for trade and commerce along their respective lines, and have become, practically, one powerful consolidated corporation, by the name of a holding corporation the principal, if not the sole, object for the formation of which was to carry out the purpose of the original

combination under which competition between the constituent companies would cease. Those who were stockholders of the Great Northern and Northern Pacific and became stockholders in the holding company are now interested in preventing all competition between the two lines, and as owners of stock or of certificates of stock in the holding company, they will see to it that no competition is tolerated. They will take care that no persons are chosen directors of the holding company who will permit competition between the constituent companies. The result of the combination is that all the earnings of the constituent companies make a common fund in the hands of the Northern Securities Company to be distributed, not upon the basis of the earnings of the respective constituent companies, each acting exclusively in its own interest, but upon the basis of the certificates of stock issued by the holding company. No scheme or device could more certainly come within the words of the act—"combination in the form of a trust or otherwise . . . in restraint of commerce among the several States or with foreign nations,"— or could more effectively and certainly suppress free competition between the constituent companies. This combination is, within the meaning of the act, a "trust;" but if not, it is a *combination in restraint of interstate and international commerce;* and that is enough to bring it under the condemnation of the act. The mere existence of such a combination and the power acquired by the holding company as its trustee, constitute a menace to, and a restraint upon, that freedom of commerce which Congress intended to recognize and protect, and which the public is entitled to have protected. If such combination be not destroyed, all the advantages that would naturally come to the public under the operation of the general laws of competition, as between the Great Northern and Northern Pacific Railway companies, will be lost, and the entire commerce of the immense territory in the northern part of the United States between the Great Lakes and the Pacific at Puget Sound will be at the mercy of a single holding cor-

poration, organized in a State distant from the people of that territory.

The Circuit Court was undoubtedly right when it said—all the Judges of that court concurring—that the combination referred to "led inevitably to the following results: First, it placed the control of the two roads in the hands of a single person, to wit, the Securities Company, by virtue of its ownership of a large majority of the stock of both companies; second, it destroyed every motive for competition between two roads engaged in interstate traffic, which were natural competitors for business, by pooling the earnings of the two roads for the common benefit of the stockholders of both companies." 120 Fed. Rep. 721, 724.

Such being the case made by the record, what are the principles that must control the decision of the present case? Do former adjudications determine the controlling questions raised by the pleadings and proofs?

The contention of the Government is that, if regard be had to former adjudications, the present case must be determined in its favor. That view is contested and the defendants insist that a decision in their favor will not be inconsistent with anything heretofore decided and would be in harmony with the act of Congress.

Is the act to be construed as forbidding every combination or conspiracy in restraint of trade or commerce among the States or with foreign nations? Or, does it embrace only such restraints as are unreasonable in their nature? Is the motive with which a forbidden combination or conspiracy was formed at all material when it appears that the necessary tendency of the particular combination or conspiracy in question is to restrict or suppress free competition between competing railroads engaged in commerce among the States? Does the act of Congress prescribe, as a *rule* for *interstate* or *international* commerce, that the operation of the natural laws of competition between those engaged in *such* commerce shall not be restricted or interfered with by any contract, combination or

conspiracy? How far may Congress go in regulating the affairs or conduct of state corporations engaged as carriers in commerce among the States or of state corporations which, although not directly engaged themselves in *such* commerce, yet have control of the business of interstate carriers? If state corporations, or their stockholders, are found to be parties to a combination, in the form of a trust or otherwise, which restrains interstate or international commerce, may they not be compelled to respect any rule for such commerce that may be lawfully prescribed by Congress?

These questions were earnestly discussed at the bar by able counsel, and have received the full consideration which their importance demands.

The first case in this court arising under the Anti-Trust Act was *United States* v. *E. C. Knight Co.*, 156 U. S. 1. The next case was that of *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290. That was followed by *United States* v. *Joint Traffic Association*, 171 U. S. 505, *Hopkins* v. *United States*, 171 U. S. 578, *Anderson* v. *United States*, 171 U. S. 604, *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211, and *Montague & Co.* v. *Lowry*, 193 U. S. 38. To these may be added *Pearsall* v. *Great Northern Railway*, 161 U. S. 646, which, although not arising under the Anti-Trust Act, involved an agreement under which the Great Northern and Northern Pacific Railway companies should be consolidated and by which competition between those companies was to cease. In *United States* v. *E. C. Knight Co.*, it was held that the agreement or arrangement there involved had reference only to the *manufacture* or *production* of sugar by those engaged in the alleged combination, but if it had directly embraced interstate or international commerce, it would then have been covered by the Anti-Trust Act and would have been illegal; in *United States* v. *Trans-Missouri Freight Association*, that an agreement between certain railroad companies providing for establishing and maintaining, for their mutual protection, reasonable rates, rules and regulations in respect

· of freight. traffic, through and local, and by which free com-
petition among those companies was restricted, was, by rea-
son of such restriction, illegal under the Anti-Trust Act; in
*United States* v. *Joint Traffic Association,* that an arrange-
ment between certain railroad companies in reference to rail-
road traffic among the States, by which the railroads involved
were not subject to competition among themselves, was also
forbidden by the act; in *Hopkins* v. *United States* and *An-
derson* v. *United States,* that the act embraced only agreements
that had direct connection with interstate commerce, and that
such commerce comprehended intercourse for all the purposes
of trade, in any and all its forms, including the transporta-
tion, purchase, sale and exchange of commodities between citi-
zens of different States, and the power to regulate it embraced
all the instrumentalities by which such commerce is conducted;
in *Addyston Pipe & Steel Co.* v. *United States,* all the members
of the court concurring, that the act of Congress made illegal
an agreement between certain private companies or corpora-
tions engaged in different States in the manufacture, sale and
transportation of iron pipe, whereby competition among them
was avoided, was covered by the Anti-Trust Act; and in *Mon-
tague* v. *Lowry,* all the members of the court again concurring,
that a combination created by an agreement between certain
private manufacturers and dealers in tiles, grates and man-
tels, in different States, whereby they controlled or sought to
control the price of such articles in those States, was con-
demned by the act of Congress. In *Pearsall* v. *Great North-
ern Railway,* which, as already stated, involved the consolida-
tion of the Great Northern and Northern Pacific Railway
companies, the court said: "The consolidation of these two
great corporations will unavoidably result in giving to the de-
fendant [the Great Northern] a monopoly of all traffic in the
northern half of the State of Minnesota, as well as of all trans-
continental traffic north of the line of the Union Pacific, against
which public regulations will be but a feeble protection. The
acts of the Minnesota Legislature of 1874 and 1881 undoubtedly

reflected the general sentiment of the public, that their best security is in competition."

We will not incumber this opinion by extended extracts from the former opinions of this court. It is sufficient to say that from the decisions in the above cases certain propositions are plainly deducible and embrace the present case. Those propositions are:

That although the act of Congress known as the Anti-Trust Act has no reference to the mere manufacture or production of articles or commodities within the limits of the several States, it does embrace and declare to be illegal every contract, combination or conspiracy, in whatever form, of whatever nature, and whoever may be parties to it, which directly or necessarily operates *in restraint* of trade or commerce *among the several States or with foreign nations;*

That the act is not limited to restraints of interstate and international trade or commerce that are unreasonable in their nature, but embraces *all* direct *restraints* imposed by any combination, conspiracy or monopoly upon such trade or commerce;

That railroad carriers engaged in interstate or international trade or commerce are embraced by the act;

That combinations even among *private* manufacturers or dealers whereby *interstate or international commerce* is restrained are equally embraced by the act;

That Congress has the power to establish *rules* by which *interstate and international* commerce shall be governed, and, by the Anti-Trust Act, has prescribed the rule of free competition among those engaged in such commerce;

That *every* combination or conspiracy which would extinguish competition between otherwise competing railroads engaged in *interstate trade or commerce,* and which would *in that way* restrain *such* trade or commerce, is made illegal by the act;

That the natural effect of competition is to increase commerce, and an agreement whose direct effect is to prevent this play of competition restrains instead of promotes trade and commerce;

That to. vitiate a combination, such as the act of Congress condemns, it need not be shown that the combination, in fact, results or will result in a total suppression of trade or in a complete monopoly, but it is only essential to show that by its necessary operation it tends to restrain interstate or international trade or. commerce or tends to create a monopoly in such trade or commerce and to deprive the public of the advantages that flow from free competition;

.That the constitutional guarantee of liberty of contract does not prevent Congress from prescribing the rule of free competition for those engaged in *interstate and international* commerce; and,

That under its power to regulate commerce among the several States and with foreign nations, Congress had authority to enact the statute in question.

No one, we assume, will deny that these propositions were distinctly announced in the former decisions of this court. They cannot be ignored or their effect avoided by the intimation that the court indulged in *obiter dicta*. What was said in those cases was within the limits of the issues made by the parties. In our opinion, the recognition of the principles announced in former cases must, under the conceded facts, lead to an affirmance of the decree below, unless the special objections, or some of them, which have been made to the application of the act of Congress to the present case are of a substantial character. We will now consider those objections.

Underlying the argument in behalf of the defendants is the idea that as the Northern Securities Company is a state corporation, and as its acquisition of the stock of the Great Northern and Northern Pacific Railway companies is not inconsistent with the powers conferred by its charter, the enforcement of the act of Congress, as against those corporations, will be an unauthorized interference by the national government with the internal commerce of the States creating those corporations. This suggestion does not at all impress us. There is no reason to suppose that Congress had any purpose

to interfere with the internal affairs of the States, nor, in our opinion, is there any ground whatever for the contention that the Anti-Trust Act regulates their domestic commerce. By its very terms the act regulates only commerce among the States and with foreign states. Viewed in that light, the act, if within the powers of Congress, must be respected; for, by the explicit words of the Constitution, that instrument and the laws enacted by Congress in pursuance of its provisions, are the supreme law of the land, "anything in the constitution or laws of any State to the contrary notwithstanding"— supreme over the States, over the courts, and even over the people of the United States, the source of all power under our governmental system in respect of the objects for which the National Government was ordained. An act of Congress constitutionally passed under its power to regulate commerce among the States and with foreign nations is binding upon all; as much so as if it were embodied, in terms, in the Constitution itself. Every judicial officer, whether of a national or a state court, is under the obligation of an oath so to regard a lawful enactment of Congress. Not even a State, still less one of its artificial creatures, can stand in the way of its enforcement. If it were otherwise, the Government and its laws might be prostrated at the feet of local authority. *Cohens* v. *Virginia,* 6 Wheat. 264, 385, 414. These views have been often expressed by this court.

It is said that whatever may be the power of a State over such subjects Congress cannot forbid single individuals from disposing of their stock in a state corporation, even if such corporation be engaged in interstate and international commerce; that the holding or purchase by a state corporation, or the purchase by individuals, of the stock of another corporation, for whatever purpose, are matters in respect of which Congress has no authority under the Constitution; that, so far as the power of Congress is concerned, citizens or state corporations may dispose of their property and invest their money in any way they choose; and that in regard to all

such matters, citizens and state corporations are subject, if to any authority, only to the lawful authority of the State in which such citizens reside, or under whose laws such corporations are organized. It is unnecessary in this case to consider such abstract, general questions. The court need not now concern itself with them. They are not here to be examined and determined, and may well be left for consideration in some case necessarily involving their determination.

In this connection, it is suggested that the contention of the Government is that the acquisition and *ownership* of stock in a state railroad corporation is itself interstate commerce, if that corporation be engaged in interstate commerce. This suggestion is made in different ways, sometimes in express words, at other times by implication. For instance, it is said that the question here is whether the power of Congress over interstate commerce extends to the regulation of the ownership of the stock in state railroad companies, by reason of their being engaged in such commerce. Again, it is said that the only issue in this case is whether the Northern Securities Company can acquire and hold stock in other state corporations. Still further, is it asked, generally, whether the organization or ownership of railroads is not under the control of the States under whose laws they came into existence? Such statements as to the issues in this case are, we think, wholly unwarranted and are very wide of the mark; it is the setting up of mere men of straw to be easily stricken down. We do not understand that the Government makes any such contentions or takes any such positions as those statements imply. It does not contend that Congress may control the mere acquisition or the mere ownership of stock in a state corporation engaged in interstate commerce. Nor does it contend that Congress can control the organization of state corporations authorized by their charters to engage in interstate and international commerce. But it does contend that Congress may protect the freedom of interstate commerce by any means that are appropriate and that are lawful and not prohibited.

by the Constitution. It does contend that no state corporation can stand in the way of the enforcement of the national will, legally expressed. What the Government particularly complains of, indeed, all that it complains of here, is the existence of a combination among the stockholders of competing railroad companies which in violation of the act of Congress restrains interstate and international commerce through the agency of a common corporate trustee designated to act for both companies in repressing free competition between them. Independently of any question of the mere ownership of stock or of the organization of a state corporation, can it in reason be said that such a combination is not embraced by the very terms of the Anti-Trust Act? May not Congress declare that *combination* to be illegal? If Congress legislates for the protection of the public, may it not proceed on the ground that wrongs when effected by a powerful combination are more dangerous and require more stringent supervision than when they are to be effected by a single person? *Callan* v. *Wilson*, 127 U. S. 540, 556. How far may the courts go in order to give effect to the act of Congress, and remedy the evils it was designed by that act to suppress? These are confessedly questions of great moment, and they will now be considered.

By the express words of the Constitution, Congress has power to "regulate commerce with foreign nations and among the several States, and with the Indian tribes." In view of the numerous decisions of this court there ought not, at this day, to be any doubt as to the general scope of such power. In some circumstances regulation may properly take the form and have the effect of prohibition. *In re Rahrer*, 140 U. S. 545; *Lottery Case*, 188 U. S. 321, 355, and authorities there cited. Again and again this court has reaffirmed the doctrine announced in the great judgment rendered by Chief Justice Marshall for the court in *Gibbons* v. *Ogden*, 9 Wheat. 1, 196, 197, that the power of Congress to regulate commerce among the States and with foreign nations is the power "to prescribe the *rule* by which commerce *is to be governed;*" that such power "is complete

in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution;" that "if, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations and among the several States, is vested in Congress *as absolutely as it would be in a single government having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States;*" that a sound construction of the Constitution allows to Congress a large discretion, "with respect to the means by which the powers it confers are to be carried into execution, which enable that body to perform the high duties assigned to it, in the manner most beneficial to the people;" and that if the end to be accomplished is within the scope of the Constitution, "all means which are appropriate, which are plainly adapted to that end and which are not prohibited, are constitutional." *Brown* v. *Maryland,* 12 Wheat. 419; *Sinnot* v. *Davenport,* 22 How. 227, 238; *Henderson* v. *The Mayor,* 92 U. S. 259; *Railroad Company* v. *Husen,* 95 U. S. 465, 472; *County of Mobile* v. *Kimball,* 102 U. S. 691; *M., K. & Texas Ry. Co.* v. *Haber,* 169 U. S. 613, 626; *The Lottery Case,* 188 U. S. 321, 348. In *Cohens* v. *Virginia,* 6 Wheat. 264, 413, this court said that the United States were for many important purposes "a single nation," and that "in all commercial regulations we are one and the same people;" and it has since frequently declared that commerce among the several States was a *unit,* and subject to national control. Previously, in *McCulloch* v. *Maryland,* 4 Wheat. 316, 405, the court had said that the Government ordained and established by the Constitution was, within the limits of the powers granted to it, "the Government of all; its powers are delegated by all; it represents all, and acts for all," and was "supreme within its sphere of action." As late as the case of *In re Debs,* 158 U. S. 564, 582, this court, every member of it concurring, said: "The entire strength of the Nation may be used to enforce in any part of the land the

full and free exercise of all National powers and the security of all rights entrusted by the Constitution to its care. The strong arm of the National Government may be put forth to brush away all obstructions to the freedom of interstate commerce or the transportation of the mails. If the emergency arises, the army of the Nation, and all its militia, are at the service of the Nation to compel obedience to its laws."

The means employed in respect of the combinations forbidden by the Anti-Trust Act, and which Congress deemed germane to the end to be accomplished, was to prescribe as *a rule* for *interstate and international* commerce, (not for domestic commerce,) that it should not be vexed by combinations, conspiracies or monopolies which restrain commerce by destroying or restricting competition. We say that Congress has prescribed such a rule, because in all the prior cases in this court the Anti-Trust Act has been construed as forbidding any combination which by its necessary operation destroys or restricts free competition among those engaged in interstate commerce; in other words, that to destroy or restrict free competition in interstate commerce was to restrain such commerce. Now, can this court say that such a rule is prohibited by the Constitution or is not one that Congress could appropriately prescribe when exerting its power under the commerce clause of the Constitution? Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine. Undoubtedly, there are those who think that the general business interests and prosperity of the country will be best promoted if the rule of competition is not applied. But there are others who believe that such a rule is more necessary in these days of enormous wealth than it ever was in any former period of our history. Be all this as it may, Congress has, in effect, recognized the rule of free competition by declaring illegal every combination or conspiracy in restraint of interstate and international commerce. As in the judgment of Congress the public convenience and the general welfare

will be best subserved when the natural laws of competition are left undisturbed by those engaged in interstate commerce, and as Congress has embodied that rule in a statute, that must be, for all, the end of the matter, if this is to remain a government of laws, and not of men.

It is said that railroad corporations created under the laws of a State can only be consolidated with the authority of the State. Why that suggestion is made in this case we cannot understand, for there is no pretense that the combination here in question was under the authority of the States under whose laws these railroad corporations were created. But even if the State allowed consolidation it would not follow that the stockholders of two or more state railroad corporations, having *competing lines and engaged in interstate commerce*, could lawfully combine and form a distinct corporation to hold the stock of the constituent corporations, and, by destroying competition between them, in violation of the act of Congress, restrain commerce among the States and with foreign nations.

The rule of competition, prescribed by Congress, was not at all new in trade and commerce. And we cannot be in any doubt as to the reason that moved Congress to the incorporation of that rule into a statute. That reason was thus stated in *United States* v. *Joint Traffic Association:* "Has not Congress with regard to interstate commerce and in the course of regulating it, in the case of railroad corporations, the power to say that no contract or combination shall be legal which shall restrain trade and commerce by shutting out the operation of the general law of competition? We think it has. . . . It is the combination of these large and powerful corporations, covering vast sections of territory and influencing trade throughout the whole extent thereof, and acting *as one body* in all the matters over which the combination extends, that constitutes the alleged evil, and in regard to which, *so far as the combination operates upon and restrains interstate commerce,* Congress has power to legislate and to prohibit." (pp. 569, 571.) That such a rule was applied to interstate commerce

should not have surprised any one. Indeed, when Congress declared contracts, combinations and conspiracies in restraint of trade or commerce to be illegal, it did nothing more than. apply to interstate commerce a rule that had been long applied by the several States when dealing with combinations that were in restraint of their domestic commerce. The decisions in state courts upon this general subject are not only numerous and instructive but they show the circumstances under which the Anti-Trust Act was passed. It may well be assumed that Congress, when enacting that statute, shared the general apprehension that a few powerful corporations or combinations sought to obtain, and, unless restrained, would obtain such absolute control of the entire trade and commerce of the country as would be detrimental to the general welfare.

In *Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Pa. St. 173, 186, the Supreme Court of Pennsylvania dealt with a combination of coal companies seeking the control within a large territory of the entire market for bituminous coal. The court, observing that the combination was wide in its scope, general in its influence, and injurious in its effects, said: "When competition is left free, individual error or folly will generally find a correction in the conduct of others. But here is a combination of all the companies operating in the Blossburg and Barclay mining regions, and controlling their entire productions. They have combined together to govern the supply and the price of coal in all the markets from the Hudson to the Mississippi rivers, and from Pennsylvania to the Lakes. This combination has a power in its confederated form which no individual action can confer. The public interest must succumb to it, for it has left no competition free to correct its baleful influence. When the supply of coal is suspended the demand for it becomes importunate, and prices must rise. Or if the supply goes forward, the prices fixed by the confederates must accompany it. The domestic hearth, the furnaces of the iron master and the fires of the manufacturer all feel the restraint, while many dependent hands are

paralyzed and hungry mouths are stinted. The influence of
a. lack of supply or a rise in the price of an article of such
prime necessity cannot be measured. It permeates the entire
mass of the community, and leaves few of its members un-
touched by its withering blight. Such a combination is more
than a contract; it is an offense. . . . In all such combina-
tions where the purpose is injurious or unlawful, the gist of
the offense is the conspiracy. Men can often do by the *com-
bination* of many what severally no one could accomplish, and
even what when done by one would be innocent. . . .
*There is a potency in numbers when combined,* which the law
cannot overlook, where injury is the consequence." The same
principles were applied in *Arnot* v. *Pittston & Elmira Coal Co.,*
68 N. Y. 558, 565, which was the case of a combination of
two coal companies, in order to give one of them a monop-
oly of coal in a particular region, the Court of Appeals of
New York holding that "a combination to effect such a purpose
is inimical to the interests of the public, and that all contracts
designed to effect such an end are contrary to public policy,
and therefore illegal." They were also applied by the Su-
preme Court of Ohio in *Central Ohio Salt Co.* v. *Guthrie,* 35
Ohio St. 666, 672, which was the case of a combination among
manufacturers of salt in a large salt-producing territory, the
court saying: "It is no answer to say that competition in the
salt trade was not in fact destroyed, or that the price of the
commodity was not unreasonably advanced. *Courts will not
stop to enquire as to the degree of injury inflicted upon the public;
it is enough to know that the inevitable tendency of such contracts
is injurious to the public.*"

So, in *Craft* v. *McConoughy,* 79 Illinois, 346, 350, which was
the case of a combination among grain dealers by which com-
petition was stifled, the court saying: "So long as competition
was free, the interest of the public was safe. The laws of trade,
in connection with the rigor of competition, was all the guar-
anty the public required, but the secret combination created by
the contract destroyed all competition and created a monopoly

against which the public interest had no, protection." Again, in *People* v. *Chicago Gas Trust Co.*, 130 Illinois, 268, 297, which involved the validity of the organization of a gas corporation which obtained a monopoly in the business of furnishing illum- inating gas in the city of Chicago by buying the stock of four other gas companies, it was said: "Of what avail is it that any number of gas companies may be formed under the general incorporation law, if a giant trust company can be clothed with the power of buying up and holding the stock and property of such companies, and, through the control thereby attained, can direct all their operations and weld them into one huge com- bination?" To the same effect are cases almost too nu- merous to be cited. But among them we refer to *Richardson* v. *Buhl*, 77 Michigan, 632, which was the case of the organi- zation of a corporation in Connecticut to unite in one cor- poration all the match manufacturers in the United States, and thus to obtain control of the business of manufacturing matches; *Santa Clara Mill & Lumber Co.* v. *Hayes*, 76 Cali- fornia, 387, 390, which was the case of a combination among manufacturers of lumber, by which it could control the business in certain localities; and *India Bagging Association* v. *Kock*, 14 La. Ann. 168, which was the case of a combination among various commercial firms to control the prices of bagging used by cotton planters.

The cases, just cited, it is true, relate to the domestic com- merce of the States. But they serve to show the authority which the States possess to guard the public against *combina- tions* that repress individual enterprise and interfere with the operation of the natural laws of competition among those engaged in trade within their limits. They serve also to give point to the declaration of this court in *Gibbons* v. *Ogden*, 9 Wheat. 1, 197—a principle never modified by any subsequent decision—that, subject to the limitations imposed by the Con- stitution upon the exercise of the powers granted by that instrument, "the power over commerce with foreign nations and among the several States is vested in Congress as absolutely

as it would be in a single government having in its constitution the same restrictions on the exercise of power as are found in the Constitution of the United States." Is there, then, any escape from the conclusion that, subject only to such restrictions, the power of Congress over interstate and international commerce is as full and complete as is the power of any State over its domestic commerce? If a State may strike down combinations that restrain its domestic commerce by destroying free competition among those engaged in such commerce, what power, except that of Congress, is competent to protect the freedom of interstate and international commerce when assailed by a combination that restrains such commerce by stifling competition among those engaged in it?

Now, the court is asked to adjudge that, if held to embrace the case before us, the Anti-Trust Act is repugnant to the Constitution of the United States. In this view we are unable to concur. The contention of the defendants could not be sustained without, in effect, overruling the prior decisions of this court as to the scope and validity of the Anti-Trust Act. If, as the court has held, Congress can strike down a combination between private persons or private corporations that restrains trade among the States in iron pipe (as in *Addyston Pipe & Steel Co.* v. *United States*), or in tiles, grates and mantels (as in *Montague* v. *Lowry*), surely it ought not to be doubted that Congress has power to declare illegal a combination that restrains commerce among the States, and with foreign nations, as carried on over the lines of competing railroad companies exercising public franchises, and engaged in such commerce. We cannot agree that Congress may strike down combinations among manufacturers and dealers in iron pipe, tiles, grates and mantels that restrain commerce among the States in such articles, but may not strike down combinations among stockholders of competing railroad carriers, which restrain commerce as involved in the transportation of passengers and property among the several States. If private parties may not, by combination among themselves, restrain interstate

and international commerce in violation of an act of Congress, much less can such restraint be tolerated when imposed or attempted to be imposed upon commerce as carried on over public highways. Indeed, if the contentions of the defendants are sound why may not *all* the railway companies in the United States, that are engaged, under state charters, in interstate and international commerce, enter into a combination such as the one here in question, and by the device of a holding corporation obtain the absolute control throughout the entire country of rates for passengers and freight, beyond the power of Congress to protect the public against their exactions? The argument in behalf of the defendants necessarily leads to such results, and places Congress, although invested by the people of the United States with full authority to regulate interstate and international commerce, in a condition of utter helplessness, so far as the protection of the public against such combinations is concerned.

Will it be said that Congress can meet such emergencies by prescribing the rates by which interstate carriers shall be governed in the transportation of freight and passengers? If Congress has the power to fix such rates—and upon that question we express no opinion—it does not choose to exercise its power in that way or to that extent. It has, all will agree, a large discretion as to the means to be employed in the exercise of any power granted to it. For the present, it has determined to go no farther than to protect the freedom of commerce among the States and with foreign states by declaring illegal all contracts, combinations, conspiracies or monopolies in restraint of such commerce, and make it a public offence to violate the rule thus prescribed. How much further it may go, we do not now say. We need only at this time consider whether it has exceeded its powers in enacting the statute here in question.

Assuming, without further discussion, that the case before us is within the terms of the act, and that the act is not in excess of the powers of Congress, we recur to the question, how far may the courts go in reaching and suppressing the combination

described in the bill?    All will agree that if the Anti-Trust Act
be constitutional, and if the combination in question be in
violation of its provisions, the courts may enforce the pro-
visions of the statute by such orders and decrees as are neces-
sary or appropriate to that end and as may be consistent with
the fundamental rules of legal procedure.    And all, we take it,
will agree, as established firmly by the decisions of this court,
that the power of Congress over commerce extends to all the
instrumentalities of such commerce, and to every device that
may be employed to interfere with the freedom of commerce
among the States and with foreign nations.    Equally, we,
assume, all will agree that the Constitution and the legal
enactments of Congress are, by express words of the Consti-
tution, the supreme law of the land, anything in the constitu-
tion and laws of any State to the contrary notwithstanding.
Nevertheless, the defendants, strangely enough, invoke in their
behalf the Tenth Amendment of the Constitution which de-
clares that "the powers not delegated to the United States by
the Constitution, nor prohibited by it to the States, are re-
served to the States respectively or to the People;" and we
are confronted with the suggestion that any order or decree
of the Federal court which will prevent the Northern Se-
curities Company from exercising the power it acquired in
becoming the holder of the stocks of the Great Northern and
Northern Pacific Railway companies will be an invasion of
the rights of the State under which the Securities Company
was chartered, as well as of the rights of the States creating the
other companies.    In other words, if the State of New Jersey
gives a charter to a corporation, and even if the obtaining of
such charter is in fact pursuant to a *combination* under which
it becomes the holder of the stocks of shareholders in two com-
peting, parallel railroad companies engaged in interstate com-
merce in other States, whereby competition between the re-
spective roads of those companies is to be destroyed and the
enormous commerce carried on over them restrained by sup-
pressing competition, Congress must stay its hands and allow

such restraint to continue to the detriment of the public because, forsooth, the corporations concerned or some of them are state corporations. We cannot conceive how it is possible for any one to seriously contend for such a proposition. It means nothing less than that Congress, in regulating interstate commerce, must act in subordination to the will of the States when exerting their power to create corporations. No such view can be entertained for a moment.

It is proper to say in passing that nothing in the record tends to show that the State of New Jersey had any reason to suspect that those who took advantage of its liberal incorporation laws had in view, when organizing the Securities Company, to destroy competition between two great railway carriers engaged in interstate commerce in distant States of the Union. The purpose of the combination was concealed under very general words that gave no clue whatever to the real purposes of those who brought about the organization of the Securities Company. If the certificate of the incorporation of that company had expressly stated that the object of the company was to destroy competition between competing, parallel lines of interstate carriers, all would have seen, at the outset, that the scheme was in hostility to the national authority, and that there was a purpose to violate or evade the act of Congress. We reject any such view of the relations of the National Government and the States composing the Union, as that for which the defendants contend. Such a view cannot be maintained without destroying the just authority of the United States. It is inconsistent with all the decisions of this court as to the powers of the National Government over matters committed to it. No State can, by merely creating a corporation, or in any other mode, project its authority into other States, and across the continent, so as to prevent Congress from exerting the power it possesses under the Constitution over interstate and international commerce, or so as to exempt its corporation engaged in interstate commerce from obedience to any rule lawfully established by Congress for such com-

merce.  It cannot be said that any State may give a corpora-
tion, created under its laws, authority to restrain interstate
or international commerce against the will of the nation as
lawfully expressed by Congress.  Every corporation created
by a State is necessarily subject to the supreme law of the
land.    And yet the suggestion is made that to restrain a state
corporation from interfering with the free course of trade and
commerce among the States, in violation of an act of Congress,
is hostile to the reserved rights of the States.   The Federal
court may not have power to forfeit the charter of the Se-
curities Company; it may not declare how its shares of stock
may be transferred on its books, nor prohibit it from acquiring
real estate, nor diminish or increase its capital stock.   All
these and like matters are to be regulated by the State which
created the company.   But to the end that effect be given to
the national will, lawfully expressed, Congress may prevent
that company, in its capacity as a holding corporation and
trustee, from carrying out the purposes of a combination
formed in restraint of interstate commerce.   The Securities
Company is itself a part of the present combination; its head
and front; its trustee.   It would be extraordinary if the court,
in executing the act of Congress, could not lay hands upon that
company and prevent it from doing that which, if done, will
defeat the act of Congress.   Upon like grounds the court can,
by appropriate orders, prevent the two competing railroad
companies here involved from coöperating with the Securities
Company in restraining commerce among the States.   In
short, the court may make any order necessary to bring about
the dissolution or suppression of an illegal combination that
restrains interstate commerce.   All this can be done without
infringing in any degree upon the just authority of the States.
The affirmance of the judgment below will only mean that no
combination, however powerful, is stronger than the law or
will be permitted to avail itself of the pretext that to prevent
it doing that which, if done, would defeat a legal enactment
of Congress, is to attack the reserved rights of the States.   It

would mean that the Government which represents all, can, when acting within the limits of its powers, compel obedience to its authority.   It would mean that no device in evasion of its provisions, however skillfully such device may have been contrived, and no combination, by whomsoever formed, is beyond the reach of the supreme law of the land, if such device or combination by its operation directly restrains commerce among the States or with foreign nations in violation of the act of Congress.

The defendants rely, with some confidence, upon the case of *Railroad Company* v. *Maryland,* 21 Wall. 456, 473. But nothing we have said is inconsistent with any principle announced in that case.   The court there recognized the principle that a State has plenary powers "over its own territory, its highways, its franchises, and its corporations," and observed that "we are bound to sustain the constitutional powers and prerogatives of the States, as well as those of the United States, whenever they are brought before us for adjudication, no matter what may be the consequences."   Of course, every State has, in a general sense, plenary power over its corporations.   But is it conceivable that a State, when exerting power over a corporation of its creation, may prevent or embarrass the exercise by Congress of any power with which it is invested by the Constitution?   In the case just referred to the court does not say, and it is not to be supposed that it will ever say, that any power exists in a State to prevent the enforcement of a lawful enactment of Congress, or to invest any of its corporations, in whatever business engaged, with authority to disregard such enactment or defeat its legitimate operation.   On the contrary, the court has steadily held to the doctrine, vital to the United States as well as to the States, that a state enactment, even if passed in the exercise of its acknowledged powers, must yield, in case of conflict, to the supremacy of the Constitution of the United States and the acts of Congress enacted in pursuance of its provisions.   This results, the court has said, as well from the nature of the Gov-

ernment as from the words of the Constitution. *Gibbons* v. *Ogden,* 9 Wheat. 1, 210; *Sinnot* v. *Davenport,* 22 How. 227, 243; *In re Debs,* 158 U. S. 564; *Missouri, Kansas & Texas Railway* v. *Haber,* 169 U. S. 613, 626, 627. In *Texas* v. *White,* 7 Wall. 700, 725, the court remarked "that 'the people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence,' and that 'without the States in union, there could be no such political body as the United States.' *County of Lane* v. *Oregon,* 7 Wall. 76. Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National Government." These doctrines are at the basis of our Constitutional Government, and cannot be disregarded with safety.

The defendants also rely on *Louisville & Nashville Railroad* v. *Kentucky,* 161 U. S. 677, 702. In that case it was contended by the railroad company that the assumption of the State to forbid the consolidation of parallel and competing lines was an interference with the power of Congress over interstate commerce. The court observed that but little need be said in answer to such a proposition, for "it has never been supposed that the dominant power of Congress over interstate commerce took from the States the power of legislation with respect to the instruments of such commerce, so far as the legislation was within its ordinary police powers." But that case distinctly recognized that there was a division of power between Congress and the States in respect to interstate railways, and that Congress had the superior right to control that commerce and forbid interference therewith, while to the States remained the power to create and to regulate the instruments of such commerce, so far as necessary to the conservation of the public interests. If there is anything in that case which

even intimates that a State or a state corporation may in any way directly restrain interstate commerce, over which Congress has, by the Constitution, complete control, we have been unable to find it.

The question of the relations of the General Government with the States is again presented by the specific contention of each defendant that Congress did not intend "to limit the power of the several States to create corporations, define their purposes, fix the amount of their capital, and determine who may buy, own and sell their stock." All that is true, generally speaking, but the contention falls far short of meeting the controlling questions in this case. To meet this contention we must repeat some things already said in this opinion. But if what we have said be sound, repetition will do no harm. So far as the Constitution of the United States is concerned, a State may, indeed, create a corporation, define its powers, prescribe the amount of its stock and the mode in which it may be transferred. It may even authorize one of its corporations to engage in commerce of every kind; domestic, interstate and international. The regulation or control of purely domestic commerce of a State is, of course, with the State, and Congress has no direct power over it so long as what is done by the State does not interfere with the operations of the General Government, or any legal enactment of Congress. A State, if it chooses so to do, may even submit to the existence of combinations within its limits that restrain its internal trade. But neither a state corporation nor its stockholders can, by reason of the non-action of the State or by means of any combination among such stockholders, interfere with the complete enforcement of any rule lawfully devised by Congress for the conduct of commerce among the States or with foreign nations; for, as we have seen, interstate and international commerce is by the Constitution under the control of Congress, and it belongs to the legislative department of the Government to prescribe rules for the conduct of that commerce. If it were otherwise, the declaration in the Constitu-

tion of its supremacy, and of the supremacy as well of the laws made in pursuance of its provisions, was a waste of words. Whilst every instrumentality of domestic commerce is subject to state control, every instrumentality of interstate commerce may be reached and controlled by national authority, *so far as to compel it to respect the rules for such commerce lawfully established by Congress.* No corporate person can excuse a departure from or violation of that rule under the plea that that which it has done or omitted to do is permitted or not forbidden by the State under whose authority it came into existence. We repeat that no State can endow any of its corporations, or any combination of its citizens, with authority to restrain interstate or international commerce, or to disobey the national will as manifested in legal enactments of Congress. So long as Congress keeps within the limits of its authority as defined by the Constitution, infringing no rights recognized or secured by that instrument, its regulations of interstate and international commerce, whether founded in wisdom or not, must be submitted to by all. Harm and only harm can come from the failure of the courts to recognize this fundamental principle of constitutional construction. To depart from it because of the circumstances of special cases, or because the rule, in its operation, may possibly affect the interests of business, is to endanger the safety and integrity of our institutions and make the Constitution mean not what it says but what interested parties wish it to mean at a particular time and under particular circumstances. The supremacy of the law is the foundation rock upon which our institutions rest. The law, this court said in *United States* v. *Lee,* 106 U. S. 196, 220, is the only supreme power in our system of government. And no higher duty rests upon this court than to enforce, by its decrees, the will of the legislative department of the Government, as expressed in a statute, unless such statute be plainly and unmistakably in violation of the Constitution. If the statute is beyond the constitutional power of Congress, the court would fail in the performance of a solemn duty if it

did not so declare. But if nothing more can be said than that Congress has erred—and the court must not be understood as saying that it has or has not erred—the remedy for the error and the attendant mischief is the selection of new Senators and Representatives, who, by legislation, will make such changes in existing statutes, or adopt such new statutes, as may be demanded by their constituents and be consistent with law.

Many suggestions were made in argument based upon the thought that the Anti-Trust Act would in the end prove to be mischievous in its consequences. Disaster to business and wide-spread financial ruin, it has been intimated, will follow the execution of its provisions. Such predictions were made in all the cases heretofore arising under that act. But they have not been verified. It is the history of monopolies in this country and in England that predictions of ruin are habitually made by them when it is attempted, by legislation, to restrain their operations and to protect the public against their exactions. In this, as in former cases, they seek shelter behind the reserved rights of the States and even behind the constitutional guarantee of liberty of contract. But this court has heretofore adjudged that the act of Congress did not touch the rights of the States, and that liberty of contract did not involve a right to deprive the public of the advantages of free competition in trade and commerce. Liberty of contract does not imply liberty in a corporation or individuals to defy the national will, when legally expressed. Nor does the enforcement of a legal enactment of Congress infringe, in any proper sense, the general inherent right of every one to acquire and hold property. That right, like all other rights, must be exercised in subordination to the law.

But even if the court shared the gloomy forebodings in which the defendants indulge, it could not refuse to respect the action of the legislative branch of the Government if what it has done is within the limits of its constitutional power. The suggestions of disaster to business have, we apprehend, their origin

in the zeal of parties who are opposed to the policy underlying the act of Congress or are interested in the result of this particular case; at any rate, the suggestions imply that the court may and ought to refuse the enforcement of the provisions of the act if, in its judgment, Congress was not wise in prescribing as a rule by which the conduct of interstate and international commerce is to be governed, that every combination, whatever its form, in restraint of such commerce and the monopolizing or attempting to monopolize such commerce shall be illegal. These, plainly, are questions as to the policy of legislation which belong to another department, and this court has no function to supervise such legislation from the standpoint of wisdom or policy.   We need only say that Congress has authority to declare, and by the language of its act, as interpreted in prior cases, has, in effect declared, that the freedom of interstate and international commerce shall not be obstructed or disturbed by any combination, conspiracy or monopoly that will restrain such commerce, by preventing the free operation of competition among interstate carriers engaged in the transportation of passengers and freight.   This court cannot disregard that declaration unless Congress, in passing the statute in question, be held to have transgressed the limits prescribed for its action by the Constitution.   But, as already indicated, it cannot be so held consistently with the provisions of that instrument.

The combination here in question may have been for the pecuniary benefit of those who formed or caused it to be formed.   But the interests of private persons and corporations cannot be made paramount to the interests of the general public.   Under the Articles of Confederation commerce among the original States was subject to vexatious and local regulations that took no account of the general welfare.   But it was for the protection of the general interests, as involved in interstate and international commerce, that Congress, representing the whole country, was given by the Constitution full power to regulate commerce among the States and with foreign

nations. In *Brown* v. *Maryland*, 12 Wheat. 419, 446, it was said: "Those who felt the injury arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control over this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the Federal Government contributed more to that great revolution which introduced the present system than the deep and general conviction that commerce ought to be regulated by Congress." Railroad companies, we said in the *Trans-Missouri Freight Association* case, "are instruments of commerce, and their business is commerce itself." And such companies, it must be remembered, operate "public highways, established primarily for the convenience of the people, and therefore are subject to governmental control and regulation." *Cherokee Nation* v. *Kansas Railway Co.*, 135 U. S. 641, 657; *Chicago &c. R. R. Co.* v. *Pullman Car Co.*, 139 U. S. 79, 90; *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447, 475; *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290, 332; *Smyth* v. *Ames*, 169 U. S. 466, 544; *Lake Shore &c. Ry. Co.* v. *Ohio*, 173 U. S. 285, 301. When such carriers, in the exercise of public franchises, engage in the transportation of passengers and freight among the States they become—even if they be state corporations—subject to such rules as Congress may lawfully establish for the conduct of interstate commerce.

It was said in argument that the circumstances under which the Northern Securities Company obtained the stock of the constituent companies imported simply an investment in the stock of other corporations, a purchase of that stock; which investment or purchase, it is contended, was not forbidden by the charter of the company and could not be made illegal by any act of Congress. This view is wholly fallacious, and does not comport with the actual transaction. There was no actual investment, in any substantial sense, by the Northern Securities Company in the stock of the two constituent com-

panies. If it was, in form, such a transaction, it was not, in fact, one of that kind. However that company may have acquired for itself any stock in the Great Northern and Northern Pacific Railway companies, no matter how it obtained the means to do so, all the stock it held or acquired in the constituent companies was acquired and held to be used in suppressing competition between those companies. It came into existence only for that purpose. If any one had full knowledge of what was designed to be accomplished, and as to what was actually accomplished, by the combination in question, it was the defendant Morgan. In his testimony he was asked, "Why put the stocks of *both* these [constituent companies] into one holding company?" He frankly answered: "In the first place, this holding company was simply a question of *custodian*, because it had no other alliances." That disclosed the actual nature of the transaction, which was only to organize the Northern Securities Company as a *holding* company, in whose hands, not as a real purchaser or absolute owner, but simply as custodian, were to be placed the stocks of the constituent companies—such custodian to represent the combination formed between the shareholders of the constituent companies, the direct and necessary effect of such combination being, as already indicated, to restrain and monopolize interstate commerce by suppressing or (to use the words of this court in *United States* v. *Joint Traffic Association*) "smothering" competition between the lines of two railway carriers.

We will now inquire as to the nature and extent of the relief granted to the Government by the decree below.

By the decree in the Circuit Court it was found and adjudged that the defendants had entered into a combination or conspiracy in restraint of trade or commerce among the several States, such as the act of Congress denounced as illegal; and that all of the stocks of the Northern Pacific Railway Company and all the stock of the Great Northern Railway Company, claimed to be owned and held by the Northern Securities Company, was acquired, and is by it held, in virtue of such com-

bination or conspiracy, in restraint of trade and commerce among the several States. It was therefore decreed as follows: "That the Northern Securities Company, its officers, agents, servants and employés, be and they are hereby enjoined from acquiring, or attempting to acquire, further stock of either of the aforesaid railway companies; that the Northern Securities Company be enjoined from voting the aforesaid stock which it now holds or may acquire, and from attempting to vote it, at any meeting of the stockholders of either of the aforesaid railway companies and from exercising or attempting to exercise any control, direction, supervision or influence whatsoever over the acts and doings of said railway companies, or either of them, by virtue of its holding such stock therein; that the Northern Pacific Railway Company and the Great Northern Railway Company, their officers, directors, servants and agents, be and they are hereby respectively and collectively enjoined from permitting the stock aforesaid to be voted by the Northern Securities Company, or in its behalf, by its attorneys or agents, at any corporate election for directors or officers of either of the aforesaid railway companies; that they, together with their officers, directors, servants and agents, be likewise enjoined and respectively restrained from paying any dividends to the Northern Securities Company on account of stock in either of the aforesaid railway companies which it now claims to own and hold; and that the aforesaid railway companies, their officers, directors, servants and agents, be enjoined from permitting or suffering the Northern Securities Company or any of its officers or agents, as such officers or agents, to exercise any control whatsoever over the corporate acts of either of the aforesaid railway companies. But nothing herein contained shall be construed as prohibiting the Northern Securities Company from returning and transferring to the Northern Pacific Railway Company and the Great Northern Railway Company, respectively, any and all shares of stock in either of said railway companies which said, The Northern Securities Company, may have heretofore received from such stock-

holders in exchange for its own stock; and nothing herein contained shall be construed as prohibiting the Northern Securities Company from making such transfer and assignments of the stock aforesaid to such person or persons as may now be the holders and owners of its own stock originally issued in exchange or in payment for the stock claimed to have been acquired by it in the aforesaid railway companies."

Subsequently, and before the appeal to this court was perfected, an order was made in the Circuit Court to this effect: "That upon the giving of an approved bond to the United States by or on behalf of the defendants in the sum of fifty thousand dollars conditioned to prosecute their appeal with effect and to pay all damages which may result to the United States from this order, that portion of the injunction contained in the final decree herein which forbids the Northern Pacific Railway Company and the Great Northern Railway Company, their officers, directors, servants and agents, from paying dividends to the Northern Securities Company on account of stock in either of the railway companies which the Securities Company claims to own and hold, is suspended during the pendency of the appeal allowed herein this day. All other portions of the decree and of the injunction it contains remain in force and are unaffected by this order."

No valid objection can be made to the decree below, in form or in substance. If there was a combination or conspiracy in violation of the act of Congress, between the stockholders of the Great Northern and the Northern Pacific Railway companies, whereby the Northern Securities Company was formed as a holding corporation, and whereby interstate commerce over the lines of the constituent companies was restrained, it must follow that the court, in execution of that act, and to defeat the efforts to evade it, could prohibit the parties to the combination from doing the specific things which being done would affect the result denounced by the act. To say that the court could not go so far is to say that it is powerless to enforce the act or to suppress the illegal combination, and powerless

to protect the rights of the public as against that combination.

It is here suggested that the alleged combination had accomplished its object before the commencement of this suit, in that the Securities Company had then organized, and had actually received a majority of the stock of the two constituent companies; *therefore,* it is argued, no effective relief can now be granted to the Government. This same view was pressed upon the Circuit Court, and was rejected. It was completely answered by that court when it said: "Concerning the second contention, we observe that it would be a novel, not to say absurd, interpretation of the Anti-Trust Act to hold that after an unlawful combination is formed and has acquired the power which it had no right to acquire, namely, to restrain commerce by suppressing competition, and is proceeding to use it and execute the purpose for which the combination was formed, it must be left in possession of the power that it has acquired, with full freedom to exercise it. Obviously the act, when fairly interpreted, will bear no such construction. Congress aimed to destroy the power to place any direct restraint on interstate trade or commerce, when by any combination or conspiracy, formed by either natural or artificial persons, such a power had been acquired; and the Government may intervene and demand relief as well after the combination is fully organized as while it is in process of formation. In this instance, as we have already said, the Securities Company made itself a party to a combination in restraint of interstate commerce that antedated its organization, as soon as it came into existence, doing so, of course, under the direction of the very individuals who promoted it." The Circuit Court has done only what the actual situation demanded. Its decree has done nothing more than to meet the requirements of the statute. It could not have done less without declaring its impotency in dealing with those who have violated the law. The decree, if executed, will destroy, not the property interests of the original stockholders of the constituent companies, but

the power of the holding corporation as the instrument of an illegal combination of which it was the master spirit, to do that which, if done, would restrain interstate and international commerce. The exercise of that power being restrained, the object of Congress will be accomplished; left undisturbed, the act in question will be valueless for any practical purpose.

It is said that this statute contains criminal provisions and must therefore be strictly construed. The rule upon that subject is a very ancient and salutary one. It means only that we must not bring cases within the provisions of such a statute that are not clearly embraced by it, nor by narrow, technical or forced construction of words, exclude cases from it that are obviously within its provisions. What must be sought for always is the intention of the legislature, and the duty of the court is to give effect to that intention as disclosed by the words used.

As early as the case of *King* v. *Inhabitants of Hodnett*, 1 T. R. 96, 101, Mr. Justice Buller said: "It is not true that the courts in the exposition of penal statutes are to narrow the construction." In *United States* v. *Wiltberger*, 5 Wheat. 76, 95, Chief Justice Marshall, delivering the judgment of this court and referring to the rule that penal statutes are to be construed strictly, said: "It is a modification of the ancient maxim, and amounts to this, that though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases which those words, in their ordinary acceptation, or in that sense in which the legislature has obviously used them, would comprehend. The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction." In *United States* v. *Morris*, 14 Pet. 464, 475, this court, speaking by Chief Justice Taney, said: "In expounding a penal statute the court certainly will not extend it beyond

the plain meaning of its words; for it has been long and well settled that such statutes must be construed strictly. Yet the evident intention of the legislature ought not to be defeated by a forced and overstrict construction. 5 Wheat. 95." So, in *The Schooner Industry,* 1 Gall. 114, 117, Mr. Justice Story said: "We are undoubtedly bound to construe penal statutes strictly; and not to extend them beyond their obvious meaning by strained inferences. On the other hand, we are bound to interpret them according to the manifest import of the words, and to hold all cases which are within the words and the mischiefs to be within the remedial influence of the statute." In another case the same eminent jurist said: "I agree to that rule in its true and sober sense; and that is, that penal statutes are not to be enlarged by implication or extended to cases not obviously within their words and purport. . . . In short, it appears to me that the proper course in all these cases is to search out and follow the true intent of the legislature, and to adopt that sense of the words which harmonizes the best with the context, and promotes in the fullest manner the apparent policy and objects of the legislature." *United States* v. *Winn,* 3 Sumner, 209, 211, 212. In *People* v. *Bartow,* 6 Cowen, 290, the highest court of New York said: "Although a penal statute is to be construed strictly, the court are not to disregard the plain intent of the legislature. Among other things, it is well settled that a statute which is made for the good of the public, ought, although it be penal, to receive an equitable construction." So, in *Commonwealth* v. *Martin,* 17 Massachusetts, 359, 362, the highest court of Massachusetts said: "If a statute, creating or increasing a penalty, be capable of two constructions, undoubtedly that construction which operates in favor of life or liberty is to be adopted; but it is not justifiable in this, any more than in any other case, to imagine ambiguities, merely that a lenient construction may be adopted. If such were the privilege of a court, it would be easy to obstruct the public will in almost every statute enacted; for it rarely happens that one is so precise and exact in its terms, as to

preclude the exercise of ingenuity in raising doubts about its construction." There are cases almost without number in this country and in England to the same effect.

Guided by these long-established rules of construction, it is manifest that if the Anti-Trust Act is held not to embrace a case such as is now before us, the plain intention of the legislative branch of the Government will be defeated. If Congress has not, by the words used in the act, described this and like cases, it would, we apprehend, be impossible to find words that would describe them. This, it must be remembered, is a suit in equity, instituted by authority of Congress "to prevent and restrain violations of the act," § 4; and the court, in virtue of a well settled rule governing proceedings in equity, may mould its decree so as to accomplish practical results—such results as law and justice demand. The defendants have no just cause to complain of the decree, in matter of law, and it should be affirmed.

The judgment of the court is that the decree below be and hereby is affirmed, with liberty to the Circuit Court to proceed in the execution of its decree as the circumstances may require.

*Affirmed.*

Mr. Justice Brewer, concurring.

I cannot assent to all that is said in the opinion just announced, and believe that the importance of the case and the questions involved justify a brief statement of my views.

First, let me say that while I was with the majority of the court in the decision in *United States* v. *Freight Association,* 166 U. S. 290, followed by the cases of *United States* v. *Joint Traffic Association,* 171 U. S. 505, *Addyston Pipe & Steel Company* v. *United States,* 175 U. S. 211, and *Montague & Co.* v. *Lowry,* 193 U. S. 38, decided at the present term, and, while a further examination (which has been induced by the able and exhaustive arguments of counsel in the present case) has not disturbed the conviction that those cases were rightly decided,

I think that in some respects the reasons given for the judgments cannot be sustained.   Instead of holding that the Anti-Trust Act included all contracts, reasonable or unreasonable, in restraint of interstate trade, the ruling should have been that the contracts there presented were unreasonable restraints of interstate trade, and as such within the scope of the act.  That act, as appears from its title, was leveled at only "unlawful restraints and monopolies."  Congress did not intend to reach and destroy those minor contracts in partial restraint of trade which the long course of decisions at common law had affirmed were reasonable and ought to be upheld.   The purpose rather was to place a statutory prohibition with prescribed penalties and remedies upon those contracts which were in direct restraint of trade, unreasonable and against public policy.  Whenever a departure from common law rules and definitions is claimed, the purpose to make the departure should be clearly shown.   Such a purpose does not appear and such a departure was not intended.

Further, the general language of the act is also limited by the power which each individual has to manage his own property and determine the place and manner of its investment.   Freedom of action in these respects is among the inalienable rights of every citizen.   If, applying this thought to the present case, it appeared that Mr. Hill was the owner of a majority of the stock in the Great Northern Railway Company he could not by any act of Congress be deprived of the right of investing his surplus means in the purchase of stock of the Northern Pacific Railway Company, although such purchase might tend to vest in him through that ownership a control over both companies.   In other words, the right, which all other citizens had, of purchasing Northern Pacific stock could not be denied to him by Congress because of his ownership of stock in the Great Northern Company.   Such was the ruling in *Pearsall* v. *Great Northern Railway,* 161 U. S. 646, in which this court said (p. 671), in reference to the right of the stockholders of the Great Northern Company to purchase the stock of the

Northern Pacific Railway Company: "Doubtless these stockholders could lawfully acquire by individual purchases a majority, or even the whole of the stock of the reorganized company, and thus possibly obtain its ultimate control; but the companies would still remain separate corporations with no interests, as such, in common."

But no such investment by a single individual of his means is here presented. There was a combination by several individuals separately owning stock in two competing railroad companies to place the control of both in a single corporation. The purpose to combine and by combination destroy competition existed before the organization of the corporation, the Securities Company. That corporation, though nominally having a capital stock of $400,000,000, had no means of its own; $30,000 in cash was put into its treasury, but simply for the expenses of organization. The organizers might just as well have made the nominal stock a thousand millions as four hundred, and the corporation would have been no richer or poorer. A corporation, while by fiction of law recognized for some purposes as a person and for purposes of jurisdiction as a citizen, is not endowed with the inalienable rights of a natural person. It is an artificial person, created and existing only for the convenient transaction of business. In this case it was a mere instrumentality by which separate railroad properties were combined under one control. That combination is as direct a restraint of trade by destroying competition as the appointment of a committee to regulate rates. The prohibition of such a combination is not at all inconsistent with the right of an individual to purchase stock. The transfer of stock to the Securities Company was a mere incident, the manner in which the combination to destroy competition and thus unlawfully restrain trade was carried out.

If the parties interested in these two railroad companies can, through the instrumentality of a holding corporation, place both under one control, then in like manner, as was conceded on the argument by one of the counsel for the appellants, could

the control of all the railroad companies in the country be placed in a single corporation. Nor need this arrangement for control stop with what has already been done. The holders of $201,000,000 of stock in the Northern Securities Company might organize another corporation to hold their stock in that company, and the new corporation holding the majority of the stock in the Northern Securities Company and acting in obedience to the wishes of a majority of its stockholders would control the action of the Securities Company and through it the action of the two railroad companies, and this process might be extended until a single corporation whose stock was owned by three or four parties would be in practical control of both roads, or, having before us the possibilities of combination, the control of the whole transportation system of the country. I cannot believe that to be a reasonable or lawful restraint of trade.

Again, there is by this suit no interference with state control. It is a recognition rather than a disregard of its action. This merging of control and destruction of competition was not authorized, but specifically prohibited by the State which created one of the railroad companies, and within whose boundaries the lines of both were largely located and much of their business transacted. The purpose and policy of the State are therefore enforced by the decree. So far as the work of the two railroad companies was interstate commerce, it was subject to the control of Congress, and its purpose and policy were expressed in the act under which this suit was brought.

It must also be remembered that under present conditions a single railroad is, if not a legal, largely a practical, monopoly, and the arrangement by which the control of these two competing roads was merged in a single corporation broadens and extends such monopoly. I cannot look upon it as other than an unreasonable combination in restraint of interstate commerce—one in conflict with state law and within the letter and spirit of the statute and the power of Congress. Therefore I concur in the judgment of affirmance

I have felt constrained to make these observations for fear that the broad and sweeping language of the opinion of the court might tend to unsettle legitimate business enterprises, stifle or retard wholesome business activities, encourage improper disregard of reasonable contracts and invite unnecessary litigation.

MR. JUSTICE WHITE, with whom concurred MR. CHIEF JUSTICE FULLER, MR. JUSTICE PECKHAM, and MR. JUSTICE HOLMES, dissenting.

The Northern Securities Company is a New Jersey corporation; the Great Northern Railway Company, a Minnesota one; and the Northern Pacific Railway Company, a Wisconsin corporation. Whilst in the argument at bar the Government referred to the subject, nevertheless it expressly disclaimed predicating any claim for relief upon the fact that the predecessor in title of the Northern Pacific Railway Company was a corporation created by act of Congress. That fact, therefore, may be eliminated.

The facts essential to be borne in mind to understand my point of view, without going into details, are as follows: The lines of the Northern Pacific and the Great Northern Railway companies are both transcontinental, that is, trunk lines to the Pacific Ocean, and in some aspects are conceded to be competing. Mr. Morgan and Mr. Hill and a few persons immediately associated with them separately acquired and owned capital stock of the Northern Pacific Railway Company, aggregating a majority thereof. Mr. Hill and others associated with him owned, in the same manner, about one-third of the capital stock of the Great Northern Railway Company, the balance of the stock being distributed among about eighteen hundred stockholders. Although Mr. Hill and his immediate associates owned only one-third of the stock, the confidence reposed in Mr. Hill was such that, through proxies, his influence was dominant in the affairs of that company.

Under these circumstances Mr. Morgan and Mr. Hill organized under the laws of New Jersey the Northern Securities Company. The purpose was that the company should become the holder of the stock of the two railroads. This was to be effected by having the Northern Securities Company give its stock in exchange for that of the two railroad companies. Whilst the purpose of the promoters was mainly to exchange the stock held by them in the two railroads for the Northern Securities Company stock, nevertheless the right of stockholders generally in the two railroads to make a similar exchange or to sell their stock to the Securities Company was provided for. Under the arrangement the Northern Securities Company came to be the registered holder of a majority of the stock of both the railroads. It is not denied that the charter, and the acts done under it, of the Northern Securities Company, were authorized by the laws of New Jersey, and, therefore, in so far as those laws were competent to sanction the transaction, the corporation held the stock in the two railroads secured by the law of the State of its domicil.

The government by its bill challenges the right of the Northern Securities Company to hold and own the stock in the two railroads. The grounds upon which the relief sought was based were, generally speaking, as follows: That as the two railroads were competing lines engaged in part in interstate commerce, the creation of the Northern Securities Company and the acquisition by it of a majority of the stock of both roads was contrary to the act of Congress known as the Anti-Trust Act. 26 Stat. 209. The clauses of the act which it was charged were violated were the first section, declaring illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations;" and the provisions of the second section making it a misdemeanor for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several

States or with foreign nations." The court below sustained the contentions of the government. It, therefore, enjoined the two railroad companies from allowing the Northern Securities Company to vote the stock standing in its name or to pay to that company any dividends upon the stock by it held. On the giving, however, of a bond fixed by the court below the decree relating to the payment of dividends was suspended pending the appeal to this court.

The court recognized, however, the right of the Northern Securities Company to retransfer the stock in both railroads to the persons from whom it had been acquired. The correctness of the decree below is the question presented for decision.

Two questions arise. Does the Anti-Trust Act, when rightly interpreted, apply to the acquisition and ownership by the Northern Securities Company of the stock in the two railroads, and, second, if it does, had Congress the power to regulate or control such acquisition and ownership? As the question of power lies at the root of the case, I come at once to consider that subject. Before doing so, however, in order to avoid being misled by false or irrelevant issues, it is essential to briefly consider two questions of fact. It is said, first, that the mere exchange by the Northern Securities Company of its stock for stock in the railroads did not make the Northern Securities Company the real owner of the stock in the railroads, since the effect of the transaction was to cause the Securities Company to become merely the custodian or trustee of the stock in the railroads; second, that as the two railroads were both over-capitalized, stock in them furnished no sufficient consideration for the issue of the stock of the Northern Securities Company. It would suffice to point out, *a*, that the proof shows that nearly nine million dollars were paid by the Securities Company for a portion of the stock acquired by it, and that, moreover, nearly thirty-five million dollars were expended by the Securities Company in the purchase of bonds of the Northern Pacific Company, which have been converted by the Securities Company into the stock of that railroad,

which the Securities Company now holds; and, *b*, that the market value of the railroad stocks is, moreover, indisputably shown by the proof to have been equal to the value fixed on them for the purpose of the exchange or purchase of such stock by the Northern Securities Company. Be this as it may, it is manifest that these considerations can have no possible influence on the question of the power of Congress in the premises; and therefore the suggestions can serve only to obscure the controversy. If the power was in Congress to legislate on the subject it becomes wholly immaterial what was the nature of the consideration paid by the company for the stock by it acquired and held if such acquisition and ownership, even if real, violated the act of Congress. If on the contrary the authority of Congress could not embrace the right of the Northern Securities Company to acquire and own the stock, the question of what consideration the Northern Securities Company paid for the stock or the method by which it was transferred must necessarily be beyond the scope of the act of Congress.

In testing the power of Congress I shall proceed upon the assumption that the act of Congress forbids the acquisition of a majority of the stock of two competing railroads engaged in part in interstate commerce by a corporation or any combination of persons.

The authority of Congress, it is conceded by all, must rest upon the power delegated by the eighth section of the first article of the Constitution, "to regulate Commerce with foreign Nations, and among the several States and with the Indian tribes." The proposition upon which the case for the government depends then is that the ownership of stock in railroad corporations created by a State is interstate commerce, wherever the railroads engage in interstate commerce.

At the outset, the absolute correctness is admitted of the declaration of Mr. Chief Justice Marshall in *Gibbons* v. *Ogden,* that the power of Congress to regulate commerce among the

States and with foreign nations "is complete in itself and may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution;" and that if the end to be accomplished is within the scope of the Constitution, "all means which are appropriate, which are plainly adapted to that end and which are not prohibited, are constitutional."

The plenary authority of Congress over interstate commerce, its right to regulate it to the fullest extent, to fix the rates to be charged for the movement of interstate commerce, to legislate concerning the ways and vehicles actually engaged in such traffic, and to exert any and every other power over such commerce which flows from the authority conferred by the Constitution, is thus conceded. But the concessions thus made do not concern the question in this case, which is not the scope of the power of Congress to regulate commerce, but whether the power extends to regulate the ownership of stock in railroads, which is not commerce at all. The confusion which results from failing to observe this distinction will appear from an accurate analysis of *Gibbons* v. *Ogden*, for in that case the great Chief Justice was careful to define the commerce, the power to regulate which was conferred upon Congress, and in the passages which I have previously quoted, simply pointed out the rule by which it was to be determined in any case whether Congress, in acting upon the subject, had gone beyond the limits of the power to regulate commerce as it was defined in the opinion. Accepting the test announced in *Gibbons* v. *Ogden* for determining whether a given exercise of the power to regulate commerce has in effect transcended the limits of regulation, it is essential to accept also the luminous definition of commerce announced in that case and approved so many times since, and hence to test the question for decision by that definition. The definition is this: "Commerce undoubtedly is traffic, but it is something more, it is intercourse. It describes the commercial intercourse between nations and parts of nations in all its branches, *and is regulated*

*by prescribing rules for carrying on that intercourse."* (Italics mine.)

Does the delegation of authority to Congress to regulate commerce among the States embrace the power to regulate the ownership of stock in state corporations, because such corporations may be in part engaged in interstate commerce? Certainly not, if such question is to be governed by the definition of commerce just quoted from *Gibbons* v. *Ogden.* Let me analyze the definition. "Commerce undoubtedly is traffic, but it is something more, it is intercourse;" that is, traffic between the States and intercourse between the States. I think the ownership of stock in a state corporation cannot be said to be in any sense traffic between the States or intercourse between them. The definition continues: "It describes the commercial intercourse between nations and parts of nations." Can the ownership of stock in a state corporation, by the most latitudinarian construction, be embraced by the words "commercial intercourse between nations and parts of nations?" And to remove all doubt, the definition points out the meaning of the delegation of power to regulate, since it says that it is to be "regulated by prescribing rules for carrying on that intercourse." Can it in reason be maintained that to prescribe rules governing the ownership of stock within a State in a corporation created by it is within the power to prescribe rules for the regulation of intercourse between citizens of different States?

But if the question be looked at with reference to the powers of the Federal and state governments, the general nature of the one and the local character of the other, which it was the purpose of the Constitution to create and perpetuate, it seems to me evident that the contention that the authority of the National Government under the commerce clause gives the right to Congress to regulate the ownership of stock in railroads chartered by state authority, is absolutely destructive of the Tenth Amendment to the Constitution, which provides that "the powers not delegated to the United States by the Consti-

tution, nor prohibited by it to the States, are reserved to the States respectively or to the people." This must follow, since the authority of Congress to regulate on the subject can in reason alone rest upon the proposition that its power over commerce embraces the right to control the ownership of railroads doing in part an interstate commerce business. But power to control the ownership of all such railroads would necessarily embrace their organization. Hence it would result that it would be in the power of Congress to abrogate every such railroad charter granted by the States from the beginning if Congress deemed that the rights conferred by such state charters tended to restrain commerce between the States or to create a monopoly concerning the same.

Besides, if the principle be acceded to, it must in reason be held to embrace every consolidation of state railroads which may do in part an interstate commerce business, even although such consolidation may have been expressly authorized by the laws of the States creating the corporations.

It would likewise overthrow every state law forbidding such consolidations, for if the ownership of stock in state corporations be within the regulating power of Congress under the commerce clause and can be prohibited by Congress, it would be within the power of that body to permit that which it had the right to prohibit.

But the principle that the ownership of property is embraced within the power of Congress to regulate commerce, whenever that body deems that a particular character of ownership, if allowed to continue, may restrain commerce between the States or create a monopoly thereof, is in my opinion in conflict with the most elementary conceptions of rights of property. For it would follow if Congress deemed that the acquisition by one or more individuals engaged in interstate commerce of more than a certain amount of property would be prejudicial to interstate commerce, the amount of property held or the amount which could be employed in interstate commerce could be regulated.

In the argument at bar many of the consequences above indicated as necessarily resulting from the contention made were frankly admitted, since it was conceded that, even although the holding of the stock in the two railroads by the Northern Securities Company which is here assailed, was expressly authorized by the laws of both the States by which the railroad corporations were created, as it was by the law of the State of New Jersey, nevertheless as such authority, if exerted by the States, would be a regulation of interstate commerce, it would be repugnant to the Constitution as an attempt on the part of the States to interfere with the paramount authority of Congress on that subject. True, this assertion, made in the oral argument, in the printed argument is qualified by an intimation that the rule would not apply to state action taken before the adoption of the Anti-Trust Act, since up to that time, in consequence of the inaction of Congress on the subject, the States were free to legislate as they pleased regarding the matter. But this suggestion is without foundation to rest on. It has long since been determined by this court that where a particular subject matter is national in its character and requires uniform regulation, the absence of legislation by Congress on the subject indicates the will of Congress that the subject should be free from state control. *County of Mobile* v. *Kimball*; 102 U. S. 691; *Robbins* v. *Shelby Taxing-District*, 120 U. S. 489, 493; *United States* v. *E. C. Knight Company*, 156 U. S. 1.

It is said, moreover, that the decision of this case does not involve the consequences above pointed out, since the only issue in this case is the right of the Northern Securities Company to acquire and own the stock. The right of that company to do so, it is argued, is one thing; the power of individuals or corporations, when not merely organized to hold stock, an entirely different thing. My mind fails to seize the distinction. The only premise by which the power of Congress can be extended to the subject matter of the right of the Securities Company to own the stock must be the proposition that such

ownership is within the legislative power of Congress, and if that proposition be admitted it is not perceived by what process of reasoning the power of Congress over the subject matter of ownership is to be limited to ownership by particular classes of corporations or persons. If the power embraces ownership, then the authority of Congress over all ownership which in its judgment may affect interstate commerce necessarily exists. In other words, the logical result of the asserted distinction amounts to one of two things. Either that nothing is decided or that a decree is to be entered having no foundation upon which to rest. This is said because if the control of the ownership of stock in competing roads by one and the same corporation is within the power of Congress, and creates a restraint of trade or monopoly forbidden by Congress, it is not conceivable to me how exactly similar ownership by one or more individuals would not create the same restraint or monopoly, and be equally within the prohibition which it is decided Congress has imposed. Besides the incongruity of the conclusion resulting from the alleged distinction, to admit it would do violence to both the letter and spirit of the Constitution, since it would in effect hold that, although a particular act was a burden upon interstate commerce or a monopoly thereof, individuals could lawfully do the act, provided only they did not use the instrumentality of a corporation. But this court long since declared that the power to regulate commerce, conferred upon Congress, was "general and includes alike commerce by individuals, partnerships, associations and corporations." *Paul* v. *Virginia*, 8 Wall. 168, 183.

Indeed, the natural reluctance of the mind to follow an erroneous principle to its necessary conclusion, and thus to give effect to a grievous wrong arising from the erroneous principle, is an admonition that the principle itself is wrong. That admonition, I submit, is conclusively afforded by the decree which is now affirmed. Without stopping to point out what seems to me to be the confusion, contradiction and denial of rights of property which the decree exemplifies, let me see

if in effect it is not at war with itself and in conflict with the principle upon which it is assumed to be based.

Fundamentally considered, the evil sought to be remedied is the restraint of interstate commerce and the monopoly thereof, alleged to have been brought about, through the acquisition by Mr. Morgan and Mr. Hill and their friends and associates, of a controlling interest in the stock of both the roads. And yet the decree, whilst forbidding the use of the stock by the Northern Securities Company, authorizes its return to the alleged conspirators, and does not restrain them from exercising the control resulting from the ownership. If the conspiracy and combination existed and was illegal, my mind fails to perceive why it should be left to produce its full force and effect in the hands of the individuals by whom it was charged the conspiracy was entered into.

It may, however, be said that even if the results which I have indicated be held necessarily to arise from the principles contended for by the government, it does not follow that such power would ever be exerted by Congress, or, if exerted, would be enforced to the detriment of charters granted by the States to railroads or consolidations thereof, effected under state authority, or the ownership of stock in such railroads by individuals, or the rights of individuals to acquire property by purchase, lease or otherwise, and to make any and all contracts concerning property which may thereafter become the subject matter of interstate commerce. The first suggestion is at once met by the consideration that it has been decided by this court that, as the Anti-Trust Act forbids any restraint, it therefore embraces even reasonable contracts or agreements. If, then, the ownership of the stock of the two railroads by the Northern Securities Company is repugnant to the act it follows that ownership, whether by the individual or another corporation, would be equally within the prohibitions of the act. As to the second, true it is that by the terms of the Anti-Trust Act the power to put its provisions in motion is, as to many particulars, confided to the highest law officer of the govern-

374                    OCTOBER TERM, 1903.

WHITE, J., The CHIEF JUSTICE, PECKHAM, HOLMES, JJ., dissenting. 193 U. S.

ment, and if that officer did not invoke the aid of the courts to restrain the rights of the railroads previously chartered by the States to enjoy the benefits conferred upon them by state legislation, or to prevent individuals from exercising their right of ownership and contract, the law in these respects would remain a dead letter. But to indulge in this assumption would be but to say that the law would not be enforced by the highest law officer of the government, a conclusion which, of course, could not be indulged in for a moment. In any view, such suggestion but involves the proposition that vast rights of property, instead of resting upon constitutional and legal sanction, must alone depend upon whether an executive officer might elect to enforce the law—a conclusion repugnant to every principle of liberty and justice.

Having thus by the light of reason sought to show the unsoundness of the proposition that the power of Congress to regulate commerce extends to controlling the acquisition and ownership of stock in state corporations, railroad or otherwise, because they may be doing an interstate commerce business, or to the consolidation of such companies under the sanction of state legislation, or to the right of the citizen to enjoy his freedom of contract and ownership, let me now endeavor to show, by a review of the practices of the governments, both state and national, from the beginning and the adjudications of this court, how wanting in merit is the proposition contended for. It may not be doubted that from the foundation of the government, at all events to the time of the adoption of the Anti-Trust Act of 1890, there was an entire absence of any legislation by Congress even suggesting that it was deemed by any one that power was possessed by Congress to control the ownership of stock in railroad or other corporations; because such corporations engaged in interstate commerce. On the contrary, when Congress came to exert its authority to regulate interstate commerce as carried on by railroads, manifested by the adoption of the interstate commerce act, 24 Stat. 379, it sedulously confined the provisions of that act to the

carrying on of interstate commerce itself, including the reason-
ableness of the rates to be charged for carrying on such com-
merce and other matters undeniably concerning the fact of
interstate commerce. The same conception was manifested
subsequently in legislation concerning safety appliances to be
used by railroads, since the provisions of the act were confined
to such appliances when actually employed in the business of
interstate commerce. 27 Stat. 531. It also may not be
doubted that from the beginning the various States of the
Union have treated the incorporation and organization of
railroad companies and the ownership of stock therein as
matters within their exclusive authority. Under this con-
ception of power in the States, universally prevailing and
always acted upon, the entire railroad system of the United
States has been built up. Charters, leases and consolidations
under the sanction of state laws lie at the basis of that enor-
mous sum of property and those vast interests represented
by the railroads of the United States. Extracts from the
reports of the Interstate Commerce Commission and from a
standard authority on the subject, which were received in
evidence, demonstrate that in effect nearly every great railroad
system in the United States is the result of the consolidation
and unification of various roads, often competitive, such con-
solidation or unification of management having been brought
about in every conceivable form, sometimes by lease under
state authority, sometimes by such leases made where there
was no prohibition against them, and by stock acquisitions
made by persons or corporations in order to acquire a con-
trolling interest in both roads. Without stopping to recite
details on the subject, I content myself with merely mentioning
a few of the instances where great systems of railroad have been
formed by the unification of the management of competitive
roads, by consolidation or otherwise, often by statutory au-
thority. These instances embrace the Boston and Maine
system, the New York, New Haven and Hartford, the New
York Central, the Reading, and the Pennsylvania systems.

376          OCTOBER TERM, 1903.

WHITE, J., The CHIEF JUSTICE, PECKHAM, HOLMES, JJ., dissenting. 193 U. S.

One of the illustrations—as to the New York Central system —is the case of the Hudson River Railroad on one side of the Hudson River and the West Shore Railroad on the other, both parallel roads and directly competitive, and both united in one management by authority of a legislative act. It is indeed remarkable, if the whole subject was within the paramount power of Congress and not within the authority of the States, that there should have been a universal understanding to the contrary from the beginning. When it is borne in mind that such universal action related to interests of the most vital character, involving property of enormous amount concerning the welfare of the whole people, it is impossible in reason to deny the soundness of the assumption that it was the universal conviction that the States, and not Congress, had control of the subject matter of the organization and ownership of railroads created by the States. And the same inference is applicable to the condition of things which has existed since the adoption of the Anti-Trust Act in 1890. Who can deny that from that date to this consolidations and unification of management, by means of leases, stock ownership by individuals or corporations, have been carried on, when not prohibited by state laws, to a vast extent, and that during all this time, despite the energy of the government in invoking the Anti-Trust Law, that no assertion of power in Congress under that act to control the ownership of stock was ever knowingly made until first asserted in this cause. Quite recently Congress has amended the interstate commerce act by provisions deemed essential to make its prohibitions more practically operative, and yet no one of such provisions lends itself even to the inference that it was deemed by any one that the power of Congress extended to the control of stock ownership. Certainly the States have not so considered it. As a matter of public history it is to be observed that not long since, by authority of the legislature of the State of Massachusetts, a controlling interest by lease of the Boston and Albany road passed to the New York Central system.

The decisions of this court to my mind leave no room for doubt on the subject. . As I have already shown, the very definition of the power to regulate commerce, as announced in *Gibbons* v. *Ogden,* excludes the conception that it extends to stock ownership. I shall not stop to review a multitude of decisions of this court concerning interstate commerce, which, whilst upholding the paramount authority of Congress over that subject, at the same time treated it as elementary, that the effect of the power over commerce between the States was not to deprive the States of their right to legislate concerning the ownership of property of every character or to create railroad corporations and to endow them with such powers as were deemed appropriate, or to deprive the individual of his freedom to acquire, own and enjoy property by descent, contract or otherwise, because railroads or other property might become the subject of interstate commerce.

In *Paul* v. *Virginia,* 8 Wall. 168, the question was as to the power of the State of Virginia to license a foreign insurance company, and one of the contentions considered was whether the contract of insurance, since it was related to .commerce, was within the regulating power of Congress and not of the State of ,Virginia. The proposition was disposed of in the following language (p. 183):

"Issuing a policy of insurance is not a transaction of commerce. The policies are simply contracts of indemnity against loss by fire, entered into between the corporations and the assured, for a consideration paid by the latter. These contracts are not articles of commerce in any proper meaning of the word. They are not subjects of trade and barter offered in the market as something having an existence and value independent of the parties to them. They are not commodities to be shipped or forwarded from one State to another, and then put up for sale. They are like other personal contracts between parties which are completed by their signature and the transfer of the consideration. Such contracts are not interstate transactions, though the parties may be domiciled

in different States.   The policies do not take effect—are not
executed contracts—until delivered by the agent in Virginia.
They are, then, local transactions, and are governed by the
local law.    They do not constitute a part of the commerce
between the States any more than a contract for the purchase
and sale of goods in Virginia by a citizen of New York whilst
in Virginia would constitute a portion of such commerce."

In other words, the court plainly pointed out the distinction
between interstate commerce as such and the contracts con-
cerning, or the ownership of property which might become the
subjects of interstate commerce.   And the authority of *Paul*
v. *Virginia* has been repeatedly approved in subsequent cases,
which are so familiar as not to require citation.

In *Railroad Co.* v. *Maryland*, 21 Wall. 456, the question was
this: The State of Maryland had chartered the Baltimore and
Ohio Railroad Company, and in the charter had imposed upon
it the duty of paying to the State a certain proportion of all its
receipts from freight, which applied as well to interstate as
domestic freight.   The argument was that these provisions
were repugnant to the commerce clause, because they neces-
sarily increased the sum which the railroad would have to
charge, and thereby constituted a regulation of commerce.
The court held the law not to be repugnant to the Constitution,
and in the course of the opinion said (p. 473):

"In view, however, of the very plenary powers which a
State has always been conceded to have over its own territory,
its highways, its franchises and its corporations, we cannot
regard the stipulation in question as amounting to either of
these unconstitutional acts."

True it is that some of the expressions used in the opinion
in the case just cited, giving rise to the inference that there
was power in the State to regulate the rates of freight on inter-
state commerce, may be considered as having been overruled
by *Wabash Railroad Company* v. *Illinois*, 118 U. S. 557.   But
that case also in the fullest manner pointed out the fact that
the power to regulate commerce, conferred on Congress by the

Constitution, related not to the mere ownership of property or to contracts concerning property, because such property might subsequently be used in interstate commerce or become the subject of it. For instance, the definition given of interstate commerce in *Gibbons* v. *Ogden*, previously referred to, was reiterated and in addition the definition expounded in *County of Mobile* v. *Kimball*, 102 U. S. 691, was approvingly quoted. That definition was as follows (p. 574):

" 'Commerce with foreign countries and among the States, strictly construed, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale and exchange of commodities. For the regulation of commerce as thus defined there can be only one system of rules, applicable alike to the whole country; and the authority which can act for the whole country can alone adopt such a system. Action upon it by separate States is not, therefore, permissible. Language affirming the exclusiveness of the grant of power over commerce *as thus defined* may not be inaccurate, when it would be so *if applied to legislation upon subjects which are merely auxiliary to commerce.*' "

In *Ashley* v. *Ryan*, 153 U. S. 436, this was the question: The property of various railroad corporations operating in the States of Ohio, Michigan, Indiana, Illinois and Missouri had been sold under decrees of foreclosure. The purchasers of the respective lines availed themselves of the Ohio statutes, and consolidated all the corporations into one so as to form a single system, the Wabash. On presenting the articles of consolidation to the Secretary of State of Ohio, that officer demanded a fee imposed by the Ohio statutes, predicated upon the sum total of the capital stock of the consolidated company. This was refused on the ground that the State of Ohio had no right to make the charge, and that its doing so was repugnant to the commerce clause of the Constitution of the United States and to the Fourteenth Amendment. This court decided against this contention. It held that, as the right to consolidate could

alone arise from the Ohio law, the corporation could not avail of that law and avoid the condition which the law imposed. Speaking of the consolidation, the court said (p. 440):

"The rights thus sought could only be acquired by the grant of the State of Ohio, and depended for their existence upon the provisions of its laws.    Without that State's consent they could not have been procured."

And, after a copious review of the authorities concerning the power of the State over the consolidation, the case was summed up by the court in the following passage (p. 446):

"Considering, as we do, that the payment of the charge was a condition imposed by the State of Ohio upon the taking of corporate being or the exercise of corporate franchises, *the right to which depended solely on the will of that State,*" (italics mine,) "and hence that liability for the charge was entirely optional, we conclude that the exaction constituted no tax upon interstate commerce, or the right to carry on the same, or the instruments thereof, and that its enforcement involved no attempt on the part of the State to extend its taxing power beyond its territorial limits."

How a right which was thus decided to depend *solely* upon the authority of the States can now be said to depend solely upon the will of Congress, I do not perceive.

In *United States* v. *E. C. Knight Co.,* 156 U. S. 1, the facts and the relief based on them were thus stated by Mr. Chief Justice Fuller, delivering the opinion of the court (p. 9):

"By the purchase of the stock of the four Philadelphia refineries, with shares of its own stock, the American Sugar Refining Company acquired nearly complete control of the manufacture of refined sugar within the United States.    The bill charged that the contracts under which these purchases were made constituted combinations in restraint of trade, and that in entering into them the defendants combined and conspired to restrain the trade and commerce in refined sugar among the several States and with foreign nations, contrary to the act of Congress of July 2, 1890."

After referring, in a general way, to what constituted a monopoly or restraint of trade at common law, the question for decision was thus stated (p. 11):

"The fundamental question is, whether conceding that the existence of a monopoly in manufacture is established by the evidence, that monopoly can be directly suppressed under the act of Congress in the mode attempted by this bill."

Examining this question as to the power of Congress, it was observed (p. 11):

"It cannot be denied that the power of a State to protect the lives, health and property of its citizens, and to preserve good order and the public morals, 'the power to govern men and things within the limits of its dominion,' is a power originally and always belonging to the States, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive."

Next, pointing out that the power of Congress over interstate commerce and the fact that its failure to legislate over subjects requiring uniform legislation expressed the will of Congress that the State should be without power to act on that subject, the court came to consider whether the power of Congress to regulate commerce embraced the authority to regulate and control the ownership of stock in the state sugar refining companies, because the products of such companies when manufactured might become the subject of interstate commerce. Elaborately passing upon that question and reaffirming the definition of Chief Justice Marshall of commerce, in the constitutional sense, it was held that, whilst the power of Congress extended to commerce as thus defined, it did not embrace the ownership of stock in state corporations, because the products of such manufacture might subsequently become the subject of interstate commerce.

The parallel between the two cases is complete. The one corporation acquired the stock of other and competing corporations by exchange for its own. It was conceded, for the

purposes of the case, that in doing so monopoly ·had been brought about in the· refining of· sugar, that the sugar to be produced was likely to become the subject of interstate commerce, and indeed that part of it would certainly become so: But the power of Congress was decided not to extend to the subject, because the ownership of the stock in the corporations was not itself commerce.

In *Pearsall* v. *The Great Northern Railway Company*, 161 ·· U. S. 646, the question was whether the acquisition by the Great Northern road of· a controlling interest in the stock of the Northern Pacific Railway Company was a violation of a Minnesota statute prohibiting the consolidation of competing lines. It is at once evident that if the subject of consolidation was within the authority of Congress, as Congress had not · expressed its will upon the subject, the act of the legislature of Minnesota was void because· repugnant to the Constitution of the United States. But the possibility of such a contention was not thought of by either party to the cause or by the court itself. Treating the power of the State as undoubted, the court, speaking through Mr. Justice Brown, decided that the Minnesota law should be enforced. It was pointed out in the opinion that, as the charter was one granted by the State, the railroad company and the ownership of stock therein was subject to the state law, and this was made the basis of the· decision. Whilst, however, resting its conclusion upon the power of the State over the corporation by it created, the court was careful to recognize that the authority in the State was so complete, as the company was a state corporation, that the State had the right, *if it chose to do so, to authorize the consolidation, even although the lines were competing.*

In *Louisville & Nashville. Railroad* v. *Kentucky*, 161 U. S. 677, the power of the State to pass a law forbidding the consolidation of competing state railroad corporations doing in part an interstate commerce business was again considered, and a state statute in which the power was exercised was upheld. Here, again, it is to be observed that if the consolidation of

state railroad corporations, because they did in part an interstate commerce business, was within the paramount authority of Congress, that authority was exclusive and the state regulation which the court upheld was void. And this question, vital to the consideration of the case, and without passing upon which it could not have been decided did not escape observation, since it was explicitly pressed upon the court and was directly determined. The court, speaking through Mr. Justice Brown, said (pp. 701, 702):

"But little need be said in answer to the final contention of the plaintiff in error, that the assumption of a right to forbid the consolidation of parallel and competing lines is an interference with the power of Congress over interstate commerce. The same remark may be made with respect to all police regulations of interstate railways.

\* \* \* \* \* \* \* \*

"It has never been supposed that the dominant power of Congress over interstate commerce took from the States the power of legislation with respect to the instruments of such commerce, so far as the legislation was within its ordinary police powers. Nearly all the railways in the country have been constructed under state authority, and it cannot be supposed that they intended to abandon their power over them as soon as they were finished. The power to construct them involves necessarily the power to impose such regulations upon their operation as a sound regard for the interests of the public may seem to render desirable. In the division of authority with respect to interstate railways Congress reserves to itself the superior right to control their commerce and forbid interference therewith; while to the States remains the power to create and to regulate the instruments of such commerce, so far as necessary to the conservation of the public interests."

How one case could be more completely decisive of another than the ruling in the case just quoted is of this, I am unable to perceive.

The subject was considered at circuit in *In re Greene,* 52 Fed. Rep. 104. The case was this: A person was indicted in one State for creating a monopoly in violation of the Anti-Trust Act of Congress and was held in another State for extradition. The writ of *habeas corpus* was invoked, upon the contention that the face of the indictment did not state an offense against the United States, since the matters charged did not involve interstate commerce. The case is referred to, although it arose at circuit and was determined before the decisions of this court in the *Pearsall* and *Louisville and Nashville* cases, because it was decided by Mr. Justice Jackson, then a Circuit Judge, who subsequently, became a member of this court. The opinion manifests that the case was considered by Judge Jackson with that care which was his conceded characteristic and was stated by him with that lucidity which was his wont. In discharging the accused on the grounds stated in the application for the writ, Judge Jackson said (p. 112):

"Congress may place restrictions and limitations upon the right of corporations created and organized under its authority to acquire, use and dispose of property. It may also impose such restrictions and limitations upon the citizen in respect to the exercise of a public privilege or franchise conferred by the United States. But Congress certainly has not the power or authority under the commerce clause, or any other provision of the Constitution, to limit and restrict the right of corporations created by the States, or the citizens of the States, in the acquisition, control and disposition of property. Neither can Congress regulate or prescribe the price or prices at which such property, or products thereof, shall be sold by the owner or owners, whether corporations or individuals. It is equally clear that Congress has no jurisdiction over, and cannot make criminal, the aims, purposes and intentions of persons in the acquisition and control of property, which the States of their residence or creation sanction and permit. It is not material that such property, or the products thereof, may become the

NORTHERN SECURITIES CO. *v.* UNITED STATES. 385

193 U. S. WHITE, J., The CHIEF JUSTICE, PECKHAM, HOLMES, JJ., dissenting.

subject of trade or commerce among the several States or with foreign nations. Commerce among the States, within the exclusive regulating power of Congress, 'consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, as well as the purchase, sale and exchange of commodities.' *County of Mobile* v. *Kimball*, 102 U. S. 691, 702; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 203. In the application of this comprehensive definition, it is settled by the decision of the Supreme Court that such commerce includes, not only the actual transportation of commodities and persons between the States, but also the instrumentalities and processes of such transportation.

\*   \*   \*   \*   \*   \*   \*   \*

"That neither the production or manufacture of articles or commodities which constitute subjects of commerce, and which are intended for trade and traffic with citizens of other States, nor the preparation for their transportation from the State where produced or manufactured, prior to the commencement of the actual transfer, or transmission thereof to another State, constitutes that interstate commerce which comes within the regulating power of Congress; and, further, that after the termination of the transportation of commodities or articles of traffic from one State to another, and the mingling or merging thereof in the general mass of property in the State of destination, the sale, distribution and consumption thereof in the latter State forms no part of interstate commerce."

If this opinion had been written in the case now considered it could not more completely than its reasoning does have disposed of the contention that the ownership of stock by a corporation in competing railroads was commerce.

*United States* v. *Freight Association*, 166 U. S. 290, was this: A large number of railway companies, who were made defendants in the cause, had formed themselves into an association, known as the Trans-Missouri Freight Association, and the companies had bound themselves by the provisions contained in the articles of agreement. Many stipulations relating to

the carrying on of interstate commerce over the roads which were parties to the agreement were contained in it, and section 3 provided as follows:

"A committee shall be appointed to establish rates, rules and regulations on the traffic subject to this association, and to consider changes therein, and make rules for meeting the competition of outside lines. Their conclusions, when unanimous, shall be made effective when they so order, but if they differ the question at issue shall be referred to the managers of the lines parties hereto; and if they disagree it shall be arbitrated in the manner provided in article VII."

The government sought to dissolve the association on the ground that the agreement restrained commerce between the States, and therefore was in violation of the Anti-Trust Act. On the hearing in this court, as the agreement directly related in many particulars to interstate transportation and the charge, to be made therefor, it was conceded on all hands that it embraced subjects which came within the power of Congress to regulate commerce. The contentions on behalf of the association were these: First. That the movement of interstate commerce by railroads was not within the Anti-Trust Act, since Congress had regulated that subject by the interstate commerce act, and did not intend to amplify its provisions in any respect by the subsequent enactment of the Anti-Trust Law. Second. That even if this were not the case, and the movement of interstate commerce by railroads was affected by the Anti-Trust Statute, the particular agreement in question did not violate the act, because the agreement did not unreasonably restrain interstate commerce. Both these contentions were decided against the association, the court holding that the Anti-Trust Act did embrace interstate carriage by railroad corporations, and as that act prohibited any contract in restraint of interstate commerce, it hence embraced all contracts of that character, whether they were reasonable or unreasonable.

The same subject was considered in a subsequent case,

*United States* v. *Joint Traffic Association,* 171 U. S. 505. In that case also there was no question that the agreement between the railroads related to the movement of interstate commerce, but it was insisted that the particular agreement there involved did not seek to fix rates, but only to secure the continuation of just rates which had already been fixed, and hence was not within the Anti-Trust Law. If this were held not to be true, a reconsideration of the question's decided in the *Freight Association* case was invoked. The court reviewed and reiterated the rulings made in the *Freight Association* case and held that the particular agreement in question came within them.

I mention these two last cases not because they are apposite to the case in hand, for they are not, since the contracts which were involved in them confessedly concerned interstate commerce, whilst in this case the sole question is whether the ownership of stock in competing railroads does involve interstate commerce. The cases are referred to in connection with the decisions previously cited, because, taken together, they illustrate the distinction which this court has always maintained between the power of Congress over interstate commerce and its want of authority to regulate subjects not embraced within that grant. The same distinction is aptly shown in subsequent cases.

*Hopkins* v. *United States,* 171 U. S. 578, involved whether a particular agreement entered into between persons carrying on the business of selling cattle on commission, exclusively at the Kansas City stock yards was valid. At those yards cattle were received in vast numbers through the channels of interstate commerce, and from thence were distributed through such channels. For these reasons the business of those engaged exclusively in the sale of cattle on the stock yards was asserted to be interstate commerce and within the power of Congress to regulate. In the opinion of the court, delivered by Mr. Justice Peckham, it was at the outset said (p. 586):

"The relief sought in this case is based exclusively on the

act of Congress approved July 2, 1890, c. 647, entitled 'An act to protect trade and commerce against unlawful restraints and monopolies,' commonly spoken of as the Anti-Trust Act. 26 Stat. 209.

"The act has reference only to that trade or commerce which exists, or may exist, among the several States or with foreign nations, and has no application whatever to any other trade or commerce.

"The question meeting us at the threshold, therefore, in this case is, what is the nature of the business of the defendants, and are the by-laws, or any subdivision of them above referred to, in their direct effect in restraint of trade or commerce among the several States or with foreign nations; or does the case made by the bill and answer show that any one of the above defendants has monopolized, or attempted to monopolize, or combined or conspired with other persons to monopolize, any part of the trade or commerce among the several States or with foreign nations?"

Proceeding, then, to consider the agreement, it was pointed out that the contention that the sale of cattle on the stock yards constituted interstate commerce was without merit. The distinction between interstate commerce as such and the power to make contracts and to buy and sell property was clearly stated, and because of that distinction the agreement was held not to be within the act of Congress, because that act could and did only relate to interstate commerce.

And on the day the decision just referred to was announced another case under the Anti-Trust Act was decided. *Anderson* v. *United States*, 171 U. S. 604. The difference between that case and the *Hopkins* case was thus stated by Mr. Justice Peckham, in delivering the opinion of the court (p. 612):

"This case differs from that of *Hopkins* v. *United States*, *supra*, in the fact that these defendants are themselves purchasers of cattle on the market, while the defendants in the *Hopkins* case were only commission merchants who sold the cattle upon commission as a compensation for their services.

"Counsel for the Government assert that any agreement or combination among buyers of cattle coming from other States, of the nature of the by-laws in question, is an agreement or combination in restraint of interstate trade or commerce."

The court, however, said it did not deem it necessary to decide whether the fact that the merchants who entered into the agreement bought cattle in other States and shipped them to other States, caused their business to be interstate commerce, because in any event the court was of opinion that the agreement which was assailed, even if it involved interstate commerce, was not in violation of any of the provisions of the Anti-Trust Act.

The *Anderson* case was followed by *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211. The case involved deciding whether a particular combination of pipe manufacturers, looking to the control of the sale and transportation of such pipe over a large territory, embracing many States and a division of the territory between the members of the combination, was within the prohibitions of the Anti-Trust Act. Coming to consider the subject, the court, through Mr. Justice Peckham, analyzed the contract and pointed out its monopolistic features. In answer to the argument that the matter complained of was not commerce, because it related only to a sale of pipe, and therefore was within the rule announced in the *Knight* and *Hopkins* cases, the *Knight* case was approvingly reviewed, and its doctrine in effect was reaffirmed, the court observing (p. 240):

"The direct purpose of the combination in the *Knight* case was the control of the manufacture of sugar. There was no combination or agreement, in terms, regarding the future disposition of the manufactured articles; nothing looking to a transaction in the nature of interstate commerce.

$$* \quad * \quad * \quad * \quad * \quad * \quad * \quad *$$

"We think the case now before us involves contracts of the nature last before mentioned, not incidentally or collaterally,

but as a direct and immediate result of the combination engaged in by defendants. . . . *The defendants by reason of this combination and agreement could only send their goods out of the State in which they were manufactured for sale and delivery in another State, upon the terms and pursuant to the provisions of such combination.* As pertinently asked by the court below, was not this a direct restraint upon interstate commerce in those goods?" (Italics mine.)

Having thus found that the agreement concerned interstate commerce, because it directly purported to control the movement of goods from one State to the other, and besides sought to prohibit that movement or restrict the same to particular individuals, it was held that the contract was, for these reasons, within the prohibitions of the act of Congress, and was therefore void. I do not pause to consider the case of *Montague & Co.* v. *Lowry,* 193 U. S. 38, decided at this term, since on the face of the opinion it is patent that the contract directly concerned the shipment of goods from one State to another, and this was the sole and exclusive basis of the decision.

Now, it is submitted, that the decided cases just reviewed demonstrate that the acquisition and ownership of stock in competing railroads, organized under state law, by several persons or by corporations, is not interstate commerce, and, therefore, not subject to the control of Congress. It is, indeed, suggested that the cases establish a contrary doctrine. This is sought to be demonstrated by quoting passages from the opinions separated from their context apart from the questions which the cases involved. But as the issues which were decided in the *Knight,* in the *Pearsall,* in the *Louisville and Nashville* case and in the *Hopkins* case directly exclude the significance attributed to the passages from the opinions in those cases relied upon, it must follow that if such passages could, when separated from their context, have the meaning attributed to them the expressions would be mere *obiter.* And this consideration renders it unnecessary for me to analyze the passages to show that when they are read in connection with their con-

text they have not the meaning now sought to be attached to them. But other considerations equally render it unnecessary to particularly review the sentences relied upon. There can be no doubt that it was expressly decided in the *Knight* case that the acquisition of stock by one corporation in other corporations so as to control them all was not interstate commerce, *although the goods of the manufacturing companies whose stock was acquired might become the subject of interstate commerce.* If then the passage from the *Knight* case could be given the meaning sought to be affixed to it, the result would be but to say that that case overruled itself. And this would be the result in the *Pearsall* case, since in that case it was decided that the States had the power to forbid the consolidation of competing railroads, even by means of the acquisition of stock. Besides, as in the *Louisville and Nashville* case, immediately following the *Pearsall*, it was expressly decided that the interstate commerce power of Congress did not embrace such consolidation, and Congress, therefore, could not restrain a State from either forbidding or permitting it to take place, it would follow that if the sentences in the *Pearsall* case had the import now applied to them, that that case not only overruled itself, but was besides overruled by the *Louisville and Nashville* case, and this although the two cases were decided on the same day, the opinions in both cases having been delivered by the same Justice.

The same confusion and contradiction arises from separating from their context and citing as applicable to this case passages from the opinions in the *Freight Association* and *Joint Traffic* cases. Those cases, as I have previously stated, related exclusively to a contract admittedly involving interstate commerce, and it was decided that any restraint of such commerce was forbidden by the Anti-Trust Act. Now in the *Hopkins* case, decided subsequent to the *Freight Association* and *Joint Traffic* cases, the contract considered unquestionably involved a restraint, but, as such restraint did not concern interstate commerce, it was held not to come within the power of Congress.

It would follow then, if the sentences quoted from the opinions in the *Freight Association* and *Joint Traffic* cases, which cases concerned only that which was completely interstate commerce, applied to that which was not such commerce, that the *Hopkins* case overruled both these cases, although the opinions in all of the cases were delivered by the same Justice, and no intimation was suggested of such overruling. It would also result that, after having overruled those cases in the *Hopkins* case, the court, in expressing its opinion through the same Justice, proceeded in the *Addyston Pipe* case, which related only to interstate commerce, to overrule the *Hopkins* case and reaffirm the prior cases.

.Of course, in my opinion, there is no ground for holding that the decided cases embody such extreme contradictions or produce such utter confusion. The cases are all consistent, if only the elementary distinction upon which they proceeded be not obscured, that is, the difference which arises from the power of Congress to regulate interstate commerce on the one hand, and its want of authority on the other, to regulate that which is not interstate commerce. Indeed, the confounding and treating as one, things which are wholly different, is the error permeating all the contentions for the Government.

What has been previously said suffices to show the reasons which control my judgment, and I might well say nothing more. There were, however, three propositions so earnestly pressed by the Government at bar upon the theory that they demonstrate that common ownership of a majority of the stock of competing railroads is subject to the regulating power of Congress that I propose to briefly give the reasons which cause me to conclude that the contentions relied upon are without merit.

1. This court, it is urged, has frequently declared that the power of Congress over interstate commerce includes the authority to regulate the instrumentalities of such commerce, and the following cases are cited: *Railroad Co.* v. *Fuller*, 17 Wall. 560; *Welton* v. *Missouri*, 91 U. S. 275; *Pensacola Tele-*

*graph Co.* v. *Western Union Telegraph Co.,* 96 U. S. 1; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196. To these cases might be added many others, including some of those which have been previously referred to by me. The argument now made is, as the power extends to instrumentalities, and railroads are such instrumentalities, therefore the acquisition and ownership of railroads, by persons or corporations, is commerce and subject to the power of Congress to regulate. But this involves a *non sequitur,* and a confusion of thought arising from again confounding as one, things which are wholly different. True, the instrumentalities of interstate commerce are subject to the power to regulate commerce, and therefore such instrumentalities when employed in interstate commerce may be regulated by Congress as to their use in such commerce. But this is entirely distinct from the power to regulate the acquisition and ownership of such instrumentalities, and the many forms of contracts from which such ownership may arise. The same distinction exists between the two which obtains between the power of Congress to regulate the movement of property in the channels of interstate commerce and its want of authority to regulate the acquisition and ownership of the same property. This difference was pointed out in the cases which have been referred to, and the distinction between the two has been from the beginning the dividing line, demarking the power of the national government on the one hand and of the States on the other. All the rights of ownership in railroads belonging to corporations organized under state law, the power to acquire the same, to mortgage, to foreclose mortgages, to lease, and the contract relations concerning them, have from the foundation had their sanction in the legislation of the several States. One may search in vain in the acts of Congress for any legislation even suggesting that the power over these subjects was deemed to be in Congress. On the contrary, the legislation of Congress concerning the instrumentalities of railroads under the interstate commerce power clearly refutes the contention, since that legislation relates only to such instrumentalities

during their actual use in interstate commerce and not otherwise. How, consistently with the proposition, can the great number of cases be explained which in both the Federal and state courts have dealt with the ownership of railroads and their instrumentalities by foreclosure and otherwise, under the assumption that the rights of the parties were controlled by state laws governing the subject? And here again it would follow, if the proposition was adopted, that all the vast body of state legislation on the subject would be void from the beginning and the enormous sum of property rights depending upon such legislation would be impaired and lost, since if the subject were within the power of Congress it was one requiring a uniform regulation, and therefore the inaction of Congress would signify an entire want of power in the States over the subjects.

2. The court, it is urged, has in a number of cases declared that the several States were without power to directly burden interstate commerce. The acquiring and ownership by one person or corporation of a majority of the stock in competing railroads engaged in interstate commerce, it is argued, being a direct burden, therefore power to regulate the subject is in Congress and not in the States. Undoubtedly not only in the decisions referred to but in many others, including most of those which have been by me quoted, the absolute want of power in the States to legislate concerning interstate commerce or to burden it directly has been declared, and the doctrine in its fullest scope is too elementary to require citation of authority. But to decide this case upon the assumption that the acquisition and ownership of stock in competing railroads engaged in interstate commerce is a regulation of commerce, or, what is the same thing, a direct burden on it, would be but to assume the question arising for decision.

Where an authority is exerted by a State which is within its power, and that authority as exercised does not touch interstate commerce or its instrumentalities, and can only have an effect upon such commerce by reason of the reflex and remote results

of the exertion of the lawful power, it cannot be said, without a contradiction in terms, that the power exercised is a regulation, because a direct burden upon commerce. *To say to the contrary would be to declare that no power on any subject, however local in its character, could be exercised by the States if it was deemed by Congress or the courts that there would be produced some effect upon interstate commerce.* The question whether a burden is direct and therefore constitutes a regulation of interstate commerce is to be determined by ascertaining whether the power exerted is lawful, generally speaking, and then by finding whether its exercise in the particular case was such as to cause it to be illegal, because directly burdening interstate commerce. If in a given case the power be lawful and the mode in which it is exercised be not such as to directly burden, there is no regulation of commerce, although as an indirect result of the exertion of the lawful power some effect may be produced upon commerce. In other words, where the power is lawful but it is asserted that it has been so exerted as to amount to a direct burden, *there must be, so to speak, a privity between the manifestation of the power and the resulting burden.* The distinction is well illustrated by the cases which have been referred to, and was very lucidly pointed out by Judge Jackson in the *Greene* case. Take the *Knight* case. There as the contract merely concerned the purchase of stock in the refineries, and contained no condition relating to the movement in interstate commerce of the goods to be manufactured by the refining companies, the court held as the right to acquire was not within the commerce clause, the fact that the owners of the manufactured product might thereafter so act concerning the product as to burden commerce, there was no direct burden resulting from the mere acquisition and ownership. On the contrary, in the *Addyston Pipe* case, after stating in the fullest way the paramount authority of Congress concerning commerce, the court approached the terms of the contract in order to determine whether it related to interstate commerce, and if it did, whether it created a direct burden. In doing so, as it

found that the contract both related to interstate commerce and directly burdened the same, the contract was held to be void. This case comes within the *Knight* case. It concerns the acquisition and ownership of stock. No contract is in question made by the owners of the stock controlling the railroads in the performance of their duties as carriers of interstate commerce. The sole contention is that as the result of the ownership of the stock there may arise, in the operation of the roads, a burden on interstate commerce. That is, that such burden may indirectly result from the acquisition and ownership. To maintain the contention, therefore, it must be decided that because ownership of property if acquired may be so used as to burden commerce, therefore to acquire and own is to burden. This, however, would be but to declare that that which was in its very nature and essence indirect is direct.

3. But, it is said, it may not be denied that the common ownership of stock in competing railroads endows the holders of the majority of the stock with a common interest in both railroads and with the authority, if they choose to exert it, to so unify the management of the roads as to suppress competition between them. This power, it is insisted, is within the regulating authority of Congress over interstate commerce. In other words, the contention broadly is that Congress has not only the authority to regulate the exercise of interstate commerce, but under that power has the right to regulate the ownership and possession of property, if the enjoyment of such rights would enable those who possessed them if they engaged in interstate commerce to exert a power over the same. But this proposition only asserts in another form that the right to acquire the stock was interstate commerce, and therefore was within the authority of Congress, and is refuted by the reasons and authorities already advanced. That the proposition, if adopted, would extend the power of Congress to all subjects essentially local, as already stated in considering the previous proposition, is to my mind manifest. So clearly is this the result of the particular proposition now being considered, that,

at the risk of repetition, I again illustrate the subject. Under this doctrine the sum of property to be acquired by individuals or by corporations, the contracts which they may make, would be within the regulating power of Congress. If it were judged by Congress that the farmer in sowing his crops should be limited to a certain production because overproduction would give power to affect commerce, Congress could regulate that subject. If the acquisition of a large amount of property by an individual was deemed by Congress to confer upon him the power to affect interstate commerce if he engaged in it, Congress could regulate that subject. If the wage-earner organized to better his condition and Congress believed that the existence of such organization would give power, if it were exerted, to affect interstate commerce, Congress could forbid the organization of all labor associations. Indeed, the doctrine must in reason lead to a concession of the right in Congress to regulate concerning the aptitude, the character and capacity of persons. If individuals were deemed by Congress to be possessed of such ability that participation in the management of two great competing railroad enterprises would endow them with the power to injuriously affect interstate commerce, Congress could forbid such participation. If the principle were adopted, and the power which would arise from so doing were exercised, the result would be not only to destroy the state and Federal governments, but by the implication of authority, from which the destruction would be brought about, there would be erected upon the ruins of both a government endowed with the arbitrary power to disregard the great guaranty of life, liberty and property and every other safeguard upon which organized civil society depends. I say the guaranty, because in my opinion the three are indissolubly united, and one cannot be destroyed without the other. Of course, to push propositions to the extreme to which they naturally lead is often an unsafe guide. But at the same time the conviction cannot be escaped by me that principles and conduct bear a relation one to the other, especially in matters of public concern. The fathers

ꞌfounded our government upon an enduring basis of right, principle and of limitation of power. Destroy the principles and the limitations which they impose; and I am unable to say that conduct may not, when unrestrained, give rise to action doing violence to the great truths which the destroyed principles embodied.

The fallacy of all the contentions of the Government is, to my mind, illustrated by the summing up of the case for the Government made in the argument at bar. The right to acquire and own the stock of competing railroads involves, says that summing up, the power of an individual *"to do"* (italics mine) absolutely as he pleases with his own, whilst the claim of the Government is that the right of the owner of property *"to do"* (italics mine) as he pleases with his own may be controlled in the public interest by legitimate legislation. But the case involves the right to *acquire and own,* not the right *"to do"* (italics mine). Confusing the two gives rise to the errors which it has been my endeavor to point out. Undoubtedly the States possess power over corporations, created by them, to permit or forbid consolidation, whether accomplished by stock ownership or otherwise, to forbid one corporation from holding stock in another, and to impose on this or other subjects such regulations as may be deemed best. Generally speaking, however, the right to do these things springs alone from the fact that the corporation is created by the States, and holds its rights subject to the conditions attached to the grant, or to such regulations as the creator, the State, may lawfully impose upon its creature, the corporation. Moreover, irrespective of the relation of creator and creature, it is, of course, true in a general sense that government possesses the authority to regulate, within certain just limits, what an owner *may do* with his property. But the first power which arises from the authority of a grantor to exact conditions in making a grant or to regulate the conduct of the grantee gives no sanction to the proposition that a government, irrespective of its power to grant, has the general authority to

limit the character and quantity of property which may be acquired and owned. And the second power, the general governmental one, to reasonably control the *use* of property, affords no foundation for the proposition that there exists in government a power to limit the quantity and character of property which may be acquired and owned. The difference between the two is that which exists between a free and constitutional government restrained by law and an absolute government unrestrained by any of the principles which are necessary for the perpetuation of society and the protection of life, liberty and property.

It cannot be denied that the sum of all just governmental power was enjoyed by the States and the people before the Constitution of the United States was formed. None of that power was abridged by that instrument except as restrained by constitutional safeguards, and hence none was lost by the adoption of the Constitution. The Constitution, whilst distributing the preëxisting authority, preserved it all. With the full power of the States over corporations created by them and with their authority in respect to local legislation, and with power in Congress over interstate commerce carried to its fullest degree, I cannot conceive that if these powers, admittedly possessed by both, be fully exerted a remedy cannot be provided fully adequate to suppress evils which may arise from combinations deemed to be injurious. This must be true unless it be concluded that by the effect of the mere distribution of power made by the Constitution partial impotency of governmental authority has resulted. But if this be conceded, *arguendo*, the Constitution itself has pointed out the method by which, if changes are needed, they may be brought about. No remedy, in my opinion, for any supposed or real infirmity can be afforded by disregarding the Constitution, by destroying the lines which separate state and Federal authority, and by implying the existence of a power which is repugnant to all those fundamental rights of life, liberty and property, upon which just government must rest.

If, however, the question of the power of Congress be conceded, and the assumption as to the meaning of the Anti-Trust Act which has been indulged in for the purpose of considering that power be put out of view, it would yet remain to be determined whether the Anti-Trust Act embraced the acquisition and ownership of the stock in question by the Northern Securities Company. It is unnecessary for me, however, to state the reasons which have led me to the conclusion that the act, when properly interpreted, does not embrace the acquisition and ownership of such stock, since that subject is considered in an opinion of Mr. Justice Holmes, which explains the true interpretation of the statute, as it is understood by me, more clearly that I would be able to do.

Being of the opinion, for the reasons heretofore given, that Congress was without power to regulate the acquisition and ownership of the stock in question by the Northern Securities Company, and because I think even if there were such power in Congress, it has not been exercised by the Anti-Trust Act, as is shown in the opinion of Mr. Justice Holmes, I dissent.

I am authorized to say that the Chief Justice, Mr. Justice Peckham and Mr. Justice Holmes, concur in this dissent.

Mr. Justice Holmes, with whom concurred the Chief Justice, Mr. Justice White, and Mr. Justice Peckham, dissenting.

I am unable to agree with the judgment of the majority of the court, and although I think it useless and undesirable, as a rule, to express dissent, I feel bound to do so in this case and to give my reasons for it.

Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests

exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend. What we have to do in this case is to find the meaning of some not very difficult words. We must try; I have tried, to do it with the same freedom of natural and spontaneous interpretation that one would be sure of if the same question arose upon an indictment for a similar act which excited no public attention, and was of importance only to a prisoner before the court. Furthermore, while at times judges need for their work the training of economists or statesmen, and must act in view of their foresight of consequences; yet when their task is to interpret and apply the words of a statute, their function is merely academic to begin with—to read English intelligently—and a consideration of consequences comes into play, if at all, only when the meaning of the words used is open to reasonable doubt.

The question to be decided is whether, under the act of July 2, 1890, c. 647, 26 Stat. 209, it is unlawful, at any stage of the process, if several men unite to form a corporation for the purpose of buying more than half the stock of each of two competing interstate railroad companies, if they form the corporation, and the corporation buys the stock. I will suppose further that every step is taken, from the beginning, with the single intent of ending competition between the companies. I make this addition not because it may not be and is not disputed but because, as I shall try to show, it is totally unimportant under any part of the statute with which we have to deal.

The statute of which we have to find the meaning is a criminal statute. The two sections on which the Government relies both make certain acts crimes. That is their immediate purpose and that is what they say. It is vain to insist that this is not a criminal proceeding. The words cannot be read one way in a suit which is to end in fine and imprisonment and another way in one which seeks an injunction. The construction which is adopted in this case must be adopted in one

of the other sort. I am no friend of artificial interpretations because a statute is of one kind rather than another, but all agree that before a statute is to be taken to punish that which always has been lawful it must express its intent in clear words. So I say we must read the words before us as if the question were whether two small exporting grocers should go to jail.

Again the statute is of a very sweeping and general character. It hits "every" contract or combination of the prohibited sort, great or small, and "every" person who shall monopolize or attempt to monopolize, in the sense of the act, "any part" of the trade or commerce among the several States. There is a natural inclination to assume that it was directed against certain great combinations and to read it in that light. It does not say so. On the contrary, it says "every," and "any part." Still less was it directed specially against railroads. There even was a reasonable doubt whether it included railroads until the point was decided by this court.

Finally, the statute must be construed in such a way as not merely to save its constitutionality but, so far as is consistent with a fair interpretation, not to raise grave doubts on that score. I assume, for the purposes of discussion, although it would be a great and serious step to take, that in some case that seemed to it to need heroic measures, Congress might regulate not only commerce, but instruments of commerce or contracts the bearing of which upon commerce would be only indirect. But it is clear that the mere fact of an indirect effect upon commerce not shown to be certain and very great, would not justify such a law. The point decided in *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 17, was that "the fact that trade or commerce might be indirectly affected was not enough to entitle complainants to a decree." Commerce depends upon population, but Congress could not, on that ground, undertake to regulate marriage and divorce. If the act before us is to be carried out according to what seems to me the logic of the argument for the Government, which I do

not believe that it will be, I can see no part of the conduct of life with which on similar principles Congress might not interfere.

This act is construed by the Government to affect the purchasers of shares in two railroad companies because of the effect it may have, or, if you like, is certain to have, upon the competition of these roads. If such a remote result of the exercise of an ordinary incident of property and personal freedom is enough to make that exercise unlawful, there is hardly any transaction concerning commerce between the States that may not be made a crime by the finding of a jury or a court. The personal ascendency of one man may be such that it would give to his advice the effect of a command, if he owned but a single share in each road. The tendency of his presence in the stockholders' meetings might be certain to prevent competition, and thus his advice, if not his mere existence, become a crime.

I state these general considerations as matters which I should have to take into account before I could agree to affirm the decree appealed from, but I do not need them for my own opinion, because when I read the act I cannot feel sufficient doubt as to the meaning of the words to need to fortify my conclusion by any generalities. Their meaning seems to me plain on their face.

The first section makes "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations" a misdemeanor, punishable by fine, imprisonment or both. Much trouble is made by substituting other phrases assumed to be equivalent, which then are reasoned from as if they were in the act. The court below argued as if maintaining competition were the expressed object of the act. The act says nothing about competition. I stick to the exact words used. The words hit two classes of cases, and only two—Contracts in restraint of trade and combinations or conspiracies in restraint of trade, and we have to consider what

these respectively are. Contracts in restraint of trade are dealt with and defined by the common law. They are contracts with a stranger to the contractor's business, (although in some cases carrying on a similar one,) which wholly or partially restrict the freedom of the contractor in carrying on that business as otherwise he would. The objection of the common law to them was primarily on the contractor's own account. The notion of monopoly did not come in unless the contract covered the whole of England. *Mitchel* v. *Reynolds*, 1 P. Wms. 181. Of course this objection did not apply to partnerships or other forms, if there were any, of substituting a community of interest where there had been competition. There was no objection to such combinations merely as in restraint of trade, or otherwise unless they amounted to a monopoly. Contracts in restraint of trade, I repeat, were contracts with strangers to the contractor's business, and the trade restrained was the contractor's own.

Combinations or conspiracies in restraint of trade, on the other hand, were combinations to keep strangers to the agreement out of the business. The objection to them was not an objection to their effect upon the parties making the contract, the members of the combination or firm, but an objection to their intended effect upon strangers to the firm and their supposed consequent effect upon the public at large. In other words, they were regarded as contrary to public policy because they monopolized or attempted to monopolize some portion of the trade or commerce of the realm. See *United States* v. *E. C. Knight Co.*, 156 U. S. 1. All that is added to the first section by § 2 is that like penalties are imposed upon every single person who, without combination, monopolizes or attempts to monopolize commerce among the States; and that the liability is extended to attempting to monopolize any part of such trade or commerce. It is more important as an aid to the construction of § 1 than it is on its own account. It shows that whatever is criminal when done by way of combination is equally criminal if done by a single man. That I am right in my interpretation

of the words of § 1 is shown by the words "in the form of trust or otherwise." The prohibition was suggested by the trusts, the objection to which, as every one knows, was not the union of former competitors, but the sinister power exercised or supposed to be exercised by the combination in keeping rivals out of the business and ruining those who already were in. It was the ferocious extreme of competition with others, not the cessation of competition among the partners, that was the evil feared. Further proof is to be found in § 7, giving an action to any person injured in his business or property by the forbidden conduct. This cannot refer to the parties to the agreement and plainly means that outsiders who are injured in their attempt to compete with a trust or other similar combination may recover for it. *Montague & Co.* v. *Lowry,* 193 U. S. 38. How effective the section may be or how far it goes, is not material to my point. My general summary of the two classes of cases which the act affects is confirmed by the title, which is "An Act to protect Trade and Commerce against unlawful Restraints and Monopolies."

What I now ask is under which of the foregoing classes this case is supposed to come, and that question must be answered as definitely and precisely as if we were dealing with the indictments which logically ought to follow this decision. The provision of the statute against contracts in restraint of trade has been held to apply to contracts between railroads, otherwise remaining independent, by which they restricted their respective freedom as to rates. This restriction by contract with a stranger to the contractor's business is the ground of the decision in *United States* v. *Joint Traffic Association,* 171 U. S. 505, following and affirming *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290. I accept those decisions absolutely, not only as binding upon me, but as decisions which I have no desire to criticise or abridge. But the provision has not been decided, and, it seems to me, could not be decided without perversion of plain language, to apply to an arrangement by which competition is ended through com-

munity of interest—an arrangement which leaves the parties without external restriction. That provision, taken alone, does not require that all existing competitions shall be maintained. It does not look primarily, if at all, to competition. It simply requires that a party's freedom in trade between the States shall not be cut down by contract with a stranger. So far as that phrase goes, it is lawful to abolish competition by any form of union. It would seem to me impossible to say that the words "every contract in restraint of trade is a crime punishable with imprisonment," would send the members of a partnership between, or a consolidation of, two trading corporations to prison—still more impossible to say that it forbade one man or corporation to purchase as much stock as he liked in both. Yet those words would have that effect if this clause of § 1 applies to the defendants here. For it cannot be too carefully remembered that that clause applies to "every" contract of the forbidden kind—a consideration which was the turning point of the *Trans-Missouri Freight Association's* case.

If the statute applies to this case it must be because the parties, or some of them, have formed, or because the Northern Securities Company is, a combination in restraint of trade among the States, or, what comes to the same thing in my opinion, because the defendants, or some or one of them, are monopolizing or attempting to monopolize some part of the commerce between the States. But the mere reading of those words shows that they are used in a limited and accurate sense. According to popular speech, every concern monopolizes whatever business it does, and if that business is trade between two States it monopolizes a part of the trade among the States. Of course the statute does not forbid that. It does not mean that all business must cease. A single railroad down a narrow valley or through a mountain gorge monopolizes all the railroad transportation through that valley or gorge. Indeed every railroad monopolizes, in a popular sense, the trade of some area. Yet I suppose no one would say that

the statute forbids a combination of men into a corporation to build and run such a railroad between the States.

I assume that the Minnesota charter of the Great Northern and the Wisconsin charter of the Northern Pacific both are valid. Suppose that, before either road was built, Minnesota, as part of a system of transportation between the States, had created a railroad company authorized singly to build all the lines in the States now actually built, owned or controlled by either of the two existing companies. I take it that that charter would have been just as good as the present one, even if the statutes which we are considering had been in force. In whatever sense it would have created a monopoly the present charter does. It would have been a large one, but the act of Congress makes no discrimination according to size. Size has nothing to do with the matter. A monopoly of "any part" of commerce among the States is unlawful. The supposed company would have owned lines that might have been competing—probably the present one does. But the act of Congress will not be construed to mean the universal disintegration of society into single men, each at war with all the rest, or even the prevention of all further combinations for a common end.

There is a natural feeling that somehow or other the statute meant to strike at combinations great enough to cause just anxiety on the part of those who love their country more than money, while it viewed such little ones as I have supposed with just indifference. This notion, it may be said, somehow breathes from the pores of the act, although it seems to be contradicted in every way by the words in detail. And it has occurred to me that it might be that when a combination reached a certain size it might have attributed to it more of the character of a monopoly merely by virtue of its size than would be attributed to a smaller one. I am quite clear that it is only in connection with monopolies that size could play any part. But my answer has been indicated already. In the first place size in the case of railroads is an inevitable incident and if it were an

objection under the act, the Great Northern and the Northern Pacific already were too great and encountered the law. In the next place in the case of railroads it is evident that the size of the combination is reached for other ends than those which would make them monopolies. The combinations are not formed for the purpose of excluding others from the field. Finally, even a small railroad will have the same tendency to exclude others from its narrow area that great ones have to exclude others from a greater one, and the statute attacks the small monopolies as well as the great. The very words of the act make such a distinction impossible in this case and it has not been attempted in express terms.

If the charter which I have imagined above would have been good notwithstanding the monopoly, in a popular sense, which it created, one next is led to ask whether and why a combination or consolidation of existing roads, although in actual competition, into one company of exactly the same powers and extent, would be any more obnoxious to the law. Although it was decided in *Louisville & Nashville Railroad Co.* v. *Kentucky*, 161 U. S. 677, 701, that since the statute, as before, the States have the power to regulate the matter, it was said, in the argument, that such a consolidation would be unlawful, and it seems to me that the Attorney General was compelled to say so in order to maintain his case. But I think that logic would not let him stop there, or short of denying the power of a State at the present time to authorize one company to construct and own two parallel lines that might compete. The monopoly would be the same as if the roads were consolidated after they had begun to compete—and it is on the footing of monopoly that I now am supposing the objection made. But to meet the objection to the prevention of competition at the same time, I will suppose that three parties apply to a State for charters; one for each of two new and possibly competing lines respectively, and one for both of these lines, and that the charter is granted to the last. I think that charter would be good, and I think the whole argument to the contrary rests

on a popular instead of an accurate and legal conception of what the word "monopolize" in the statute means. I repeat, that in my opinion there is no attempt to monopolize, and what, as I have said, in my judgment amounts to the same thing, that there is no combination in restraint of trade, until something is done with the intent to exclude strangers to the combination from competing with it in some part of the business which it carries on.

Unless I am entirely wrong in my understanding of what a combination in restraint of trade" means, then the same monopoly may be attempted and effected by an individual, and is made equally illegal in that case by § 2. But I do not expect to hear it maintained that Mr. Morgan could be sent to prison for buying as many shares as he liked of the Great Northern and the Northern Pacific, even if he bought them both at the same time and got more than half the stock of each road.

There is much that was mentioned in argument which I pass by. But in view of the great importance attached by both sides to the supposed attempt to suppress competition, I must say a word more about that. I said at the outset that I should assume, and I do assume, that one purpose of the purchase was to suppress competition between the two roads. I appreciate the force of the argument that there are independent stockholders in each; that it cannot be presumed that the respective boards of directors will propose any illegal act; that if they should they could be restrained, and that all that has been done as yet is too remote from the illegal result to be classed even as an attempt. Not every act done in furtherance of an unlawful end is an attempt or contrary to the law. There must be a certain nearness to the result. It is a question of proximity and decree. *Commonwealth* v. *Peaslee,* 177 Massachusetts, 267, 272. So, as I have said, is the amenability of acts in furtherance of interference with commerce among the States to legislation by Congress. So, according to the intimation of this court, is the question of liability under the present stat-

ute. *Hopkins* v. *United States*, 171 U. S. 578; *Anderson* v. *United States*, 171 U. S. 604. But I assume further, for the purposes of discussion, that what has been done is near enough to the result to fall under the law, if the law prohibits that result, although that assumption very nearly if not quite contradicts the decision in *United States* v. *E. C. Knight Co.*, 156 U. S. 1. But I say that the law does not prohibit the result. If it does it must be because there is some further meaning than I have yet discovered in the words "combinations in restraint of trade." I think that I have exhausted the meaning of those words in what I already have said. But they certainly do not require all existing competitions to be kept on foot, and, on the principle of the *Trans-Missouri Freight Association's* case, invalidate the continuance of old contracts by which former competitors united in the past.

A partnership is not a contract or combination in restraint of trade between the partners unless the well known words are to be given a new meaning invented for the purposes of this act. It is true that the suppression of competition was referred to in *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290, but, as I have said, that was in connection with a contract with a stranger to the defendant's business—a true contract in restraint of trade. To suppress competition in that way is one thing, to suppress it by fusion is another. The law, I repeat, says nothing about competition, and only prevents its suppression by contracts or combinations in restraint of trade, and such contracts or combinations derive their character as restraining trade from other features than the suppression of competition alone. To see whether I am wrong, the illustrations put in the argument are of use. If I am, then a partnership between two stage drivers who had been competitors in driving across a state line, or two merchants once engaged in rival commerce among the States whether made after or before the act, if now continued, is a crime. For, again I repeat, if the restraint on the freedom of the members of a combination caused by their entering into partnership is a restraint of

trade, every such combination, as well the small as the great, is within the act.

In view of my interpretation of the statute I do not go further into the question of the power of Congress. That has been dealt with by my brother White and I concur in the main with his views. I am happy to know that only a minority of my brethren adopt an interpretation of the law which in my opinion would make eternal the *bellum omnium contra omnes* and disintegrate society so far as it could into individual atoms. If that were its intent I should regard calling such a law a regulation of commerce as a mere pretense. It would be an attempt to reconstruct society. I am not concerned with the wisdom of such an attempt, but I believe that Congress was not entrusted by the Constitution with the power to make it and I am deeply persuaded that it has not tried.

I am authorized to say that the CHIEF JUSTICE, MR. JUSTICE WHITE and MR. JUSTICE PECKHAM concur in this dissent.